# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

**JILL BABCOCK,**                                **CLASS ACTION**
**MARGUERITE MADDOX,**                           **JURY DEMAND**
**and ASHLEY JACOBSON, on**
**behalf of themselves and all others similarly situated,**

      **PLAINTIFFS,**

                              **CASE No.: 22-cv-12951-MAG**
**-vs-**                                    **JUDGE: MARK A. GOLDSMITH**

**STATE OF MICHIGAN,**
**COUNTY OF WAYNE,**
**CITY OF DETROIT,**
**WAYNE COUNTY BUILDING AUTHORITY,**
**DETROIT BUILDING AUTHORITY,**
**and**
**DETROIT-WAYNE JOINT BUILDING AUTHORITY,**

      **DEFENDANTS, Jointly and Severally.**
_____/

## FIRST AMENDED
## CLASS ACTION CIVIL and DISABILITY RIGHTS COMPLAINT
## FOR INJUNCTIVE and OTHER RELIEF

    Plaintiffs JILL BABCOCK, MARGUERITE MADDOX, and ASHLEY

JACOBSON, by and through their attorneys MICHAEL W. BARTNIK and

ELIZABETH K. ABDNOUR, state the following:

## INTRODUCTORY STATEMENT

1. This is an action to enforce the civil rights of persons with disabilities against the State of Michigan and certain of its political subdivisions which have repeatedly and continuously harmed Plaintiffs by denying to them their fundamental civil rights of due process and equal protection, to have equal access to the Defendants' buildings and facilities, and to have equal access to the services, amenities, programs, activities, and civic responsibilities as enjoyed by other persons in the buildings and facilities owned, leased, and operated jointly and severally by the Defendants, including for the Defendant governments' executive, legislative, and judicial branches and electoral and administrative review functions.

2. Defendants' most palpable, egregious, and pernicious violation is their incessant failure to have accessible toilets readily and equally available in their buildings for disabled members of the public who "need to use the facilities now" in order to actually "use the government facility" to access the Defendants' services, amenities, programs, and activities, and to exercise the Plaintiffs' civic responsibilities and civil rights.

3.  But Defendants' flagrant transgressions extend to other building components, such as non-compliant entrances and exits; exterior doors; sidewalks, ramps, and approaches; parking and drop-offs; stairways; routes of access; interior doors; service counters; emergency protocols; signage and other information; voting registration and polling places; and other violations enumerated below.

4.  These are not merely "minor" inconsistencies or failures. They are clear violations of federal and state laws which interfere with Plaintiffs' fundamental equal rights to access.

5.  Defendants have long been aware of their obligations and their violations for nearly five decades, including since at least 1966 and 1968 when the first State and Federal laws requiring "barrier-free" design were enacted, M.C.L. 125.1351, and 42 U.S.C. § 4151(3), 42 U.S.C. § 4152, and 42 U.S.C. § 4155.

6.  Due to Defendants' extensive, long-standing, willful, deliberate, and intentional, and deliberately indifferent violations of applicable  Federal and State Constitutions and laws, and Defendants' continuous and intentional patterns, practices, and policies of active illegal discrimination against persons with disabilities, these Plaintiffs have been injured and

denied access to basic and necessary governmental functions and
services.

7.  Plaintiffs request this Court to take such actions as necessary and proper
through declaratory judgment, injunctive relief, and damages to compel
these Defendants to comply with the provisions of these and related laws.

## FEDERAL JURISDICTION

8.  This Court has original, subject matter jurisdiction under 28 U.S.C. §
1331 and § 1343(a)(3) and (4) over matters contained in this complaint
including for violations of Title II of the Americans with Disabilities Act
42 U.S.C. § 12133 *et seq*.; Section 504 of the Rehabilitation Act of 1973,
29 U.S.C. § 794 *et seq*.; the Voting Accessibility for the Elderly and
Handicapped Act, 52 U.S.C. § 20105(a) *et seq*. and 52 U.S.C. § 20106 *et
seq*.; and the Architectural Barriers Act, 42 U.S.C. § 4151 *et seq*.

9.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over
Plaintiffs' state law claims, because they are so related to the federal
question claims that they form part of the same case or controversy.

10. This Court has jurisdiction under 28 U.S.C. §§ 2201 and 2202 to issue
declaratory judgment in this case.

11. The State of Michigan is not immune from this action for injunctive and declaratory relief, including pursuant to section 5 of the Fourteenth Amendment; the Rehabilitation Act of 1973, 42 U.S.C. § 2000d-7; Title II of the Americans with Disabilities Act 42 U.S.C. § 12202 and 42 U.S.C. § 12201(b); and the Michigan Persons with Disabilities Civil Rights Act, M.C.L. 37.1103(g) and (i), M.C.L. 37.1302(a), and M.C.L. 37.1606.

12. Additionally, the State of Michigan is not immune to private claims for damages under the Michigan Persons with Disabilities Civil Rights Act, M.C.L. 37.1103(g) and (i), M.C.L. 37.1302(a), and M.C.L. 37.1606.

13. None of the other defendants enjoy any immunity under the Eleventh Amendment or Michigan law.

14. The Americans with Disabilities Act does not preempt any other federal or state laws that give equal or greater coverage or protection to persons with disabilities, 42 U.S.C. § 12201(b), including continued availability of civil rights actions under 42 U.S.C. § 1983.

## VENUE

15. Plaintiffs reside in the Eastern District of Michigan, 28 U.S.C. § 1391(c)(1).

16. A substantial part of the events and omissions giving rise to the claims occurred in the Eastern District of Michigan.

17. All Defendants are located within the Eastern District of Michigan, and Defendant State of Michigan is also located in the United States Western District of Michigan, 28 U.S.C. § 1391(c)(2).

18. Venue is proper in the City of Detroit of the United States District Court of the Eastern District of Michigan, 28 U.S.C. § 1391(b)(1) and (2).


## PARTIES PLAINTIFF

19. Each Plaintiff has been injured by Defendants and otherwise has standing including as:

    a. a "qualified individual with a disability" under applicable Federal laws including 42 U.S.C. § 12131(2);

    b. a "person with a disability", and a "person with disabilities", Michigan Persons with Disabilities Civil Rights Act, M.C.L. 37.1103(h);

    c.  a "person in a wheelchair or other persons with physical disabilities",

    Michigan Sidewalks: Persons with Disabilities Act, M.C.L. 125.1361;

    and

    d.   being "physically limited" under the Michigan Architectural Barriers

    Act, M.C.L. 125.1351(f).

20. Each plaintiff has suffered, and will continue to suffer, actual, concrete injuries-in-fact as stated herein, which are traceable to the Defendants' actions and inaction as stated herein, and which are likely to be redressed by the judicial relief being requested in this case.

21. Plaintiff Jill Babcock is a citizen and resident of the City of Detroit, the County of Wayne, and the State of Michigan.

22. Plaintiff Jill Babcock has several physical disabilities and impairments including *inter alia* a type of Ataxia, a progressive neurological disorder that affects her strength, agility, balance, gait, motor skills, bladder control and speech. These impairments of her bladder and kidney functions, strength, fatigue, and mobility require her to use a manual wheelchair, an electric scooter or wheelchair, or other mobility device to navigate, and as a matter of personal health, also require her to have

FIRST AMENDED CLASS
ACTION COMPLAINT
7

prompt, if not immediate access to accessible toilets throughout the day and outside her home, to avoid additional injury and harm.

23. Plaintiff Jill Babcock has been denied her rights due to Defendants' inaccessible public buildings including as described in this complaint.

24. Plaintiff Jill Babcock is an attorney licensed by the State of Michigan to practice law anywhere in the State.

25. Plaintiff Jill Babcock practices law and uses her legal background in her capacity as a volunteer community advocate and disability rights activist, including as a Council Member of the Michigan State Bar Section on Elder Law and Disability Rights.  She is also employed by the City of Detroit in the Housing and Revitalization Department (HRD) focusing on Accessible Housing, but not specifically employed there as an attorney. HRD is located in the Coleman A. Young Municipal Center (CAYMC) at 2 Woodward Avenue in Detroit.

26. The lack of access described in this complaint illegally discriminates against her as an attorney due to her disabilities by interfering with her ability to fully and effectively engage in and develop her non-employment professional activities, to enhance her professional reputation within the legal and general communities, and to enjoy the

benefits and personal satisfaction of achieving her goals to serve within the profession.

27. For example, on April 11, 2023, Plaintiff Jill Babcock was scheduled to give an in-person public presentation with two other disability rights activists to a mixed audience of disabled and non-disabled persons in the 13th Floor Public Auditorium of CAYMC.  There is only one accessible entrance to the auditorium, and it is all the way around to the far back-side of the two-story auditorium.  There are no accessible toilet rooms in the auditorium, nor in the public hallways leading into the auditorium. It is not possible, or very difficult for a person in a wheelchair to make such presentation because there are at least two steps up to both aisles of the speaker dais. Additionally, for the audience and speakers, a speaker in a wheelchair at the lectern is not visible to persons on the dais due to the location and height of the lectern.  The auditorium does not have captioning and is not wired for auditory aids for persons with hearing loss. There are insufficient accessible seats or seating areas for the audience members in wheelchairs, a serious disadvantage when one is making a presentation on disability issues which presumably would have more than four or five audience members in mobility devices. Other

deficiencies as to this auditorium are noted in the DLZ report attached as Exhibit B.  Plaintiff Jill Babcock was informed the presentation would be by remote zoom because the auditorium was under construction, however, after giving the remote presentation, upon viewing the auditorium several days later in April 2023, no such construction had ever occurred, and all the above defects remain in place.

28. As an additional example, Plaintiff Jill Babcock is an appointed member of the Council of the Elder Law and Disability Rights Section of the State Bar of Michigan. She is also a voluntary member of the Disability Rights Committee of that Section. On May 24, 2023, the Section is planning a legislative advocacy day to meet State Senators and State Legislators to advance its legislative agenda. Plaintiff Jill Babcock will be delayed, or even prevented, from attending or fully participating in all the scheduled activities, due to the Defendants' inaccessible toilet rooms, toilets and related facilities, inaccessible entrances, inaccessible curb-cuts and crosswalks, and inaccessible parking in and immediately adjacent to the State Capitol and the Senators' and Legislators' office buildings as described in this complaint. Also, because there are so few wheeled vehicle accessible spaces in the Galleries, unless she is one of the first

half-dozen or so persons in a wheelchair to arrive at the Capitol to view live proceedings of the Senate or the House, she will be denied her Federal and State Constitutional Rights including her right to observe said proceedings.

29. As an additional example, in January 2023, Plaintiff Jill Babcock attended a swearing-in ceremony for a newly elected Judge of the State of Michigan 54B Judicial District Court; however, after the event, in order to go to dinner with the rest of the group after the event, she had to leave the building by herself because the accessible entrance/exit was separate and further away from the destination than the entrance/exit used by the other parties who are not mobility impaired.

30. Immediately prior to the pandemic, Plaintiff Jill Babcock was summoned to jury duty for the State of Michigan Third Judicial Circuit Court, Criminal Division, located in the Frank Murphy Hall of Justice.

    a. Due to the slope and due to cracks in the poorly maintained concrete or asphalt, Plaintiff Jill Babcock could not get up the nominally accessible ramp to get into the building without someone assisting her. There were no accessible parking spaces at Gratiot adjacent to the ramp: the spaces were and still are blocked by concrete planters as

described elsewhere in this complaint. These conditions remain in
April 2023.

b.  In March and April 2023, Plaintiff Jill Babcock was summoned for
jury duty to the State of Michigan Thirty Sixth Judicial District Court,
but she has been told twice not to appear. However, she is informed
and believes the Thirty Sixth Judicial District Court has an unwritten
policy to decline jury service to citizens with mobility impairments
because the jury assembly room and possibly the jury boxes are not all
accessible. In checking the building in advance of her anticipated jury
duty, she has also observed that the main entrance to the building is
not accessible and inadequately marked with no or with improper
directional signs for persons with mobility impairments.  There is no
accessible on-street parking, and the drop-off area on Madison is not
accessible. The public instead is directed to park in the private, City-
licensed parking lot across Madison.  However, that lot does not have
any spaces, for accessible parking, and there are no accessible curb
cuts or mid-block, marked crosswalk with crossing island and
crossing warning signals from that licensed lot to the courthouse
across Madison even though almost all pedestrians cross at that mid-

block driveway of that parking lot to take the shortest route to the

entrance to the Thirty Sixth Judicial District Court courthouse. There

is no such available shortest route free and clear across Madison to the

courthouse for Plaintiffs.

31. On multiple occasions in 2019 through 2023, Plaintiff Jill Babcock has

needed to access the public areas of CAYMC for personal business

matters in such offices as the ombudsman, building and safety,

department of public works, public assessors' office, and the elections

bureau. She has been discriminated against due to her disabilities and

denied full access to these and many other public areas of the building

because they are located on public floors of the building where the toilet

rooms are locked and do not have accessible toilets, toilet stalls,

lavatories, and other accessibility features. She has been denied full

access to these and many other public areas of the building because these

public offices and areas do not have accessible entrance doors as

described in the DLZ Evaluation, Exhibit B, since they are glass, heavy,

and lack automatic door openers and the protective barriers at the bottom

of the doors. She has been denied full access to these and many other

public areas of the building because these public offices and areas do not

have accessible counters, or the counters are blocked. The counters and

literature racks exceed the required 36-inch maximum useable height for

persons in wheelchairs. Additionally, even during the 2022 election

cycle, the elections bureau office in the building did not have its counter

at the proper height, nor did it have an area for privately completing a

ballot.

32. Plaintiff Jill Babcock has repeatedly been denied full and equal access to

the various street festivals such as Hart Plaza, Street Arts at Wayne State,

and annually since 2020 at Dally in the Alley, and other such events

because the sidewalks and curbs are not all accessible and are

inconsistently accessible and poorly maintained.

33. In 2022 in Detroit, Plaintiff Jill Babcock fell out of her wheelchair while

attempting to cross a street due to a poorly maintained curb cut with a

large hole at the edges of the curb cut and the street. She caught her

wheels in the hole which caused the chair to tip, ejecting her from her

chair and injuring her mouth and face.

34. Plaintiff Jill Babcock has repeatedly been delayed or discouraged from

attending other cultural activities and various restaurants in Detroit and

Wayne County due to parking issues and other accessibility issues near and within the venues, including but not limited to:

a. There is no on-street accessible parking in the Greektown or Mexican Village neighborhoods of Detroit.

b. When visiting the Michigan Science Center in 2023, there were only two such nominally accessible spaces on the street, but both are too far from the entrance, and neither one has a cone or other sign to prevent or warn against parking within the striped access aisle area of the spaces.

c. There are insufficient accessible parking spaces in other areas of the Cultural Center, and along Michigan Avenue in the Corktown area of Detroit. In those areas which have shared bicycle lanes, Plaintiff Jill Babcock has difficulty safely exiting her vehicle because there is insufficient room to avoid hitting or being hit by bicycles, stand-up scooters, or skateboarders.

d. Plaintiff Jill Babcock has been denied equal access to several non-compliant restaurants which have been built or opened as new restaurants within the last five years, for which the City of Detroit and the City of Detroit Building Department have issued Occupancy

Permits, or issued, approved, or renewed Business or Liquor Licenses

even though the buildings and building plans do not comply with the

law. For example (the trade names of these non-party businesses are

being provided by Plaintiffs' counsel to defense counsel

simultaneously with service of this amended complaint):

    i.  Plaintiff Jill Babcock was unable to attend an event in April

        2023 at a new restaurant on West McNichols between

        Wyoming and Livernois because it has no elevator to the public

        banquet area on the second floor. This is a new restaurant in a

        building which was gutted to the four walls and retrofitted in

        2022 and 2023, partially paid with City of Detroit funding.

        Defendants City of Detroit and Detroit Building Authority

        issued an occupancy permit and business licenses and approved

        liquor licenses even though the restaurant blatantly violates

        accessibility laws by preventing her from equal access to the

        public second floor and by having separate areas which do not

        service persons with disabilities.

   ii.  The same type of improper approval by Defendants City of

        Detroit and Detroit Building Authority deters or prevents

Plaintiff Jill Babcock from patronizing a new but non-compliant market with a restaurant near Wayne State University and the Cultural Center on Second Avenue in Detroit, because there is no elevator to the well-advertised, publicly promoted, second floor customer outdoor eating area overlooking the plaza and garden.

iii. The same type of improper approval by Defendants City of Detroit and Detroit Building Authority deters or prevents her from patronizing another new, or newly retrofitted, but non-compliant restaurant which is located down the street on Second Avenue from the above market and restaurant, where the Defendants have authorized a valet service. However, when Plaintiff Jill Babcock went there to attend a birthday party in 2023, the valet service was blocking the only two accessible parking spaces to the restaurant, and there was no other nearby accessible parking on the street.

iv. Outside of Detroit, and in Wayne County, Plaintiff Jill Babcock was denied similar access at a restaurant which had the proper ramp but did not have any accessible parking areas in its lot, on

the grounds as stated by the owner, that it had been granted a "variance". As an attorney familiar with disability laws, Plaintiff Jill Babcock knows that no such variances are allowed, and upon information and belief, Defendant Wayne County or Wayne County Building Authority improperly granted the license or permit despite blatant violations in the business' plans.

v.  Plaintiff Jill Babcock has been prevented or deterred from visiting multiple other new or newly retrofitted restaurants in Detroit and Wayne County which have been issued business licenses or occupancy permits despite these and similar violations.

35. Plaintiff Jill Babcock has experienced many of the same issues in CAYMC as experienced by Plaintiff Marguerite Maddox described below.

a.  The Office of Disability Affairs on the 12th floor of CAYMC has a heavy glass door which Plaintiff Jill Babcock finds difficult to open due to its weight, and it lacks the required door opener. The toilet

rooms on that public floor are also locked, and do not have any
accessible toilets or other features.

b. There are two new accessible, one-person toilet rooms on the public
5th and 9th floors, however these toilet rooms are not open to the public
and require a key instead of a key-fob making it difficult to quickly
unlock and access the toilet for a person such as Jill Babcock with
hand dexterity or hand strength issues.

c. In addition to the problems noted as to Marguerite Maddox at the
Skywalk into CAYMC below, the security device at the employee
entrance is not wide enough for a wheelchair. In April 2023, Plaintiff
Jill Babcock was initially refused her entry into the employee entrance
because security personnel did not have a scanning wand, indicating
Defendants' failure to properly equip, train, or supervise. She was
delayed for about 15 minutes by this confrontation until eventually
one of the other security personnel left to obtain the scanning wand
from another area of the building.

36. Plaintiff Marguerite Maddox is a citizen and resident of the City of
Detroit, the County of Wayne, and the State of Michigan.

FIRST AMENDED CLASS
ACTION COMPLAINT
19

37. Plaintiff Marguerite Maddox requires the use of a service animal for mobility and other assistance. Scarlett has assisted her since 2017, and prior to Scarlett, Plaintiff relied on her service animal, Jello.

38. Plaintiff Marguerite Maddox has Cerebral Palsy, cervical dystonia, hearing impairment, speech impairment, and some vision decline.

39. To access and live within the community, Plaintiff Marguerite Maddox is dependent upon her service dog Scarlett, she is dependent upon various assistive devices and policies for hearing, and communication, and she is dependent upon specialized walkers including a HEAO 4-wheel walker with seat for mobility.

40. Scarlett is a certified assistance dog. Separately and with Scarlett, Plaintiff Marguerite Maddox cannot access or has difficulty accessing the community and the Defendants' buildings, voting registration and polling places, facilities, programs, and services without fully compliant shared use and accessible streets, sidewalks, paths or trails, curb cuts and pedestrian crossings, entrances, free and clear paths, doorways and doors within buildings, toilet rooms and toilets, assistive listening devices and closed captioning, and other accessible features required by law and including as described in this complaint.

41. Plaintiff Marguerite Maddox has long been active and is recognized in community affairs and politics as a disability rights activist, including *inter alia*, having been awarded the Spirit of Detroit Award in 2017 with Jello, her service dog at the time. She started in local political activity beginning as an adolescent when her grandmother began teaching her how "the system worked" by taking her to meetings of the Detroit City Council, and to events and meetings with United States Representative John Conyers, Jr.  She was a member of the Board of Directors of a local 501c3 non-profit, public charity of individuals with disabilities for people with disabilities.

42. Plaintiff Marguerite Maddox prefers to exercise her right to vote in person, and votes in person at her precinct voting location, two blocks from her house, in the Ladder Company Number 7, Engine Company Number 17 Fire Station located at 6100 Second Avenue in Detroit, which has not been accessible up to and including the 2022 elections. The entrance door is too narrow, and has a step which is too high, so she must knock on one of the large truck garage doors for it to be opened, so that she can get into the station.  She was told in 2020 that this location would be fully accessible in 2022, but when she voted in 2022, she found the

conditions had not changed, and the voting location still had the same defects and was not accessible as required. Additionally, the accessible voting machine did not work, and it took an hour for staff to get it to work, in 2020 and again when she voted in 2022.

43. Plaintiff Marguerite Maddox with Scarlett tries to attend and to speak publicly on pertinent issues at almost every meeting of the City Council of Defendant City of Detroit. The discriminatory inaccessible conditions described in this complaint impede her ability to participate, and they also upset her, which in turn further compromises her speech when she is agitated and stressed.

44. Since 2008, Plaintiff Marguerite Maddox has been asking the Detroit City Council to resolve issues relating to persons with hearing impairments. For example, she has been asking City Council to install proper closed captioning for the public meeting spaces. This issue was not addressed until the pandemic, and the resolution is still inadequate for her needs or the needs of other persons with hearing impairments:

a. For remote attendance, closed captioning is not always "turned on" for cable or zoom audiences, and she must telephone into the meeting, after the meeting has started, to remind staff to activate the service;

b. When attending in person meetings:

    i. there is still no wiring for listening devices, and listening devices are not offered;

    ii. instead of installing one or more large, dedicated, real-time captioning display devices facing into the audience, there are two large video screens with captioning on two sides of the conference table for the Council members, which are parallel instead of perpendicular to the audience, such that these screens are not readily visible to the audience in the main seating section; and

    iii. there is only one such large video screen perpendicular to face the audience, but that is in the outside "overflow" aisle which does not have sufficient seating for persons with walkers or wheelchairs or service dogs; and

c. City Council does not always have an American Sign Language interpreter at these meetings.

45. Additionally, the City Council meeting space and main audience area is behind two heavy glass doors. Both the main and the overflow audience areas do not have sufficient seating for persons with walkers or

wheelchairs or service dogs. Plaintiff Marguerite Maddox has been denied proper seating on numerous but not all occasions. This inconsistent access indicates poor training and poor supervision because her access depends upon which security personnel happen to be on duty at the time.

46. There is no readily available, public, unlocked, toilet room adjacent to the public City Council meeting room or the 13th floor auditorium, and even when the adjacent toilet rooms are unlocked, there is no accessible toilet, toilet stall, or other required accessible features, so Plaintiff Marguerite Maddox has had to leave the meeting on several occasions to go all the way down to the basement to use the toilet. City Council does not pause the meeting and wait for her to return.

47. Plaintiff Marguerite Maddox does not drive and is otherwise dependent upon the local bus system and the People Mover, which do not fully comply with the law. The doors on the People Mover vehicles close too quickly for her. The Rosa Parks Transit Center does not always have an unlocked accessible toilet room, and the accessible lavatory sink has been removed. In April 2023, the automatic door opener at Rosa Parks Transit Center was not working. Plaintiff Marguerite Maddox has observed staff

at the Rosa Parks Transit Center and the People Mover who are often

untrained and are sometimes verbally abusive to her or other patrons with

disabilities. Several of the bus stops adjacent to CAYMC and adjacent to

other buildings described in this Complaint, as well as other locations she

wants visit in Detroit, are not always completely accessible. Additionally,

with her walker and her service dog Scarlett, Plaintiff Marguerite

Maddox finds that many sidewalks on Woodward near CAYMC at

Jefferson are blocked by restaurant outdoor eating areas, that many curb

cuts are not wide enough for her, Scarlett, and competing pedestrians and

upright scooters and boarders, and that many crossing signals are not

timed to allow sufficient time to safely cross the street. Further, she

cannot directly access the Millender Center or the Renaissance Center

from CAYMC since she cannot return to CAYMC from the Millender

Center Skywalk: the second-floor entrance is for employees only, and

there is no elevator from the Skywalk to the ground. For the same reason,

Plaintiff Marguerite Maddox and other persons with mobility disabilities

cannot use the People Mover Station in the Millender Center to access

the Skywalk to CAYMC, but instead must go outside to cross the busy

streets of Randolph and Jefferson meant to be avoided by the Skywalk.

48. For the same reasons of inaccessibility, Plaintiff Marguerite Maddox has also been denied access to other public meetings of the Defendants in other inaccessible buildings of the Defendants described in this complaint, and she has also decided not to attend several meetings in other inaccessible buildings described in this complaint because she knows these, and other accessibility problems exist.

49. Plaintiff Ashley Jacobson is a citizen and resident of Whitmore Lake, the County of Washtenaw, and the State of Michigan.

50. Plaintiff Ashley Jacobson has several physical disabilities and impairments including *inter alia* impairments of her bladder, spine, joints, and immune system. Specifically, she is diagnosed with Systemic Lupus Erythematosus, Interstitial Cystitis, and Endometriosis. These impairments affect her strength, balance, restroom needs, dexterity, fine and gross motor skills, and the ability to stand for long periods of time, which often requires her to use a cane or wheelchair. She also consistently utilizes other medical devices, catheters for personal use and bladder treatments, equipment, and mobility aids as her symptoms necessitate.

51. Plaintiff Ashley Jacobson is an attorney licensed by the State of Michigan to practice law anywhere in the State. She has had to turn down business due to the Defendants' discriminatory refusal to make their buildings accessible as described in this complaint. She has also had to endure delays and inconveniences not experienced by able-bodied attorneys, due to Defendants' discriminatory refusal to make their buildings accessible as described in this complaint.

52. For at least the past two years, Plaintiff Ashley Jacobson has represented and continues to represent at least 15 clients and cases in the State of Michigan Forty Fourth Judicial Circuit and Juvenile Court and the State of Michigan Fifty Third Judicial District Court, located at its 204 S. Highlander Way building in Howell, Michigan.  In this building, she serves as a court-appointed juvenile court attorney representing juveniles and adults in delinquency and child protective proceedings. She also has clients who privately retained her and have pending cases in this building in both the District and Circuit courts.

53. The 204 S. Highlander Way building is not fully accessible. For example, although the building has one accessible stall in each toilet room, two of those toilet rooms are at the very end of each end of the long building

making it difficult to get to in time.  The third toilet room is located

closer in the very center of the long hallway, next to the juvenile court

referee room in which Plaintiff Ashley Jacobson has many cases, with

security officers posted at the door.  However, this restroom is always

sealed off and closed whenever the court calls in jurors.  It is sectioned

off and only jurors are allowed to use this restroom, which means when it

is necessary for her to use the toilet, Plaintiff Ashley Jacobson must

literally hobble with her cane or other device to either end of the

building.  This occurs often, including as recently as in April 2023. Even

though she is not required by applicable laws, Plaintiff Ashley Jacobson

has called the court's Americans with Disabilities Act (ADA) coordinator

to discuss this problem and she has never received a return call or

message.

54. In various courts and with various judges before whom she practices,

Plaintiff Ashley Jacobson is faced with the Hobson's choice of whether

to wear her mask for her personal health protection, or to remove it to

avoid the ire of some judges or security personnel. She is

immunocompromised and is also on certain medication which makes her

more susceptible to infection including COVID-19, and accordingly she

is prescribed for and prefers to wear a mask, but as the pandemic eases, this issue has confronted her more and will only increase as more cases return to live proceedings in person.

55. During the past several years, up to and through the pandemic to the current time, Plaintiff Ashley Jacobson has had multiple cases, hearings, and meetings with and on behalf of her clients before these and other commissions, courts, boards, and offices of each of the various Defendants, including but not limited to many of the Defendants' buildings and courts described in this complaint, but which she cannot specifically disclose due to client confidentiality.  She has had to limit or eliminate her practice in certain such inaccessible buildings or courts or share her work and thus the fees with other attorneys who are not disabled. The masking issue has occurred and continues to occur in each of these scenarios and is likely to continue beyond the "official" end of the COVID-19 pandemic.  Also, in many public meetings, and before many judges, Plaintiff Ashley Jacobson and/or her clients have not been given sufficient time to speak by not being allowed any additional time to the persons with disabilities to either get to the meeting, or to get to the podium, or to otherwise allow for mobility, incontinence, speech, vision,

or hearing impairments. She has observed this treatment as to other persons both in person and on remote hearings.

56. Plaintiff Ashley Jacobson lives in Washtenaw County, and when she started her law practice, she sought to become a court-appointed juvenile court attorney in the State of Michigan Twenty Second Judicial Circuit Court located in Washtenaw County. But due to her experiences with the lack of close or accessible parking, lack of accessibility in the building, and lack of accessible entrances as described in this complaint, she had to eliminate that practice and pursue her work elsewhere. Even as recently as during the COVID-19 pandemic, the buttons for the automatic doors have been blocked by the garbage containers inside the building on two occasions, preventing her ready exit. If the State would require accessibility changes to and adjacent to that building, Plaintiff Ashley Jacobson would pursue appointments and private clients in that court.

57. Each in her own way, all three Plaintiffs want to be fully engaged in their communities outside of the four walls of their homes. Each of them also actively advocates for disability rights for themselves and for other persons with disabilities, in their own social, professional, and volunteer circles.

58. As attorneys, Plaintiffs Jill Babcock and Ashley Jacobson, and other

   similarly situated attorneys with visible and invisible disabilities already

   endure insulting comments, misplaced pity, avoidance, and other

   discrimination from the bar and from many able-bodied colleagues. They

   have many other impediments to entering and advancing in the

   profession of law.  Defendants' repeated failures to comply with the

   accessibility requirements of laws that have existed for up to 57 years (a)

   further aggravates the illegal discrimination plaintiffs and similarly

   situated attorneys already endure, (b) serves as a terrible example to law

   firms and other legal employers, and (c) contributes to the low number of

   attorneys with disabilities relative to the general population, to wit, less

   than 5% of attorneys publicly admit to having a disability, while over

   20% of adults publicly admit to having a disability.

59. All three Plaintiffs, and similarly situated class members, experience

   increased emotional trauma due to illegal discrimination by Defendants

   including as specified in this complaint.  Additionally, these three

   Plaintiffs have had to endure additional emotional distress associated

   with sharing their personal, private lives to redress grievances which

would not have occurred if Defendants had simply followed the laws at issue in this Complaint.

60. All three Plaintiffs, and similarly situated class members, also must spend more money than able-bodied persons due to illegal discrimination by Defendants including as specified in this complaint: because of inaccessible parking, sidewalks and streets, they must expend additional money on transportation; Defendants' failure to design, build, and maintain correct curb cuts damages their wheeled devices, and also causes water, snow, and ice to flow or collect at the base of the curb cuts, which in turn leads to deterioration of the tires, wheels, hand-rims, and undercarriages of their manual wheelchairs and electric scooters or wheelchairs, leading to increased maintenance or replacement costs; due to Defendants' locked toilet rooms and inaccessible toilet rooms and toilets, they must purchase additional protective undergarments, co-pays on urologist and other medical consults, increased costs of laundry and dry-cleaning, and other increased expenditures for incontinence and other medical issues including as described in this complaint.

61. Plaintiff Ashley Jacobson and similarly situated class members also incur emotional and financial injury caused by the stress of having to turn away

business due to inability to represent them in Defendants' inaccessible buildings.

62. As residents and citizens, Plaintiffs Jill Babcock, Marguerite Maddox with or without Scarlett, and Ashley Jacobson are fully and equally entitled as any other person without impairments, to equally gain access into and around any of the government buildings at issue, and to equally access any of the services, programs, and activities contained or conducted in these and other government buildings by the State of Michigan, the County of Wayne, the City of Detroit, and other counties and units of local government in the State of Michigan.

### *Plaintiffs' Injuries as Class Representatives and Class Action Discussion*

63. As a direct result of Defendants violating the laws at issue, Plaintiffs have been injured by repeatedly being deprived of their fundamental rights under law. Unlike able-bodied persons, for example and without limitation:

a. Plaintiffs are not able to "get around" within the community, or to maneuver, navigate, or travel upon the public streets, roadways, sidewalks, paths or trails, or adjacent areas.

b.  Plaintiffs are not able to gain simple access into these buildings when the Defendants repeatedly and collectively fail to comply with the laws governing the approaches, parking, ramps, signage, entrances, entrance doors, and entrance door openers into the buildings.

c.  Plaintiffs are not able to maneuver or navigate within the buildings when Defendants repeatedly and collectively fail to have the requisite free and clear path, fail to have space for Plaintiffs and their wheelchairs and assistive devices in offices or public meeting rooms, fail to have internal door openers and doors that are light enough to allow Plaintiffs to open them and to keep them open while using their wheelchairs or assistive devices into the respective offices or public meeting halls, or fail to have clear service counters and document shelves and racks at the mandatory heights.

d.  Plaintiffs cannot access toilet rooms and toilets and lavatories when Defendants repeatedly and collectively refuse to follow mandatory laws on accessible facilities including by locking toilet rooms and otherwise refusing to have fully accessible toilet rooms, toilet stalls, toilet, and lavatories.

64. In addition to denying Plaintiffs equal participation in their voluntary and other community activities, Defendants' collective refusal to comply with the law makes it difficult or impossible for Plaintiffs and other disabled persons to make a living when their jobs require them to go into public buildings and facilities to conduct business.

65. Plaintiff Marguerite Maddox, with or without Scarlett, as citizen and as advocate, travels to and attends public meetings and visits the various public offices in Defendants' buildings throughout the metropolitan Detroit area, Lansing, and elsewhere in the State of Michigan.  The lack of access described in this complaint illegally interferes with her efforts to advocate for herself and for other persons with disabilities.

66. Plaintiff Ashley Jacobson makes her living and supports herself and her family as an attorney including by going into courts, juvenile facilities, and municipal, county, and State offices and facilities throughout the State of Michigan. As a direct result of Defendants not complying with these laws, she has lost work, continuing business opportunities, and money damages because of her inability to, or additional difficulties to, gain access to the Defendants' buildings and the services, programs, and

activities therein. The lack of access described in this complaint

interferes with her ability to do her job or to do it effectively.

67. Each Plaintiff is entitled to, qualified to, and otherwise able to use the

services which are being denied due to Plaintiffs' disabilities but for the

Defendants' actions and inactions, and their intentional or willful

disregard of the Defendants' obligations under State and Federal laws:

U.S. Const. Amend. I (freedoms of speech, assembly, redress of

grievances); U.S. Const. Amend. V (life including bodily integrity,

liberty, or property shall not be deprived without due process of law);

U.S. Const. Amend. VI (assistance of counsel); U.S. Const. Amend. VII

(right to jury); U.S. Const. Amend. IX (enumeration of certain rights

shall not be construed to deny others retained by the people); U.S.

Const. Amend. XIV, § 1 (privileges and immunities, due process, equal

protection) and § 5 (Congressional powers to enforce Amend. XIV); U.S.

Const. Amends. XV, XIX, and XXVI (rights to vote); Mich. Const. 1963,

Art. I, § 2 (equal protection, non-discrimination); Mich. Const. 1963, Art.

I, § 17 (right to bodily integrity); Mich. Const. 1963, Art. I, § 5 (freedom

of speech); Mich. Const. 1963, Art. I, § 13 (right to conduct suits in

proper person or by counsel); Mich. Const. 1963, Art. I, § 14 (right to

jury trial); Mich. Const. 1963, Art. I, § 17 (right to due process of law);

Mich. Const. 1963, Art. I, § 23 (enumeration of certain rights not

construed to deny or disparage other rights retained by the people); and

Mich. Const. 1963, Art. I, § 17 (unjust takings clause).

68. Each Plaintiff has been denied rights, services, or accommodations by

Defendants because of Plaintiffs' disabilities.

69. The Defendants have treated each Plaintiff adversely due to the

Plaintiffs' disability or disabilities.

70. Joinder of Plaintiffs' claims against these common Defendants is proper,

including but not limited to similarity of facts and claims, and for reasons

of judicial economy.

71. Each Plaintiff is a "qualified individual with a disability" who, without

the removal of architectural, communication, or transportation barriers,

has been denied, is being denied, and will continue to be denied equal

access to the receipt of essential services, or participation in the programs

or activities provided by the Defendants. 42 U.S.C. § 12131(2).

72. Each Plaintiff has been denied, is being denied, and will continue to be

denied barrier-free access to the buildings and facilities at issue and as

required by Federal and State laws.

73. Each Plaintiff is a "person with a disability" and is "guaranteed . . . as a civil right" the "full and equal utilization of public accommodations, public services, and educational facilities without discrimination because of a disability." M.C.L. 37.1102 and M.C.L. 37.1103(h).

74. Each Plaintiff has been discriminated against and suffered injury from the Defendants and is fully representative of a class of injured persons with mobility and incontinence impairments and other disabilities.

75. The class of similar persons are so numerous, and their claims under the facts and laws so similar, that combining their claims with the Plaintiffs' claims into a class action for injunctive and declaratory judgment serves the interest of the class, and the judicial economy interests of the courts and of the Defendants.

## PARTIES DEFENDANT

76. Defendants under Federal laws are "public entit(ies)" as defined by Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131(1)(A) and (B).

77. Defendants under Michigan laws are "agencies of state and local government" M.C.L. 125.1361, and "persons" or "entities" which "shall

accommodate a person with a disability for purposes of employment, public accommodation, public service, education, or housing unless the person demonstrates that the accommodation would impose an undue hardship." M.C.L. 37.1102(2) and M.C.L. 37.1103(g) and (i).

78. None of these Defendants can demonstrate any difficulty or hardship whatsoever, much less "undue hardship" as a defense to the relief requested.

79. Defendant State of Michigan has been a state and political subdivision of the United States of America since January 26, 1837, and was previously part of the Northwest Territory and Ordinance as of 1787.  Mich. Const. 1963, Art. I, § 1, Eff. Jan. 1, 1964.   It is a public entity. 42 U.S.C. § 12131(1)(A).   With over 10 million residents in 2023, Michigan is the tenth most populous state in the country. According to the Michigan Economic Development Corporation, in 2022 Michigan's economy was ranked number one out of thirty-seven states with more than 2 million residents.  If Michigan was a separate country, comparing 2021 Gross Domestic Products, its economy would be ranked as the 36th largest economy in the world.   The State of Michigan's budget for fiscal year 2022 was $74.1 billion, with a surplus of $9 billion as of January 2023.

The Governor has proposed a budget of $79 billion dollars for fiscal year beginning October 2023, with substantial portions of the surplus being set aside for reserve.

80. Defendant County of Wayne is a political subdivision of the State of Michigan, with an elected county executive, board of supervisors, sheriff, treasurer, county clerk, register of deeds, and prosecuting attorney. Mich. Const. 1963, Art. VII, § 1, Eff. Jan. 1, 1964. It is a public entity. 42 U.S.C. §§ 12131(1)(A) and (B). The county seat is Detroit. With more than 1,700,000 residents in 2023, it is the most populous, and most densely populated, county in the State. The County of Wayne budget for fiscal year 2022-2023 is $1.86 billion.

81. Defendant City of Detroit is an incorporated municipality and political subdivision of the State of Michigan, with an elected mayor, city council, city clerk, police commissioner, and city treasurer. Mich. Const. 1963, Art. VII, § 21, Eff. Jan. 1, 1964. It is a public entity. 42 U.S.C. §§ 12131(1)(A) and (B). With more than 621,000 residents in 2023, it is the most populous, and one of the most densely populated, cities in the State. The City of Detroit budget for fiscal year 2021-2022 was $2.33 billion

and for fiscal year 2022-2023 is $2.45 billion, with a surplus of $156 million.

82. Defendant State of Michigan has one court of justice. Mich. Const. 1963, Art. VI, § 1, Eff. Jan. 1, 1964; Am. Init., approved Nov. 6, 2018, Eff. Dec. 22, 2018.

83. Defendant State of Michigan is specifically charged under the United States Constitution, Amend. XIV, § 1 and § 5, *Tennessee v. Lane*, 541 U.S. 509 (2004), and the Constitution of the State of Michigan, Mich. Const. 1963, Art. VI, § 1, Art VI, § 7, with providing fully accessible courts for all judicial proceedings and other manifestations of that process including the courtrooms, chambers, clerk's offices, the jury assembly rooms, the jury boxes, the jury rooms, lock-ups and detention areas, and all ancillary facilities; also, the ADA and the ADA Accessibility Guidelines (ADAAG) created by the U.S. Access Board, most recently amended in 2015, delineates specifications for these facilities.

84. Together with the State, Defendants County of Wayne and City of Detroit are also specifically charged with providing the services described in the preceding paragraphs within their respective bailiwicks,

and the State, County, and City are all severally and jointly responsible for funding all expenses, maintenance, maintenance reserves, capital improvements, and all other  necessary costs of state and federal requirements established by state and federal laws, of the Third Judicial Circuit Court, the Wayne County Probate Court, and the Thirty Sixth District Court of the City of Detroit. M.C.L. 600.9947, M.C.L. 600.9945, M.C.L. 600.837, M.C.L. 600.550, M.C.L. 600.425.

85. Defendants State, County, and City, and the other non-Defendant counties and municipalities with similar facilities and defects as discussed in this complaint, jointly or severally, have control over the design, layout, construction, and maintenance of the streets and highways, sidewalks and curbs, public parks, and improved areas adjacent to and leading to the buildings and facilities and public parks at issue within their respective bailiwicks.

86. Defendant Wayne County Building Authority is a public body corporate established by the County of Wayne pursuant to State law, M.C.L. 123.951 and M.C.L. 123.957, with certain enforcement powers pursuant to the Construction Act and Building Codes, and with authority over approval, design, construction, and maintenance of space, buildings,

structures, improved areas, and public facilities used, occupied, owned, or leased as lessor or lessee by the County of Wayne within certain areas of CAYMC, and, upon information and belief, outside of CAYMC, including but not limited to the buildings described below.  It is a public entity. 42 U.S.C. § 12131(1)(B).  Wayne County Building Authority also has enforcement powers to approve or reject building plans and to issue or deny occupancy permits for privately owned properties which are open to the public within Wayne County but beyond the corporate borders of the City of Detroit.

87. Defendant Detroit Building Authority is a public body corporate established by the City of Detroit pursuant to State law, M.C.L. 123.951 and M.C.L. 123.957, with certain enforcement powers pursuant to the Construction Act and Building Codes, and with authority over approval, design, construction, and maintenance of space, buildings, structures, improved areas, and public facilities used, occupied, owned, or leased as lessor or lessee by the City of Detroit within certain areas of CAYMC, and, upon information and belief, outside of CAYMC, including but not limited to the Frank Murphy Hall Of Justice, the Thirty Sixth District Court, and other buildings described below.  It is a public entity. 42

U.S.C. § 12131(1)(B).  The Detroit Building Authority also has enforcement powers to approve or reject building plans and to issue or deny occupancy permits for privately owned properties which are open to the public within the corporate borders of the City of Detroit.

88. Defendant Detroit-Wayne Joint Building Authority is a public body corporate established by the City of Detroit and by the County of Wayne pursuant to State law, M.C.L. 123.952 and M.C.L. 123.957, to construct, own and manage CAYMC located at the foot of Woodward at East Jefferson in the City of Detroit, 2 Woodward Avenue, Detroit Michigan. Its primary tenants currently include the executive and legislative branches of government and certain elected officials for the City of Detroit, for the County of Wayne, the State's Third Judicial Circuit and Probate Courts, the Clerks for the City of Detroit and the County of Wayne, other offices of the City and County, and at least one retail food and sundries shop.  It has authority over approval, design, construction, operation, and maintenance of all the space, building(s), structure(s), improved areas, and public facility occupied, owned, or leased as either lessor or lessee within CAYMC.  It is a public entity. 42 U.S.C. § 12131(1)(B). Since 2005 it has reduced its operating budget from over

$15,000,000 to under $8,800,000 annually, but nevertheless has failed to implement the required accessibility features to the premises.

## DEFENDANTS HAVE INJURED EACH OF THE PLAINTIFFS

89. Pursuant to the Federal and State Constitutions cited, Plaintiffs are each entitled to, and in need of the services and participation in the programs or activities provided by one or more of the Defendants in their buildings described below, including by way of example and not by limitation, to physically attend in their own person:

   a. to be engaged in, be integrated into, and be part of the community, including for example and not by limitation, *Olmstead v. L. C.*, 527 U.S. 581 (1999), and 28 C.F.R. § 35.130 (General prohibitions against discrimination).

   b. to be "out and about" in their communities, to socialize, to visit with friends and family, to visit cultural institutions such as libraries, museums, and theatres, to visit parks, to visit restaurants, to shop and conduct daily personal business,  to visit health care and veterinarian care providers, and to otherwise engage in the same activities as persons who do not have disabilities.

c.  to attend and participate in the public meetings of the legislative, executive, administrative, and judicial bodies of the Defendants.

d.  to lobby, instruct, and meet with their representatives, the elected officials, and the other officers and employees of the Defendants, and with other citizens engaged in the same activities.

e.  to engage in free speech.

f.  to peaceably assemble and protest.

g.  to petition for redress of grievances.

h.  to consult for the common good.

i.  to review and examine in person all public records including as to property, zoning and land use, buildings, marriages, businesses, elections and campaigns, administrative hearings and appeals, and the judicial branch.

j.  to register to vote.

k.  to apply for, receive, and return absentee ballots.

l.  to vote.

m. to file to run for public office or seek volunteer appointments.

n.  to file for and receive permits or licenses.

o.  to pay or to contest taxes, assessments, exemptions, and fees.

p.  to monitor the actions of these governments as they pertain to their own affairs as well as to the general welfare and public good.

q.  to be called to jury duty, to participate in jury pools, and to serve on juries.

r.  and to observe and to participate in the services of the judicial branch and of the administrative hearings and appeals departments of the Defendants.

90. Plaintiff Ashley Jacobson is engaged in the private practice of law to earn a living and to conduct a profitable business in the State of Michigan.  As such, and to conduct such practice and business on her own behalf and on behalf of her clients, she too must have immediate, in-person physical access, in the same extent as any other attorney licensed by the State of Michigan, to all the above services, programs and activities, and to other services, programs and activities such as by way of example and not limitation:

a.  to attend to and conduct depositions, discovery, negotiations, investigations, and other meetings in all branches of the Defendants, and in the administrative review sections of the legislative and executive branches, and in the Defendants' judicial branches.

b. to also attend hearings, trials, and appeals in the Defendants' judicial branches and in the administrative hearings and appeals sections of the Defendants' legislative and executive branches.

c. to meet with clients or witnesses who are confined in the Juvenile Center or in the lockups of either the City or the Sheriff.

d. to meet and interact with Judges, administrative hearing judges or officers, and their staff, and other attorneys or parties.

e. and all such other services, programs, activities and matters as needed or useful or advantageous to meet the needs of her clients and to fulfil her fiduciary and advocacy duties.

### INACCESSIBLE TOILET ROOMS (INCLUDING LOCKED TOILET ROOMS IN PUBLIC AREAS OF PUBLIC BUILDINGS), TOILETS, LAVATORIES AND FIXTURES VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS TO BODILY INTEGRITY

91. Plaintiffs Jill Babcock and Ashley Jacobson and similar class members suffering incontinence and other conditions affecting their kidneys, urinary system, bowel system, or gastro-intestinal system, have been harmed physically and medically by the Defendants' malfeasance and nonfeasance:

a. Holding urine or feces too long in the body is painful.

b.  Holding urine or feces too long or repeatedly, depletes muscle control over the bladder and defecation functions, and increases the risk of dangerous infections including urinary tract infections, or exacerbating existing medical conditions.

c.  Not having timely access to a toilet and holding urine or feces too long can also precipitate Autonomic Dysreflexia (AD), sometimes referred to as Autonomic Hyperreflexia, which is a potentially life-threatening medical condition including for many people with spinal cord injury experience when there is pain or discomfort below their level of injury, even if the pain or discomfort cannot be felt. Thus, it is essential to have consistent access to an accessible toilet, Having a full bladder can trigger AD, which causes a spike in blood pressure to the extent a person can die.

d.  Somewhat counterintuitively, without timely access to an accessible toilet, if there is constipation, it can induce the vasovagal reflex which can trigger vasovagal or defecation syncope which in turn can cause cardiac or cerebral ischemia or other cardio-vascular events, resulting in loss of consciousness and sometimes resulting in death.

e. Urinating or defecating in one's clothing further increases the risk of dangerous infections, rashes, discomfort, and exacerbations.

f. One can hold urine and feces only to a point, beyond which there is urinary incontinence or fecal incontinence, *i.e.,* partial to full loss of control causing leakage of urine and feces.

g. Leaking urine or feces occurs on the way to the toilet rooms, and especially when there is not an accessible route to the toilet rooms.

h. Leaking urine or feces even occurs in the toilet rooms and in the toilet stalls while trying to get into a toilet stall or to transfer onto the toilet, where not properly accessible under the federal and state laws, thereby aggravating all the above.

i. Urinating or defecating in one's clothing, even if using incontinence aids, is humiliating.

j. Incontinence entails a risk of criminal charges. Urinating or defecating in any public area is a misdemeanor under State law and most municipal ordinances, punishable by fines or jail or both. In some municipalities in Michigan, it is a civil infraction, with civil penalties but a lesser burden of proof. Also, State criminal law remains enforceable even in those jurisdictions.

    k.  All the above stigmatizes any person beyond infancy.

    l.  It is so humiliating and stigmatizing that persons will not even admit they have ever experienced bladder or fecal incontinence or constipation.

92. Each Plaintiff relies on disability-accessible, barrier-free buildings and toilet rooms as a citizen, an attorney, or an activist or advocate.  As a result of Defendants' unwillingness to provide the mandatory accessibility measures, these Plaintiffs face discriminatory barriers impeding their respective equal use and access of these buildings in a manner comparable to that of their nondisabled peers.

    a.  By way of example and not limitation, there is only one nominally accessible, publicly open, toilet for each gender in each of the two towers of CAYMC. Until 2022 or 2023, there was only one such toilet for each gender, in the East Tower.

    b.  These publicly accessible toilets are only located  in the basement of the 14-story East Tower, and the  20-story West Tower. As of April 19, 2023, the elevator basement lobby of the West Tower has signs (which are not otherwise compliant) that point to the East Tower for

accessible toilet rooms, instead of directing toward the recently
retrofitted accessible toilets in the West Tower.

c.  It takes up to 20 or more minutes to get from one of the 14 to 20
floors at and above grade into an elevator and then to proceed to the
only (partially) accessible toilets  in the basement of  each tower of
the building.

d.  On occasion, during events at the auditorium on the 13th floor of the
East Tower, or for City Council meetings, Defendants will unlock the
toilet rooms adjacent to those auditorium and meetings rooms,
however, they are not accessible and plaintiffs and similarly situated
persons must still go to the basement to use the accessible toilets, even
if the meetings or events continue beyond 4:30 when the building
closes.

e.  This barrier occurs in other buildings in the State, where there is only
one toilet room per gender in a multi-story or a multi-tower, Article II
public building, including for example and not limitation, the State of
Michigan Eleventh Judicial Circuit Court located in St. Ignace  and
one of the two towers of the State of Michigan Sixth Judicial Circuit
Court located in Pontiac.

93. Access the toilet and lavatory with dignity, in a safe toilet room for

sanitation and hygiene, is a basic human and constitutional right, for

example and not limitation:

a. "The right to sanitation entitles everyone to have physical and

affordable access to sanitation, in all spheres of life, that is safe,

hygienic, secure, and socially and culturally acceptable and that

provides privacy and ensures dignity." *Human Rights to Water and*

*Sanitation*, UN-WATER, https://www.unwater.org/water-facts/human-

rights-water-and-sanitation (last visited Apr. 27, 2023).

b. Former Special Rapporteur on the Human Right to Water and

Sanitation Catarina de Albuquerque states that access to sanitation is

one of the "underlying determinants of health and contributors to

individual dignity and public welfare…":

> The rights to water and sanitation cover the majority of
> the needs of good hygiene. With respect to the water
> requirements of good hygiene, General Comment No. 15
> states that access to sufficient water for domestic
> purposes includes access to water for hygiene purposes,
> the provision of appropriate storage facilities and hygiene
> in food preparation. With respect to the right to
> sanitation, the hygiene requirements are that the latrine
> should be easy to clean and should contain facilities for
> hand washing. The right to health also covers the
> underlying determinants of health, including access to
> water and sanitation…

CATERINA DE ALBUQUERQUE, ON THE RIGHT TRACK: GOOD

PRACTICES IN REALISING THE RIGHTS TO WATER AND SANITATION 141

(2012),

https://www.ohchr.org/sites/default/files/Documents/Issues/Water/Bo

okonGoodPractices_en.pdf.

94. The Defendants' refusal to comply with the laws on disability-accessible restrooms causes physical demands on Plaintiff Ashley Jacobson, as she is required to travel quite far to find the next accessible restroom stall. She risks falling and is unable to use necessary equipment because of the lack of physical space and mobility bars in the stalls. Ashley has had to turn down cases in these buildings, which not only affects her financially, but emotionally as she must consider the inequality she faces as a disabled attorney and explain it to clients who seek her services in those buildings. Additionally, she must spend time considering and compensating for building inaccessibility in ways her nondisabled peers do not. The violations of disability rights inflicted by Defendants has caused and will continue to cause her physical, financial, and emotional harm until appropriately remedied.

95. Defendants have breached constitutionally protected bodily integrity of Plaintiffs by failing to provide publicly open toilets and toilet rooms in their governmental buildings as described herein, and by failing to provide fully accessible toilets and toilet rooms as described herein.

## INACCESSIBLE PARKING, SIDEWALKS AND CURBS, GRADING, ENTRANCES AND EXITS, AND INTERIOR SPACES

96. Defendants' other violations relating to free and clear access to and within the buildings also harm Plaintiffs, by denying to them the same rights as non-disabled persons, for example and not limitation:

a. *PARKING:* Michigan is often referred to as the automotive capital of the world, and its citizens demand and calibrate travel and parking time by the minutes to drive to a location and the steps to walk to a building or destination within a building or complex, however, Defendants have repeatedly failed to make available to Plaintiffs the mandatory number and type of fully accessible parking spaces near their public facilities. For example, at the State's complex in Lansing, with the Michigan Hall of Justice at one end, Michigan State Administrative Office Buildings on a concrete plaza over a massive parking garage, the Michigan Capitol, and then the Anderson

Legislative Office Building and George W. Romney Office Building,

there are no accessible parking spaces or insufficient number of such

spaces available on the streets closest to the Supreme Court Building,

or the State Capitol or the Legislative and Executive Buildings, and

many of the curb-cuts are deficient on slope, materials, direction and

safety.

b. ***SIDEWALKS, CURBS, CROSSINGS and OTHER ISSUES:*** Once

near, at, or inside the applicable building, as described elsewhere in

this complaint and at trial, Plaintiffs and other persons with mobility

and other impairments must continuously struggle to proceed up non-

existent, or decrepit, or poorly designed or maintained ramps and curb

cuts, and then struggle to open doors which are heavy or lack openers,

or openers which do not work or are poorly marked or badly located,

for example. Defendants otherwise fail to comply with mandatory

accessibility requirements in the physical environment as to hearing,

and vision impairments, all of which discriminate and injure plaintiffs

and persons similarly situated.

97. Defendants' repeated failure to follow these laws and the minimum

guidelines causes harm to plaintiffs and similarly situated persons with

disabilities, including but not limited to Defendants' failure to follow

minimum accessibility guidelines set forth in the Michigan Construction

Code; Michigan Building Code, Chapter 11 (Accessibility); Michigan

Plumbing Code, Chapter 4 (Fixtures Faucets and Fixture Fittings); the

International Building Codes); ADA Title II Regulations, 28 C.F.R. Parts

35 and 36 (Nondiscrimination on the Basis of Disability in State and

Local Government Services); 2010 ADA Standards for Accessible

Design; ABA Accessibility Standards; the Access Board Courthouse

Access Advisory Committee (Designing Accessible Courthouses); the

U.S. Courts Design Guide, revised 2021 (for persuasive authority); and

National Center for State Courts, The Courthouse Guide to Planning and

Design Needs of Persons with Disabilities.

98. These and other violations of disability rights inflicted by Defendants

have caused and will continue to cause other economic, professional, and

reputational harm to:

    a.  Plaintiff Marguerite Maddox with or without Scarlett as a public

       advocate for disability rights.

    b.  Plaintiffs Jill Babcock and Ashley Jacobson as licensed attorneys in

       government and private practice, as well as in the general exercise and

advancement of their skills, experiences, wisdom, and standing and reputation in the legal profession.

c. Other persons with similar or other employment or professions or organizing and advocacy who have disabilities including but not limited to mobility and continence impairments.

99. These and other violations of disability rights inflicted by Defendants have caused and will continue to cause emotional distress, humiliation, delay, inconvenience, and other harm to Plaintiffs and other individuals with disabilities including mobility and continence impairments.

100. Applying the recognized concept of intersectionality in civil rights and discrimination, Defendants' repeated, collective discrimination in these matters causes and continue to cause even greater harm to all three Plaintiffs who are women, to Plaintiff Marguerite Maddox who is also a Black woman, and to similarly situated class members.

101. Defendants are jointly and severally liable for these injuries and compensatory damages for economic harm, and damages for emotional distress, humiliation, delay, inconvenience, and other harm to Plaintiffs and the class members for violations stated herein, and without regard to

Defendants' attempts to allocate or isolate responsibility between or among themselves or others.

102.   Plaintiffs and similarly situated class members are entitled to punitive damages from Defendants for their common patterns, practices, and policies of repeated and intentional, or willfully indifferent, violations of the Federal and State laws at issue.

**DEFENDANTS HAVE REPEATEDLY VIOLATED FEDERAL AND STATE DISABILITY LAWS DIRECTLY CAUSING HARM TO PLAINTIFFS AND INTERFERING WITH THEIR RIGHTS, INCLUDING AT THESE BUILDINGS AND FACILITIES**

103.   Each Defendant has, and all Defendants in concert have, repeatedly and oftentimes continuously failed to comply with the laws of the United States and of the State of Michigan to make their physical spaces fully accessible to Plaintiffs and to other persons with disabilities to enable Plaintiffs and other persons with disabilities to have barrier-free access and equal opportunity with other residents and citizens to fulfill their participatory obligations as citizens such as by paying taxes, voting, attending public meetings, and performing jury duty, and to also enable Plaintiffs to have equal access to the services and amenities provided by

the Defendant governments. Mich. Const. 1963, Art. I, § 2, Eff. Jan. 1, 1964.

104.   Defendants supply these services, programs, and activities to the public in the buildings described below, and in so doing are obligated to make these services, programs, and activities fully and equally accessible to all persons including the Plaintiffs and other persons who have physical restrictions, in barrier-free buildings and facilities.

105.   Defendant State of Michigan individually or with the applicable county or municipality, controls, owns, leases, operates, and funds or supervises as to all the buildings and operations described below, and as to similar facilities and operations throughout the State, including for example but not limited to the  court buildings for the Third, Sixth, Eleventh, Sixteenth, Twenty-Second, Thirtieth, Forty-Fourth, and Forty-Seventh Judicial Circuit Courts located in the counties of Wayne, Oakland, Mackinac, Macomb, Washtenaw, Ingham, Livingston, and Delta, and other Probate and District Courts as described in this complaint.

106.   Each of the Defendants owns, leases, operates, manages, or otherwise has joint authority and control with the other Defendants, and is jointly

and severally responsible and liable for accessibility compliance and violations at CAYMC.

107.   Except for Detroit-Wayne Joint Building Authority, each of the Defendants also owns, leases, or operates, has joint control with the other Defendants, and is jointly and severally responsible and liable for accessibility compliance and violations at the Guardian Building.

108.   Except for Detroit-Wayne Joint Building Authority, each of the Defendants also owns, leases, or operates, has joint control with the other Defendants, and is jointly and severally responsible and liable for accessibility compliance and violations at the following Defendants' facilities:

a.  the Frank Murphy Hall of Justice;

b.  the State of Michigan 36th Judicial District Court-Detroit Courthouse,

c.  the Lincoln Hall of Juvenile Justice;

d.  the State of Michigan Third Judicial Circuit Court Family Court and Friend of the Court Division Offices and Courtrooms located in the Penobscot Building, as lessees;

e.  the Wayne County Register of Deeds and the Wayne County Treasurer's Office located at 400 Monroe, Detroit, as lessees, and;

    f.  the Wayne County Criminal Justice Center under construction at 1301

East Warren Avenue, Detroit.

***VIOLATIONS AT THE STATE CAPITOL, MICHIGAN HALL OF
JUSTICE, GEORGE W. ROMNEY BUILDING, MICHIGAN SENATE
BUILDING, AND ANDERSON HOUSE OFFICE BUILDING AND
OTHER BUILDINGS ON THE PLAZA AND CAPITOL LOOP***

109.   There are multiple violations at the Michigan Supreme Court Hall of

Justice in Lansing, Michigan, including by way of example and not

limitation:

    a.  At one or more of the public streets immediately adjacent to the Court

Hall of Justice, there is insufficient pedestrian access for persons with

disabilities, for example the pedestrian ramps are not fully compliant,

there are not enough accessible parking spaces, and any such

nominally accessible parking spaces are not fully compliant and are

too far from the entrances to the Hall of Justice.

    b.  Access to the parking garage first requires one to notice a small non-

compliant sign for public access for persons with disabilities, and then

to call "security" from an inaccessible call box located on the

passenger side of the drive.

FIRST AMENDED CLASS
ACTION COMPLAINT
62

c.  There are no signs, or insufficiently visible signs directing persons with disabilities around the imposing staircases at the east façade of the building.

d.  The revolving door entrances to the building are not sufficiently graded or accessible to persons with disabilities.

e.  There are no parking or drop-off areas on the streets on the west, north, or south facades which are closest to the Hall of Justice.

f.  The nominally accessible parking spaces in the parking lot are too far from the entrances to the Hall of Justice, and due to curb locations, requires one to travel to the left and away from the entrance, and requires one to travel into the traffic lane of the parking lot. These spots also lack proper curb cuts and accessible routes to the Michigan Library and Constitution Hall located across Walnut.

110.  The George W. Romney Building (which includes the Governor's Office), 111 S. Capitol; the Michigan Senate Building, 201 Townsend Street; and the Anderson House Office Building(s), 124 N. Capitol, all in downtown Lansing, Michigan, are deficient including by way of example and not limitation:

a.  Various crosswalk curb cuts and crosswalks on the surrounding streets of Ottawa, Washington, Walnut, Allegan, Townsend, and Capitol are not the proper width, grade or slope, use paving bricks instead of solid smooth pavement, lack compliant raised, tactile ramp inserts, or are cut at dangerous angles into the street or other cross walks.  The sidewalk and crossing under the bridge link of the Anderson Building is at a dangerous slope and less than the required level width for that sidewalk.

b.  Certain transit stops on the surrounding streets are not compliant, for example constructed on lawns instead of properly sized or positioned concrete pads.

c.  Insufficient number of accessible parking spaces for the public on the streets, and those that exist are too far from the applicable buildings, are next to curbs or planters or signposts, are otherwise dangerous and cannot be used by the drivers or passengers without the person with disability having to maneuver into oncoming traffic to get to the curb cuts and to the sidewalks or parking kiosks.

d.  No visibly marked, compliant accessible drop-off areas.

FIRST AMENDED CLASS
ACTION COMPLAINT
64

111.   The Michigan State Capitol, Heritage Hall Capitol Visitors Center, and the State Office Buildings Plaza between the Capitol and the Hall of Justice, including by way of example and not limitation:

a.   No visible signs or visibly marked wheelchair accessible entrances to the Capitol at ground level.

b.   No visible door openers at the north, west, or south ground level entrances to the Capitol, and no signs at or inadequate signs to the nominally accessible east entrance.

c.   No visible compliant signs for the Ottawa entrance to the below-grade ramp going down into the new, underground Capitol Historical Center on the north side of the Capitol.

d.   Insufficient seating for wheeled vehicles for persons with disabilities in the public galleries of the House or the Senate, and insufficient accessible toilet rooms or toilets in the Capitol, or insufficient directional signs. The only properly marked and fully accessible toilets and toilet rooms appear to be farthest from the Capitol and in one corner of the Historical Center.

e.  Insufficient accessible parking spaces or drop off areas for the public,
including no such areas on any of the surrounding streets immediately
adjacent to the Capitol and Plaza.

f.  The Plaza itself is approximately one-half mile from the Capitol to the
Hall of Justice, and approximately one-quarter mile for the State
Office Buildings, yet there is only one, poorly marked entrance ramp
to the purported "accessible route" to the Plaza from Ottawa and
Allegan streets, and none are visible from Walnut. That ramp appears
to be at an extreme and unsuitable grade, without appropriate or
suitable railings, and is too far from the various destination Office
Buildings along the Plaza

g.  Poorly marked and inaccessible parking at the Michigan Library,
Michigan Historical Museum, Elliot-Larsen Office Building, and
Michigan Constitution Hall, including but not limited to (a) two
directional signs positioned on Walnut without any curb cuts on either
side of the street and without a marked mid-block pedestrian crossing
with warning lights, (b) inaccessible public entrance to the Elliot-
Larsen Office Building, (c) insufficient directional signage to
accessible parking, and (d) the only completely accessible parking

areas with proper access aisles and level surfaces appear to be only

reserved for employee use not the public, and even the majority of

those spaces are not fully compliant.

### *VIOLATIONS AT THE COLEMAN A. YOUNG MUNICIPAL CENTER*

112.   Construction on the Coleman A. Young Municipal Center (CAYMC)

in Detroit, Michigan, began in 1951 and was completed in 1954.  It was

then known as the "City-County Building".   It was renamed following

the 1997 death of Hon. Coleman A. Young, a State Senator, a Civil

Rights Leader, the first elected African American Mayor of one of the

largest cities in the country, and at 20 years the longest serving elected

Mayor of the City of Detroit.

113.   CAYMC is iconic.  It is a nationally recognized, architecturally

significant, municipal government structure.

a.  CAYMC comprises 745,000 square feet in two office towers, with the

West Tower at 20-stories (often called the "Court Tower"), and the

East Tower at 14-stories (often called the "City Tower").

b.  The towers are connected by a common lobby, a common basement

connected via tunnel, a bridged section on each floor above grade, and

the roof.

    c.  Most of these areas are open to the public.

    d.  It serves an annual population of visitors and employees of over 1 million people per year, or over 4,000 per business day.

    e.  With the 2020 Census describing 19% of the City of Detroit population having a recognized disability, 760 individual, daily visitors and employees of the building are likely to have a disability recognized under Federal and State laws.

114.  CAYMC is a "public facility" as defined by Act 1 of 1966, M.C.L. 125.1351(g).

115.  From initial construction until today, CAYMC has served multiple governmental purposes including for the executive functions of the City and County, for the Legislative functions of the City and of the County, for the elected officials including at various times the Sheriff of the County, and Treasurers and Clerks of the City and County, and for the Judicial functions of Third Judicial Circuit and Probate Court of the unified State of Michigan Court System.

116.  From initial construction until today, CAYMC fails to comply with the "barrier free design" requirements of Act 1 of 1966, M.C.L. 125.1351(b) for persons who are "physically limited" as defined by

M.C.L. 125.1351(f), and fails to comply with the Architectural Barriers

Act, the Rehabilitation Act of 1973, and the Americans with Disabilities

Act as amended and the related regulations, including as follows:

a.  Only the Detroit-Wayne Joint Building Authority has conducted the

    mandatory access report, attached as Exhibit B, and incorporated in its

    entirety here by reference. Conducted by a third-party vendor, DLZ, it

    reports multiple violations, including inaccessible toilets and toilet

    rooms, entrances into the building, lack of emergency evacuation

    equipment in the stairwells, heavy glass doors at interior offices,

    improper or non-existent signage, and protrusions into the route of

    travel in the hallways and even in the stairwells.

b.  Additionally, except in the basements of each tower, all the toilet

    rooms in the 14-story East Tower and many of the women's toilet

    rooms in the 20-story West Tower, are illegally closed to the public.

    On occasion the toilet rooms at the 13th floor auditorium and City

    Council are open during events, but they are not accessible.

c.  The detention areas on the 20th floor do not have accessible toilets,

    and there is not enough space in the office for a detainee or an

    attorney in a wheelchair to navigate to the either male or female cell.

d.  CAYMC is comparable to a 34-story office tower, if both towers were stacked, and yet it has only two, purportedly accessible, sets of public toilet rooms for persons with disabilities, and those are in the basements.

e.  There is insufficient accessible parking and no drop-off areas on Jefferson, Woodward, or Randolph, and the drop-off area on Larned is usually blocked and lacks adequate signage. The accessible parking space or spaces on Jefferson are similar to the spaces described above in Lansing, to wit, placed next to curbs and other impediments, and requiring one to travel into oncoming traffic. The accessible parking space at the Randolph entrance is not enforced and instead is used by public officials' vehicles.

f.  Other than one emergency skid observed on the first-floor stairwell, there are no emergency skids for impaired persons to evacuate the building in the event of an emergency. Defendants fail to include impaired persons in fire evacuation drills, and there are no emergency evacuation procedures published or indicated on any signs in the building for persons with disabilities.

g. The parking, drop-off, and entrance on Larned have been updated, yet are not done correctly, for example and not limitation, inadequate signs as noted above, and an improperly sloped ramp, without properly placed railings, leading to a central revolving door which is not large enough for wheelchairs, requiring persons with wheeled devices or canes or walkers, to cross to the left or right into the path of able-bodied persons to get to the purportedly accessible entrance doors.

h. The drinking fountains were also recently updated, yet they violate the guidelines and laws by protruding into the route of travel which is required to be "unobstructed".

117. Additionally, upon information and belief, beginning in 1954, the Joint Building Authority entered one or more leases of the property back to the City of Detroit and to the County of Wayne for initial period or periods "not to exceed 50 years". M.C.L. 123.958.

118. Said leases will have expired no later than 2004.

119. Pursuant to the Barrier Free Act, upon entering into any new lease or rental agreement of CAYMC after June 30, 1974, Defendants were required ("shall") to bring the entire Center "into compliance (to 'meet

the barrier free design requirements contained in the state construction code') before a lease or rental agreement is renewed." M.C.L. 125.1351(g)(ii).

120.  Additionally, on multiple occasions after initial construction up through and including the present time, and specifically from and after July 20, 1975, the building, structure, and improved areas of CAYMC have been altered without fulfilling the requirements of barrier free construction, including for example but not limitation:

a.  Alterations to the only two "handicap" toilet stalls in the building, located in the basement of the two-tower skyscraper consisting of fourteen floors on the East Tower and twenty floors on the West Tower.

b.  Alterations to certain other toilet rooms and toilet stalls.

c.  Alterations to office space on the 12th floor of the East Tower to establish the physical location for the so called "Office of Disability Rights," specifically targeting persons with disabilities.  Sadly, this office is not compliant, for example and without limitation it has a glass door that is too heavy and lacks the damage plate at the bottom to prevent wheelchair damage.

d.  Alterations to the 13th floor of the East Tower including the large auditorium for government and other public meetings.

e.  Alterations to other floor(s) of the East Tower including the public areas of the offices of the elected Mayor and the Offices of the City Council and its elected Members.

f.  Alterations to the City Council Rooms for public "Meeting of the Whole" and of adjacent public City Council Member offices.

g.  Alterations to the ground level offices of the East Tower by altering, removing, and rearranging marble and glass walls, counters, and other physical areas of the public space for interaction between the public and the government.

h.  Alterations to other public areas of the structure and building and improved areas to either remove, expand, or modify public offices of other departments which have moved into and out of the building, including for example the Register of Deeds and Treasury functions of the County have been relocated to 400 Monroe, with such space in CAYMC then becoming occupied by other County or City departments.

i.  Alterations to the ground floor and the second floor for security purposes following the terrorist attack on other skyscrapers in 2001.

j.  Alterations to the 13th Floor of the West Tower for the relocation or installation of "bond" company and "legal newspaper" offices and/or desks and/or enclosed rooms on the court floors.

k.  Placement and removal of foreclosure desks and other counters on main floor and elsewhere in CAYMC.

l.  Alterations to the transition bridges on each floor from one tower into the other.

m.  The removal of the full-service public and employee cafeteria in the basement.

n.  Alterations to the East Tower to incorporate an enclosed bridge (or skyway) from the second floor across the parking lot and Randolph Street to the adjacent Millender Center, which included erecting an exterior staircase to the East Tower without any elevator or lift, failing to install accessible entrances on the first and second floors, and failing to install accessible security gates, as well as other violations.

o.  Alterations to remove and replace all the elevators in or about 1991.

p.  Alterations to the entrance ramps and entrances at all four ground floor entrances, including but not limited to a reconstruction of a non-compliant wheelchair ramp at the north entrance, instead of properly grading the ramp, changing the doors, and installing accessible automatic door openers to make the entire area accessible.

q.  Alterations to the parking areas adjacent to the East Entrance, the North Entrance, and the public street portions of the North and the South Entrance, without adding sufficient accessible parking or accessible drop-off areas.

r.  Alterations to the building for LEED certification and national awards.

s.  Alterations to revamp the foundations, plumbing and drainage, install a new bicycle plaza at West entrance, install a new pedestrian plaza at the West entrance, and install new security parking berms and other security at East entrance.

t.  Alteration and installation of a non-compliant and often non-functional lift elevator between the mezzanine of the Probate Court and other public areas of the Probate Court.

121.    None of these alterations have complied with the mandatory

requirements of Act 1 of 1966, M.C.L. 125.1352(2)(b), that the entire

public facility shall meet the barrier free design requirements of the state

construction code.

122.    Also, the alterations have not complied with the mandatory

requirements of Act 1 of 1966, M.C.L. 125.1352(2)(a), that full

compliance is necessary in both (A) the area affected by the alteration,

and (B) "the areas necessary to provide a continuous and unobstructed

route of travel to and from the affected areas from and including the

nearest entrance".

123.    None of the alterations, construction, or reconstruction of the streets,

driveways, curbs, sidewalks, ramps, railings, or intersections between

pedestrian and motorized lines of travel, on or adjacent to the building,

structure and improved areas are constructed in a manner that has the

required grading or other requirements to accommodate Plaintiffs or

other persons with wheelchairs or other physical disabilities, in violation

of Act 8 of 1973, Sidewalks; Persons With Disabilities, M.C.L.

125.1361.

124.   Despite these laws being in effect for decades, despite the mandatory

lease provisions and compliance required by M.C.L. 123.958, and despite

Defendants' knowledge of the readily available, now routine, design and

construction standards for compliance with disability laws, the

Defendants have spent money and made improvements to the various

buildings and facilities, but have not spent any, or sufficient, money or

made the required improvements or upgrades as to accessibility at issue

in this case.

125.   Collectively and individually, Defendants have repeatedly, and

knowingly and intentionally (or with deliberate indifference and/or

willful and ignorant disregard of the facts and law) engaged in a pattern,

practice, and policy of discriminating against Plaintiffs and other persons

with mobility and incontinence impairments, in violation of their

obligations under state and federal laws cited in this complaint.

126.   Due  to the "double I formation" within the central corridor on the

"east-west axis" of each Tower, combined with the two separate, central,

vertically stacked tubes for elevators, plumbing, electrical, internet,

HVAC, and other maintenance access located within each Tower of the

structure, and the nature and sequence of construction or reconstruction

of the structure and of the sidewalks, parking areas and grounds

surrounding the structure, at the present time as of the year 2023 C.E., all

of these alterations yield a situation in which the entire public building

and improved areas collectively do not comply either with the mandatory

barrier-free requirements of Michigan Barrier Free Design Act, Michigan

Construction Code, Sidewalks; Persons with Disabilities Act, Persons

with Disabilities Civil Rights Act, nor with the Federal 1991 ADA

Accessibility Guidelines, 2010 ADA Standards for Accessible Design,

Architectural Barriers Act of 1968, Section 504 of the Rehabilitation Act

of 1973, and Title II of the Americans with Disabilities Act.

127.   Each such failure has deprived Plaintiffs of their civil rights, thereby

injuring them, including physically, financially, and professionally, and

causing emotional distress, humiliation, embarrassment, delay, and

inconvenience.

### *VIOLATIONS AT THE FRANK MURPHY HALL OF JUSTICE*

128.   The Frank Murphy Hall of Justice, formerly Recorders Court

Building, has multiple violations, including by way of example and not

limitation:

a. On information and belief, does not have accessible toilets or toilet rooms on each floor.

b. On information and belief, does not have an accessible toilet facility in each of the lockups.

c. Fails to properly maintain the concrete ramp into the building from Gratiot.

d. Has a steam tower located in the crosswalk at Gratiot and St. Antoine.

e. Does not have sufficient accessible parking spaces or accessible vehicles and passenger drop off areas on Gratiot, St. Antoine, or Clinton. The designated accessible spaces on Gratiot have signs which face parallel to the lane of traffic and are not visible to a driver until after having passed the spot. Additionally, the spot or spots are next to curbs or planters or signposts, are otherwise dangerous and cannot be used by the drivers or passengers, without the person with disability having to maneuver into oncoming traffic to get to the curb cuts and to the sidewalk.

## *VIOLATIONS AT THE 36TH DISTRICT COURT BUILDING*

129.   The State of Michigan Thirty-Sixth District Court in the City of

Detroit has multiple violations, including by way of example and not

limitation:

   a.   Does not have accessible entrances or proper signage into the facility

     as described previously in this Complaint.

   b.   Does not have accessible parking or drop off areas as described

     previously in this Complaint.

   c.   Has a new but non-compliant drinking fountain on the first-floor

     public lobby.

   d.   Upon information and belief, the jury assembly area is not fully

     compliant.

## *VIOLATIONS AT THE LINCOLN JUVENILE JUSTICE CENTER*

130.   The Lincoln Juvenile Justice Center in Detroit has multiple violations,

including by way of example and not limitation:

   a.   Does not have enough accessible toilets or toilet rooms.

   b.   Does not have accessible entrances into the facility, except for

     example at the employee-only entrance which is only available

through a gated employee parking lot at the back of the building

complex.

c.  Does not have accessible parking or drop off areas as described above.

d.  On information and belief, does not have accessible residency or

holding areas for the juveniles, either at the Lincoln Juvenile Justice

Center or the offsite locations.

*VIOLATIONS AT THE WAYNE COUNTY CRIMINAL JUSTICE
CENTER UNDER CONSTRUCTION ON EAST WARREN*

131.  The Wayne County Criminal Justice Center, 1301 East Warren,

Detroit, is a $600,000,000.00 new construction, 11-acre campus

containing a new 5-story County Jail Adult Detention Center, a new 3-

story County Juvenile Detention Center, a 7-story Criminal Courthouse, a

Sheriff's Office, and a 4-story Administration Building.

132.  Although the street address is on East Warren, it is set back one-half

city block from East Warren, north of the Detroit Department of

Transportation Garage and Terminal.

133.  Construction began in 2019, with completion scheduled for early

2022.

134.  The project is not yet completed, and has missed multiple milestone

deadlines, including as recently as February 1, 2023.

FIRST AMENDED CLASS
ACTION COMPLAINT
81

135.   Once construction is complete, the County predicts move-in will take

an additional four to six months for the multiple occupants described

above.

136.   The Criminal Justice Center has multiple violations including by way

of example and not limitation, and including by direct observation and

upon information and belief:

a.  Failure to conduct accessibility and compliance analysis and reports.

b.  Failure to publish and make readily available to the public, the

accessibility and compliance analysis and report.

c.  Failure to have or plan for fully accessible parking lots, sidewalks, or

drop off areas, from the main parking lot on East Warren, for

example, there are certain curb cuts on certain islands within the

parking area, but from the west they lead one to a fully curbed area

closest to the building, thereby requiring one to travel north (left)

within the traffic lanes of the parking lot to get to the one, small curb

cut adjacent to the building. The apparent drop-off area to the south of

the main entrance is also curbed and requires one to travel into the

traffic lane to get to the entrance. While the sweeping exterior

staircase at the south entrance is prominent, the signage, railings, and

ramps to that south entrance are otherwise not readily visible or
adequate.

d.  Failure to plan and provide sufficient public parking lots to the
general public, thereby further limiting accessible parking. The
property plans have three parking lots, only one of which is open to
the public.  There is no readily available parking in the immediate
vicinity, since the property is bordered to the west by Interstate-75, to
the south by the Detroit Department of Transportation Garage and
Terminal, and to the east and north by other buildings including
warehouses and office buildings. The north side parking lot is not
accessible, including because it is too far from the public entrance.
This scenario creates an artificially low proportion of accessible
parking spaces.

e.  Failure to plan and provide accessible transit stops: DDOT Route 40
Russell is the only line servicing the project, with 3 stops on Russell,
none of which are accessible.  The next closest is DDOT Route 8
Warren, which is about one-quarter mile away.

f.  On information and belief, does not have or plan for fully accessible
entrances within facility, for example displaying in renderings a

prominent sweeping lobby staircase to upper levels without displaying

handicap access, proper signage to the elevators, or sufficient

elevators.

### VIOLATIONS AT WAYNE COUNTY EXECUTIVE AND LEGISLATIVE OFFICES AND CERTAIN PUBLIC CITY OF DETROIT OFFICES IN THE GUARDIAN BUILDING

137.   Wayne County Executive Offices, Wayne County Commission

Offices, and City of Detroit's Detroit Economic Growth Corporation are

located on the upper floors of the Guardian Building, another iconic,

architecturally significant skyscraper in downtown Detroit, Michigan.

The public auditorium of the Wayne County Commission is located in

the sub-mezzanine at the Congress and Griswold entrances. The

applicable space comprises 200,000 square feet of the 500,000 square

foot building.  The Guardian Building, with these major occupants, has

multiple violations, including by way of example and not limitation:

a.  Insufficient signage at the entrances at Griswold and Congress.

b.  No accessible entrance on Congress, and the entrance on Griswold

only serves a portion of the building, thereby requiring Plaintiffs

essentially to go to the "backdoor" on Larned, creating the following

problems:

FIRST AMENDED CLASS
ACTION COMPLAINT

i.  The entrances at Griswold and Congress are set into the
building for shelter, with awnings and wind-protective screens,
and sometimes have been posted with  uniformed door
attendants on the sidewalks. Instead any persons with mobility
disabilities intending to access the retail lobby or the
Commission public meeting room on the lower Mezzanine
must proceed south the entire length of the building on
Griswold, without the support of an attendant or railings, to the
sole, nominally accessible entrance on Larned, which is
exposed to the weather and wind off of the Detroit River and
has no awning, wind-screen, or outside attendants, to proceed to
an interior lift in the small Larned lobby, which may or may not
be attended or operational, and then return north to an elevator
lobby for the Mezzanine, and through the entire retail lobby.

ii. Combined with the interior, grand staircase at the Congress and
Griswold lobby, this layout also deprives Plaintiffs equal access
to the commercial and retail lobby and upper lobby mezzanine
which able-bodied persons can readily access from the
Griswold and Congress entrances.

FIRST AMENDED CLASS
ACTION COMPLAINT
85

iii. The layout also restricts Plaintiffs' access to the public auditorium for the County Commission on the sub-mezzanine in the Congress and Griswold lobby, where the County's legislative branch conducts public meetings.

c. No accessible parking or drop-off areas, including specifically at the Larned entrance which has no standing or no parking and is a full traffic lane. While there is parking on Congress and Griswold, none of it is accessible, and there is no accessible drop-off area, even though Defendants encourage and allow private vendors to operate valet parking in travel lanes of Congress and Griswold in front of the adjacent Penobscot, Ford, and Buhl Buildings.

d. No proper notices or signs on Larned, Congress, or Griswold, nor on Woodward adjacent to the Capital One Café Buildings, to alert the public to the nearest accessible entrances.

e. Once inside, the main stairway to the commercial and retail lobbies of the building are not fully accessible to Plaintiffs, even though they are fully accessible to other able-bodied visitors to the Defendants' offices.

FIRST AMENDED CLASS
ACTION COMPLAINT
86

    f.  No fully accessible toilet rooms or toilets in the Congress and

       Griswold lobby. There is only one nominally accessible toilet on these

       public floors, and it is located in the north corner of the retail level.

***VIOLATIONS AT THE WAYNE COUNTY REGISTER OF DEEDS***
***AND OTHER PUBLIC OFFICES IN THE***
***400 MONROE STREET BUILDING***

138.   Certain County Register of Deed and City and County Treasurer

Offices are located on the upper floors of the 400 Monroe Street Building

in Detroit, Michigan, which has multiple violations, including by way of

example and not limitation:

    a.  No fully accessible entrances within the multi-use commercial

       building, from the Beaubien or Casino entrances.

    b.  No proper notices or signs Monroe or Beaubien to alert the public to

       the nearest accessible entrances.

    c.  No accessible parking or drop off areas, including specifically at the

       Brush, Monroe or Beaubien entrances which have no standing or no

       parking for disability access, and are full traffic lanes.

### VIOLATIONS AT THE FRIEND OF THE COURT AND FAMILY COURT OFFICES AND COURTROOMS IN THE PENOBSCOT BUILDING

139.   Certain State of Michigan Third Judicial Circuit Court operations are located on the upper floors of one of the three tower buildings comprising the Penobscot Building in Detroit, Michigan, which has multiple violations, including by way of example and not limitation:

   a.   No accessible parking or drop off areas, instead either forbidding parking or allowing only paid "valet" parking services.

   b.   No proper notices or signs on Fort, Shelby, Congress, or Griswold to alert the public to the nearest accessible entrances.

   c.   No ready access to the stair lift or elevators to the Griswold lobby from the Congress and Fort Street entrances.

   d.   Not fully accessible toilets or toilet rooms.

   e.   Not fully accessible referee and meeting rooms.

### VIOLATIONS AT THE 47TH CIRCUIT COURT AND 94TH DISTRICT COURT BUILDING IN ESCANABA, MICHIGAN

140.   The State of Michigan Forty-Seventh Judicial Circuit Court and Ninety-Fourth Judicial District Court are located in the combined Court and Delta County building in Escanaba, Michigan. It has accessible

toilets and accessible entrance; however, it also has other major violations, including by way of example and not limitation:

a. Not enough accessible parking spaces or drop off areas, including that there is no blue striped access aisle space between the only two accessible spaces in the parking lot, and the only accessible parking space on the street is at a curb immediately adjacent to a light pole which partially blocks the space, and requires travel in traffic.

b. A heavy door separating the lavatories from the toilets in the men's room.

c. No accessible jury boxes in the Circuit Courtroom(s), although the District Courtroom does appear to be accessible.

### VIOLATIONS AT THE 44TH CIRCUIT COURT BUILDINGS

141.   The State of Michigan Forty-Fourth Judicial Circuit Court is located in the Livingston County at two locations, one in Brighton and one in Howell, which have multiple violations, including by way of example and not limitation:

a. No fully accessible toilets or toilet rooms in Howell, due to the most convenient and centrally located one being blocked whenever there is a jury.

b.  No fully accessible entrance wide enough in Howell.

c.  Not fully accessible or sufficient accessible parking.

## VIOLATIONS AT THE 11TH CIRCUIT COURT BUILDING

142.  The State of Michigan Eleventh Judicial Circuit Court is located in the

Mackinac County Offices and Court Building in St. Ignace, Michigan,

which has multiple violations, including by way of example and not

limitation:

a.  No accessible toilets or toilet rooms on any of the upper floors.

b.  No fully accessible entrance into facility: the exterior door to the

purportedly accessible exterior elevator below grade, is locked, can

only be opened by the deputy on duty at the first-floor interior security

gate, and there is no communication device or signage to indicate

whether that deputy is readily available.

c.  Not have enough accessible parking or drop-off areas.

d.  No accessible toilet rooms or toilets other than in the basement.

e.  No proper evacuation equipment in the stairwells.

## VIOLATIONS AT THE 16TH CIRCUIT COURT BUILDING

143.  The State of Michigan Sixteenth Judicial Circuit and Probate Courts

are located in the Macomb County and Court Building in Mt. Clemens,

Michigan, which has multiple violations, including by way of example and not limitation:

a.  Not enough accessible parking or drop off areas and does not properly maintain the parking or drop off areas it designates as accessible.

b.  No proper evacuation equipment in the stairwells.

### *VIOLATIONS AT THE 6TH CIRCUIT COURT BUILDINGS*

144.   The State of Michigan Sixth Judicial Circuit and Probate Courts are located in the multi-building complex at 1200 North Telegraph in Pontiac, Michigan, which has multiple violations, including by way of example and not limitation:

a.  No accessible toilets or toilet rooms on any of the upper floors of the original Court Tower.

b.  No proper signage or directions to the only accessible toilets in the original Court Tower on the ground floor.

c.  The only accessible toilet rooms in the original Court Tower are not fully accessible.

d.  No proper evacuation notices or signs in either tower, and no proper evacuation equipment in many of the  stairwells of the upper floors of the original Court Tower.

FIRST AMENDED CLASS
ACTION COMPLAINT
91

e. Inaccessible parking and approaches to the Court, for example and not limitation, huge security planters block the path from the north parking lot to the entrance, the formerly accessible public parking in the north and west lots have been assigned to employee or police usage only, and in the south lot the spaces were moved across a new boulevard, they are not properly maintained or marked, and they are painted in two colors, once in blue and once in yellow such that it is impossible to determine the perimeters of the parking spaces or access aisles.

## VIOLATIONS AT THE 22ND JUDICIAL CIRCUIT COURT BUILDING

145. The State of Michigan Twenty-Second Judicial Circuit Court and Probate Courts are located in Ann Arbor, Michigan, and have multiple violations, including by way of example and not limitation:

a. No fully accessible entrances into the facility, including the automated door opener is blocked from Main Street approach by the concrete garbage container, and the grading at Main Street and Huron Street is too steep and lacks railings.

b. The curb cuts at Ann and Main are poorly designed and maintained causing puddles and ice or snow to accumulate.

c.  No accessible on-street spaces or drop-off areas, and insufficient off-street parking spaces in the lot at Ann and Main which appears to serve both the Court and the County buildings.  That off-street parking does not have an adequate accessible route out of that parking lot, nor across Main to the Courthouse, and further lacks any signs pointing to the nearest accessible route crossing Main, whether it should be at Ann to the County Building or at Huron to the only ostensibly accessible entrance at Main and Huron. Further, there is no pedestrian island with appropriate crosswalks and warning lights on Main to create a free and clear route mid-block like there is in other areas of Ann Arbor.

## DEFENDANTS' DUTY TO COMPLY WITH RELEVANT STATE AND FEDERAL ACCESSIBILITY LAWS

146.  Each of the public entity Defendants has received Federal funding, including most recently COVID-19 economic relief from the U.S. Departments of Treasury, Transportation, Health and Human Services, and/or the State of Michigan; and/or funding from the American Rescue Plan Act of 2021, the Build Back Better Act, and/or the Inflation Reduction Act of 2022, subjecting them to the anti-discrimination and

fully access provisions of the Rehabilitation Act of 1973, including 29 U.S.C. §§ 794(b)(1)(A) and (B).

147.   Many if not most of the modifications required to comply with the laws are simple maintenance budget items, such as removing locks to the toilet rooms in CAYMC, switching out non-compliant toilets, lavatories, other restroom fixtures, painting parking spaces and installing signs.

148.   Except for the referenced self-assessment by the Detroit-Wayne Joint Building Authority, and upon information and belief, a 2008 self-assessment audit by the State, none of the Defendants has commissioned or completed any of the initial mandatory self-assessments, or the tri-annual reports, as to the physical limitations in any of the facilities.

149.   Upon information and belief, each of the Defendants has failed to allocate or spend any such money for the needed improvements discussed in this complaint.

150.   Moreover, during pandemic beginning January 21, 2020, Defendants have completely failed to take advantage of the closed and semi-closed status of many of these buildings to make the facilities accessible as required by Federal and State law.

151.   Each Defendant knows or should know of their individual and collective failures to correct these deficiencies, including specifically failures of the City to comply in good faith with even the bare minimum of agreements with the United States Department of Justice over 10 years ago, and more recently, beginning in January 2020 Defendants City, County, and Detroit-Wayne Joint Building Authority failing to cooperate in good faith to resolve the issues raised via community ad hoc committee. Meetings were finally held in October and November 2021, and January 2022, and then abruptly and unilaterally cancelled by Defendants in February 2022. *See* Exhibit A, agenda circulated before the meetings were cancelled.

152.   Defendants City, County,  and City and County Building Departments have ignored repeated complaints about the public meeting areas for Detroit City Council, and the public 13th-floor auditorium as to how to make them accessible to the public, or to speakers who have physical disabilities, including such basic items as having adequate aisleways, seating areas, ramps, or rails.

153.   Defendants' repeated failures evidence their pattern, practice, and policy of illegal discrimination.

## *CAUSES OF ACTION*

### *COUNT I*
### *Violations of Title II of the Americans with Disabilities Act*
### *42 U.S.C. § 12131 et seq.*
### *(As to All Defendants)*

154.   Plaintiffs re-allege and incorporate by reference the allegations set

forth in all preceding paragraphs.

155.   Title II of the ADA provides "[N]o qualified individual with a

disability shall, by reason of such disability, be excluded from

participation in or be denied the benefits of the services, programs, or

activities of a public entity, or be subjected to discrimination by any such

entity," 42 U.S.C. § 12132.

156.   Plaintiffs are, and at all times relevant herein were, persons with

"disability" within the meaning of the ADA, 42 U.S.C. § 12102.

157.   Plaintiffs are, and at all times relevant herein were, "qualified

individual(s) with a disability" within the meaning of the ADA, 42 §

U.S.C. 12131(2), who "with or without reasonable modifications to rules,

policies, or practices, the removal of architectural, communication, or

transportation barriers, or the provision of auxiliary aids and services,

meet[] the essential eligibility requirements for the receipt of services or

the participation in programs or activities provided by a public entity,"

including as specified in this complaint.

158. Defendants are, and at all times relevant herein were, public entities

within the meaning of the ADA, 42 U.S.C. §§ 12131(1)(a) and (b).

159. Defendants' duties under Title II of the ADA are mandatory and well

established for over thirty years.

160. At all times relevant herein, Defendants have known their duties and

obligations under Title II of the ADA.

161. At all times relevant herein, Defendants have knowingly failed to

carry out and execute their duties and obligations.

162. Defendants' failures have been and are willful and by choice, or

deliberately indifferent, or both.

163. The elements or features of the Defendants' facilities that do not

comply prevent persons with disabilities from fully and equally enjoying

the Defendants' services, programs, or activities and constitute

discrimination on the basis of disability within the meaning of 42 U.S.C.

§ 12132 and 28 C.F.R. §§ 35.149 and 35.150.

164. In acting as alleged herein, Defendants individually and collectively

have repeatedly and continuously discriminated against Plaintiffs and

similarly disabled persons on the basis of their disabilities in violation of Title II of the ADA and its implementing regulations. Defendants' discriminatory conduct includes, *inter alia*:

a.  Excluding them from participating in or denying them the benefits of the services of its executive, legislative, and judicial branches and electoral and administrative review functions in violation of 42 U.S.C. § 12132.

b.  Denying and excluding them from participation by denying them access by failing to eliminate the physical obstacles to their participation as described herein, in violation of 42 U.S.C. § 12132.

c.  Defendants knowingly, deliberately, intentionally, and actively continue to unlawfully discriminate against Plaintiffs and all other similarly situated qualified individuals who have disabilities, by continuing to conduct their executive, legislative, and judicial branches, and electoral and administrative review functions in facilities that Defendants know are not accessible and which otherwise fail to meet the requirements under the ADA and its implementing regulations.

d.  Alternatively, Defendants' actions and omissions have been and are reckless or willfully indifferent to their obligations.

165.  But for these and other failures by Defendants to comply with the law, Plaintiffs would be able to fully and equally participate in the exercise of their constitutional and civil activities, they would be able to fully and equally participate in the Defendants' programs and activities, and they would be able to fully and equally receive other services and programs offered by Defendants to the general public who are not disabled or qualified persons with disabilities.

166.  As a direct and proximate result of Defendants' actions and omissions, Plaintiffs and all other similarly situated qualified individuals have suffered damages in the form of extreme embarrassment, humiliation, emotional and physical distress, delays, other difficulties, and the loss of their civil rights described hereinabove.

167.  As a direct and proximate result of Defendants' actions and omissions, Plaintiff Ashley Jacobsen and all other similarly situated qualified individuals who are licensed attorneys engaged in the private practice of law to support themselves and their families, have also suffered economic damages, including lost profits, wages, or earnings.

168.   As a direct and proximate result of Defendants' actions and

omissions, Plaintiffs Jill Babcock and Ashley Jacobsen and all other

similarly situated qualified individuals with disabilities who are licensed

attorneys whether or not engaged in the private practice of law have

suffered damage to their professional standing by being deprived of the

same access as their able-bodied peers to these activities, facilities, and

services, and consequently they have suffered economic damages,

including lost opportunity, profits, wages, or earnings.

169.   Pursuant to 42 U.S.C. §§ 12133 and 12205, Plaintiffs are entitled to

and pray for judgment as set forth below.


### COUNT II
### Violations of Section 504 of the Rehabilitation Act of 1973
### 29 U.S.C. § 794 et seq.
### (As to Defendants State of Michigan, County of Wayne,
### City of Detroit, Wayne County Building Authority,
### Detroit Building Authority, and
### Detroit-Wayne Joint Building Authority)

170.   Plaintiffs re-allege and incorporate by reference the allegations set

forth in all preceding paragraphs.

171.   Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its

implementing regulations provide, in pertinent part, that "[n]o otherwise

qualified individual with a  disability . . . shall, solely by reason of his or

her disability, be excluded from the  participation in, be denied the

benefits of, or be subjected to discrimination under any  program or

activity receiving Federal financial assistance." 20 U.S.C. § 794(a); *see

also* 34 C.F.R. § 104.4(a).

172.   A person is an "individual with a disability" under Section 504 if that

person experiences  "a physical or mental impairment which substantially

limits one or more major life activities."  29 U.S.C. § 705(20)(B)

(incorporating definition in 42 U.S.C. § 12102 by reference).

173.   "Major life activities" include, but are not limited to, "caring for

oneself, performing manual tasks, seeing, hearing, eating, sleeping,

walking, standing, lifting, bending, speaking, breathing, learning,

reading, concentrating, thinking, communicating, and working." 42

U.S.C. § 12102(2)(A).

174.   The term "program or activity" means all the operations of:

(1)(A) a department, agency, special purpose district, or other
instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes
such assistance and each such department or agency (and each
other State or local government entity) to which the assistance
is extended, in the case of assistance to a State or local
government; . . .

(3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship --

(i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

(ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

(B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

(4) any other entity which is established by two or more of the entities described in paragraph (l), (2) or (3); any part of which is extended Federal financial assistance.

20 U.S.C. § 794(b).

175.   In acting as alleged herein, Defendants individually and collectively have repeatedly and continuously discriminated against Plaintiffs and similarly disabled persons on the basis of their disabilities in violation of Section 504. Defendants' discriminatory conduct includes, *inter alia*:

a.  Excluding them from participating in or denying them the benefits of the services of its executive, legislative, and judicial branches, and electoral and administrative review functions, in violation of 20 U.S.C. § 794.

b. Denying and excluding them from participation by denying them access by failing to eliminate the physical obstacles to their participation as described herein, in violation of 20 U.S.C. § 794.

c. Defendants knowingly, deliberately, intentionally, and actively continue to unlawfully discriminate against Plaintiffs and all other similarly situated qualified individuals who have disabilities, by continuing to conduct their executive, legislative and judicial branches, and electoral and administrative review functions, in facilities that Defendants know are not accessible and which otherwise fail to meet the requirements under the ADA and its implementing regulations.

d. Alternatively, Defendants' actions and omissions have been and are deliberately indifferent to their obligations.

176. Defendants' violations of Section 504 have caused, and continue to cause, actual and proximate harm to Plaintiffs.

177. At the time Defendants violated Plaintiffs' rights under Section 504 as set forth above, Defendants, and their respective agents, had knowledge that harm to a federally protected right was substantially likely, and were deliberately indifferent to that risk.

178.   These repeated violations constitute a continuing violation of Section 504.

179.   But for these and other failures by Defendants to comply with the law, Plaintiffs would be able to fully and equally participate in the exercise of their constitutional and civil activities, they would be able to fully and equally participate in the Defendants' programs and activities, and they would be able to fully and equally receive other services and programs offered by Defendants to the general public who are not disabled or qualified persons with disabilities.

180.   As a direct and proximate result of Defendants' actions and omissions, Plaintiffs and all other similarly situated qualified individuals have suffered damages in the form of extreme embarrassment, humiliation, emotional and physical distress, delays, other difficulties, and the loss of their civil rights described hereinabove.

181.   As a direct and proximate result of Defendants' actions and omissions, Plaintiff Ashley Jacobsen and all other similarly situated qualified individuals who are licensed attorneys engaged in the private practice of law to support themselves and their families, have also suffered economic damages, including lost profits, wages, or earnings.

182.   As a direct and proximate result of Defendants' actions and

omissions, Plaintiffs Jill Babcock and Ashley Jacobsen and all other

similarly situated qualified individuals with disabilities who are licensed

attorneys whether or not engaged in the private practice of law have

suffered damage to their professional standing by being deprived of the

same access as their able-bodied peers to these activities, facilities, and

services, and consequently they have suffered economic damages,

including lost opportunity, profits, wages, or earnings.

183.   Pursuant to 29 U.S.C. § 794a, Plaintiffs are entitled to and pray for

judgment as set forth below.


### COUNT III
### Violations of the Michigan Persons with Disabilities Civil Rights Act
### M.C.L. 37.1101 et seq.
### (As to All Defendants)

184.   Plaintiffs re-allege and incorporate by reference the allegations set

forth in all preceding paragraphs.

185.   Individually and collectively, Defendants have repeatedly and

continuously discriminated against Plaintiffs and similarly disabled

persons in violation of the Michigan Constitution and laws of the State of

Michigan including but not limited to the Michigan Persons with

Disabilities Civil Rights Act (PDCRA), the related Elliott-Larsen Civil

Rights Act (ELCRA), and applicable provisions of the Michigan

Administrative Code and regulations.

186.   The Defendants and their agents are subject to and required to follow

the mandatory provisions of PDCRA: "AN ACT to define the civil rights

of persons with disabilities; to prohibit discriminatory practices, policies,

and customs in the exercise of those rights; to prescribe penalties and to

provide remedies; and to provide for the promulgation of rules." Act 220

of 1976.

187.   PDCRA establishes and guarantees the civil rights of disabled person

at issue in this case, M.C.L. 37.1102(1):

> The opportunity to obtain employment, housing, and other real
> estate and full and equal utilization of public accommodations,
> public services, and educational facilities without
> discrimination because of a disability is guaranteed by this act
> and is a civil right.

188.   PDCRA incorporates and does not conflict with other statutes,

including the ELCRA, M.C.L. 37.1604: "Nothing in this act shall be

interpreted as invalidating any other act that establishes or provides

programs or services for persons with disabilities."

189.  The plaintiffs and similarly situated persons are persons with

disabilities entitled to the protections and civil rights established by

PDCRA, M.C.L. 37.1103:

Definitions:

(d) Except as provided under subdivision (f), "disability" means 1 or more of the following:

(i) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:. . .(f)or purposes of article 3, is unrelated to the individual's ability to utilize and benefit from a place of public accommodation or public service.

(ii) A history of a determinable physical or mental characteristic described in subparagraph (i).

(iii) Being regarded as having a determinable physical or mental characteristic described in subparagraph (i).

(g) "Person" includes an individual. . . ."

(h) "Person with a disability" or "person with disabilities" means an individual who has 1 or more disabilities.

(l) "Unrelated to the individual's ability" means, with or without accommodation, an individual's disability does not prevent the individual from doing 1 or more of the following:

(ii) For purposes of article 3, utilizing and benefiting from a place of public accommodation or public service.

190. PDCRA specifically includes the Defendants, M.C.L. 37.1103:

(g) "Person" includes an individual, agent, association, corporation, joint apprenticeship committee, joint-stock company, labor union, legal representative, mutual company, partnership, receiver, trust, trustee in bankruptcy, unincorporated organization, this state, or any other legal, commercial, or governmental entity or agency.

(i) "Political subdivision" means a county, city, village, township, school district, or special district or authority of this state.

191. PDCRA specifically applies to the Defendants' buildings and facilities

and services at issue in this case, Article 3, M.C.L. 37.1301:

(a) "Place of public accommodation" means a business, educational institution, refreshment, entertainment, recreation, health, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public.

(b) "Public service" means a public facility, department, agency, board, or commission owned, operated, or managed by or on behalf of this state or a subdivision of this state, a county, city, village, township, or independent or regional district in this state or a tax exempt private agency established to provide service to the public, except that public service does not include a state or county correctional facility with respect to actions or decisions regarding an individual serving a sentence of imprisonment.

192.   The Defendants are prohibited from discriminatory denial of

accommodation and full and equal enjoyment to plaintiffs and other

persons with disabilities in the provision of access and services at issue in

this case, M.C.L. 37.1302:

> Except where permitted by law, a person shall not:
>
>> (a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation or public service because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages, or accommodations or because of the use by an individual of adaptive devices or aids.

193.   The Defendants are also prohibited from aiding or abetting each other

or interfering with the exercise or enjoyment of discriminatory denial of

accommodation and full and equal enjoyment to plaintiffs and other

persons with disabilities in the provision of access and services at issue in

this case, M.C.L. 37.1602:

> A person or 2 or more persons shall not do the following:
>
>> (a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

(b) Aid, abet, incite, compel, or coerce a person to engage in a violation of this act.

(c) Attempt directly or indirectly to commit an act prohibited by this act.

(d) Willfully interfere with the performance of a duty or the exercise of a power by the commission or any of its authorized representative

(e) Willfully obstruct or prevent a person from complying with this act or an order issued.

(f) Coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by article 5.

194.   Section 102 of PDCRA mandates Defendants ". . . shall accommodate a person with a disability for purposes of employment, public accommodation, public service, education, or housing unless the person demonstrates that the accommodation would impose an undue hardship." M.C.L. 37.1102(2)

195.   Defendants are unable to and have failed to establish any "undue hardship."

196.   Defendants' duties under PDCRA are mandatory and well established for nearly fifty (50) years.

FIRST AMENDED CLASS
ACTION COMPLAINT

197.  At all times relevant herein, Defendants have known their duties and obligations under PDCRA.

198.  At all times relevant herein, Defendants have knowingly failed to carry out and execute their duties and obligations.

199.  Defendants' failures have been and are willful and by choice, or deliberately indifferent, or both.

200.  The elements or features of the Defendants' facilities that do not comply prevent persons with disabilities from fully and equally enjoying the Defendants' services, programs, or activities and constitute discrimination on the basis of disability within the meaning of PDCRA.

201.  In acting as alleged herein, Defendants individually and collectively have repeatedly and continuously discriminated against Plaintiffs and similarly disabled persons on the basis of their disabilities in violation of PDCRA. Defendants' discriminatory conduct includes, *inter alia*:

a.  Excluding them from participating in or denying them the benefits of the services of its executive, legislative, and judicial branches, and electoral and administrative review functions.

b.  Denying and excluding them from participation by denying them

access by failing to eliminate the physical obstacles to their

participation as described herein.

c.  Defendants knowingly, deliberately, intentionally, and actively

continue to unlawfully discriminate against Plaintiffs and all other

similarly situated qualified individuals who have disabilities, by

continuing to conduct their executive, legislative, and judicial

branches and electoral and administrative review functions in facilities

that Defendants know are not accessible and which otherwise fail to

meet the requirements under the Persons With Disabilities Civil

Rights Act and the Elliot-Larsen Civil Rights Act and its

implementing regulations.

d.  Alternatively, Defendants' actions and omissions have been and are

reckless or willfully indifferent to their obligations.

202.  But for these and other failures by Defendants to comply with the law,

Plaintiffs would be able to fully and equally participate in the exercise of

their constitutional and civil activities, they would be able to fully and

equally participate in the Defendants' programs and activities, and they

would be able to fully and equally receive other services and programs

FIRST AMENDED CLASS
ACTION COMPLAINT
112

offered by Defendants to the general public who are not disabled or

qualified persons with disabilities.

203.   As a direct and proximate result of Defendants' actions and

omissions, Plaintiffs and all other similarly situated qualified individuals

have suffered damages in the form of extreme embarrassment,

humiliation, emotional and physical distress, delays, other difficulties,

and the loss of their civil rights described hereinabove.

204.   As a direct and proximate result of Defendants' actions and

omissions, Plaintiff Ashley Jacobsen and all other similarly situated

qualified individuals who are licensed attorneys engaged in the private

practice of law to support themselves and their families, have also

suffered economic damages, including lost profits, wages, or earnings.

205.   As a direct and proximate result of Defendants' actions and

omissions, Plaintiffs Jill Babcock and Ashley Jacobsen and all other

similarly situated qualified individuals with disabilities who are licensed

attorneys whether or not engaged in the private practice of law have

suffered damage to their professional standing by being deprived of the

same access as their able-bodied peers to these activities, facilities, and

services, and consequently they have suffered economic damages,

including lost opportunity, profits, wages, or earnings.

206.    By posting signs in the public hallways of CAYMC, the original

tower of the Oakland County Courthouse and County Offices, and other

Defendants' locations, which state "HANDICAPPED BATHROOMS

LOCATED IN BASEMENT", or similar worded signs,  Defendants have

published and posted signs which blatantly indicate they deny to persons

with disabilities full and equal access to the facilities, in violation of

ELCRA, M.C.L. 37.2302:

Prohibited Conduct: . . .

> (b) Print, circulate, post, mail, or otherwise cause to be
> published a statement, advertisement, or sign which indicates
> that the full and equal enjoyment of the goods, services,
> facilities, privileges, advantages, and accommodations of a
> place of public accommodation or public service will be
> refused, withheld from, or denied an individual because of a
> disability that is unrelated to the individual's ability to utilize
> and benefit from the goods, services, facilities, privileges,
> advantages, or accommodations or because of the use by an
> individual of adaptive devices or aids, or that an individual's
> patronage of or presence at a place of public accommodation is
> objectionable, unwelcome, unacceptable, or undesirable
> because of a disability that is unrelated to the individual's
> ability to utilize and benefit from the goods, services, facilities,
> privileges, advantages, or accommodations or because of the
> use by an individual of adaptive devices or aids.

207. Additionally, at all times relevant herein, Defendants have failed to have or timely replace necessary and proper signage as indicated in the complaint and by the proofs at trial, as required by Michigan law at various times up to and including the amendments of October 23, 2022, M.C.L. 37.1102a, including but not limited to such instances which fail to communicate the most basic information, as:

   a. Upside down braille signage on at least one public elevator bank on the main, first floor level, and missing braille signage inside one or more of the public elevators of CAYMC.

   b. Improper and missing signage on multiple public locations in the CAYMC, Oakland County Courthouse, and other Defendant locations.

   c. Improper "emergency route" signs in multiple public locations of the Defendants which fail to notate equipment availability and locations, routes, or safe areas for persons with disabilities.

208. As a direct and proximate cause of Defendants multiple acts and omissions, plaintiffs and similarly situated persons have been deprived of their substantive rights to due process and to equal enjoyment and access to the facilities and services of the defendants and suffered severe

physical harm, aggravation and exacerbation of existing physical

ailments and impairments, severe emotional distress, loss of civil rights,

frustrations, difficulty, delays, inconvenience, embarrassment.

209.   Plaintiffs and similarly situated persons are entitled to relief requested,

M.C.L. 37.1607, "(t)his act shall not diminish the right of a person to

seek direct and immediate legal or equitable remedies in the courts of this

state."

210.   Plaintiffs and similarly situated persons are also entitled to relief

pursuant to M.C.L. 37.1606:

> (1) A person alleging a violation of this act may bring a civil action
> for appropriate injunctive relief or damages, or both.
> (2) An action commenced pursuant to subsection (1) may be brought
> in the circuit court for the county where the alleged violation
> occurred, or for the county where the person against whom the civil
> complaint is filed resides or has his or her principal place of business.
> (3) As used in subsection (1), "damages" means damages for injury or
> loss caused by each violation of this act, including reasonable
> attorneys' fees. (omitting from this quotation subsections (4) and (5)
> which apply to Article 2).

## *COUNT IV*
## *Violations of the Michigan Barrier Free Act, Michigan Sidewalks Act, Michigan Construction Code, Detroit Construction Code, and applicable International Building and Plumbing Codes*
## *(As to All Defendants)*

211.   Plaintiffs re-allege and incorporate by reference the allegations set

forth in all preceding paragraphs.

212.   The defendants and their agents are subject to and required to follow

the mandatory provisions of Act 1 of 1966, the Barrier Free Act, M.C.L.

125.1351 *et seq.*

> AN ACT to provide for the accessibility and the utilization by
> the physically limited persons of public facilities and facilities
> used by the public; to create a barrier free design board and to
> prescribe its powers and duties; to prescribe the powers and
> duties of certain other state and local authorities; to provide
> remedies; and to provide for the enforcement of this act."

213.   Beginning with a compliance date of 1974, M.C.L. 125.1352, barrier

free access is mandated at M.C.L. 125.1351(b) as "Barrier free design"

means those architectural designs which eliminate the type of barriers

and hindrances that deter physically limited persons from having access

to and free mobility in and around a building, structure, or improved

area." Building, improved area, and structure are further defined at

M.C.L. 125.1351(c), (e), and (h), and include all the buildings and

adjacent areas at issue in this complaint.

214.   M.C.L. 125.1352(1) mandates that Defendants'  "…public facility[ies] or facility[ies] used by the public the contract for construction of which or the first contract for construction of a portion of which is made after July 2, 1974, shall meet the barrier free design requirements contained in the state construction code."

215.   Defendants' improvements or construction on or before July 2, 1974, must comply with the timelines for compliance mandated by M.C.L. 125.1352(2) and (3).

216.   Pursuant to M.C.L. 125.1355, the Barrier Free Act is implemented through a Commission, the Director, and the Michigan Stille-Derossett-Hale Single State Construction Code Act of 1972 (State Construction Code).

217.   The Defendants and their agents are subject to and required to follow the mandatory provisions of the State Construction Code, including "'Barrier free design' [which] means design complying with legal requirements for architectural designs that eliminate the type of barriers and hindrances that deter persons with disabilities from having access to and free mobility in and around a building or structure." M.C.L. 125.1502a(1)(d).

218.   The State Construction Code further establishes regulations to

implement the Code for purposes of ensuring the health, safety, and

welfare of the occupants and users of buildings, structures, the land area

incidental to the buildings and structures, and incorporating and updating

on a consistent schedule the applicable international codes including for

the buildings at issue, M.C.L. 125.1504(1), (2) and (5):

> (1) The director shall prepare and promulgate the state
> construction code consisting of rules governing the
> construction, use, and occupation of buildings and structures,
> including land area incidental to the buildings and structures,
> the manufacture and installation of building components and
> equipment, the construction and installation of premanufactured
> units, the standards and requirements for materials to be used in
> connection with the units, and other requirements relating to the
> safety, including safety from fire, and sanitation facilities of the
> buildings and structures.
>
> (2) The code shall consist of the international residential code,
> the international building code, the international mechanical
> code, the international plumbing code, the international existing
> building code, and the international energy conservation code
> published by the international code council and the national
> electrical code published by the national fire prevention
> association, with amendments, additions, or deletions as the
> director determines appropriate. The director may adopt all or
> any part of these codes or the standards contained within these
> codes by reference.
>
> (5) The director shall add, amend, and rescind rules to update
> the Michigan building code, the Michigan mechanical code, the
> Michigan plumbing code, the Michigan rehabilitation code for
> existing buildings, the Michigan electrical code, and the

commercial chapters of the Michigan energy code not less than once every 3 years to coincide with the national code change cycle.

219.   The International Building Code, Plumbing Code, Mechanical Code, and other applicable codes further establish regulations which require implementing the State Construction Code for purposes of ensuring the health, safety, and welfare of the occupants and users of buildings, structures, the land area incidental to the buildings and structures, and incorporating and updating on a consistent schedule the applicable international codes including for the buildings at issue:

> (3) The code shall be designed to effectuate the general purposes of this act and the following objectives and standards:
>
>> (a) To provide standards and requirements for construction and construction materials consistent with nationally recognized standards and requirements.
>>
>> (b) To formulate standards and requirements, to the extent practicable in terms of performance objectives, so as to make adequate performance for the use intended the test of acceptability.
>>
>> (c) To permit to the fullest extent feasible the use of modern technical methods, devices, and improvements, including premanufactured units, consistent with reasonable requirements for the health, safety, and welfare of the occupants and users of buildings and structures.

FIRST AMENDED CLASS
ACTION COMPLAINT
120

(d) To eliminate restrictive, obsolete, conflicting, or unnecessary construction regulations that tend to increase construction costs unnecessarily or restrict the use of new materials, products, or methods of construction, or provide preferential treatment to types or classes of materials or products or methods of construction.

(e) To ensure adequate maintenance of buildings and structures throughout this state and to adequately protect the health, safety, and welfare of the people.

(f) To provide standards and requirements for cost-effective energy efficiency that will be effective April 1, 1997.

(g) Upon periodic review, to continue to seek ever-improving, cost-effective energy efficiencies.

220.   Defendants' toilet and toilet room facilities are required to comply

with the International Plumbing Code, as to number and location of

fixtures, and to be accessible and open to the public at all times the

building is occupied, Section 403 Minimum Plumbing Facilities and

Section 404 Accessible Plumbing Facilities, Mich. Admin. Code R.

408.30758, including:

403.3 Employee and public toilet facilities. For structures and tenant spaces intended for public utilization, customers, patrons and visitors shall be provided with public toilet facilities. . . . Employee toilet facilities shall be either separate or combined employee and public toilet facilities.

403.3.1. Access. The route to the public toilet facilities required by section 403.3 shall not pass through kitchens,

storage rooms, or closets. Access to the required facilities shall be from within the building. All routes shall comply with the accessibilities requirements of the Michigan building code. The public shall have access to the required toilet facilities at all times that the building is occupied.

403.3.3 Location of toilet facilities in occupancies other than malls. In occupancies other than covered and open mall buildings, the required public and employee toilet facilities shall be located not more than one story above or below the space required to be provided with toilet facilities, and the path of travel to such facilities shall not exceed a distance shall not exceed  distance of 500 feet (152 m). . . .

403.3.6 Door locking. Where a toilet room is provided for the use of multiple occupants, the egress door for the room shall not be lockable from the inside of the room. This section does not apply to family or assisted-use rooms.

221.   In conjunction with the Michigan Construction Code, M.C.L. 125.1508a(2), and as amended, Defendants are also required to comply with the Detroit Building Codes to the extent the buildings, sites, facilities, and elements and spaces are located within the corporate boundaries of the City of Detroit, including but not limited to the Detroit City Building Code, the Detroit City Plumbing Code, the Accessible and Usable Buildings and Facilities 2009 of Detroit.

FIRST AMENDED CLASS
ACTION COMPLAINT
122

222.   Defendants City of Detroit and its Building Department and Wayne County and its Building Department have discriminated against and caused harm to plaintiffs due to their disabilities by approving many occupancy permits and business licenses to commercial businesses subject to Title III obligations even though the plans blatantly fail to comply with the barrier free provisions of the state and federal laws described in this complaint.

223.   The defendants and their agents are subject to and required to follow the mandatory provisions of the Sidewalks law.

224.   The plaintiffs and similarly situated persons are persons with disabilities entitled to the protections established by the Michigan Construction Act, including M.C.L. 125.1502a Additional Definitions (1) (z) "'Person with disabilities' means an individual whose physical characteristics limit that individual's ability to be self-reliant in the individual's movement throughout and use of the building environment."

**DAMAGES**

225.   Plaintiffs re-allege and incorporate by reference the allegations set forth in all the preceding paragraphs.

FIRST AMENDED CLASS
ACTION COMPLAINT
123

226.   Defendants' actions and inaction constitute continuing discrimination in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) *et seq.*; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*; Article III of Michigan's Persons With Disabilities Civil Rights Act, M.C.L. 37.1101 *et seq.*; and applicable sections of the Elliott-Larsen Civil Rights Act, M.C.L. 37.2101 *et seq.*

227.   Plaintiffs and similarly situated individuals with disabilities have been harmed and continue to be harmed by Defendants' continuous and repeated refusal to make their buildings and facilities readily accessible to and usable by persons with disabilities, and Plaintiffs and similarly situated individuals with disabilities are entitled to damages including compensatory damages, and damages for emotional distress, humiliation, delay, and inconvenience, including under 29 U.S.C. § 794a(a)(2) and (b), 42 U.S.C. § 12133 and M.C.L. 37.1606.

228.   As a direct and proximate result of the above-described conduct, Plaintiffs suffered general, specific, incidental, and consequential injuries and damages, past, present, and future, in excess of the jurisdictional threshold of this Court, an amount that shall be fully proven at the time of

trial. These past, present, and future damages include, but are not limited to, the following:

a.  Pain and suffering;

b.  Mental and emotional distress;

c.  Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, and humiliation;

d.  Loss of constitutional rights;

e.   Loss of employment;

f.  Damage to professional reputation;

g.  Economic loss;

h.  Loss of the ordinary pleasures of everyday life;

i.  Loss of relationships;

j.  Travel and travel-related expenses; and

k.  All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## PUNITIVE DAMAGES

229.  Plaintiffs re-allege and incorporate by reference the allegations set forth in all the preceding paragraphs.

230.   Defendants each know their obligations under the laws at issue in this case.

231.   Defendants have each spent money on other improvements without spending money to fulfill their obligations under the laws at issue in this case.

232.   Defendants' actions and inaction, individually and in concert with each other, are intentional, or willfully indifferent violations of the laws at issue in this case.

233.   Defendants' actions, individually and in concert, constitute unlawful patterns, practices, and policies of discrimination.

234.   Plaintiffs and similarly situated individuals have been harmed by Defendants intentional or willfully indifferent discrimination.

235.   Defendants are liable for punitive damages under Federal and State laws, including the Rehabilitation Act of 1973 and M.C.L. 37.1606.

## JURY DEMAND

236.   Plaintiffs demand a trial by a jury of their peers as to their claims for damages and any other claim to which they may be entitled to a jury.

FIRST AMENDED CLASS
ACTION COMPLAINT
126

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs request this Court grant relief including the following:

A. Declare and find that Defendants are jointly and severally liable to Plaintiffs and other similarly affected persons with disabilities under these and other applicable Federal and State laws.

B. Certify this case as a class action.

C. Enter a preliminary order compelling Defendant State to survey its court locations which are not barrier-free and equally accessible, and if necessary to join such court locations and counties or jurisdictions as third-party Defendants.

D. Enter declaratory and injunctive relief compelling Defendants to comply with the disability laws by making their buildings and areas barrier-free and equally accessible to both able-bodied and disabled persons.

E. Enter continuing injunctive relief and maintain jurisdiction in this case until such time as all Defendants demonstrate to this Court that they have made the changes needed to fully comply with this Court's orders and the applicable laws.

F.  Enter judgment against Defendants for compensatory damages including for economic losses and for emotional distress, humiliation, embarrassment, delay, and inconvenience, in amounts according to the proofs.

G.  Enter judgment against Defendants for punitive damages in amounts necessary to deter Defendants' future intentional and willfully indifferent violations of the law.

H.  Award attorneys' fees, costs, and expenses against Defendants and to Plaintiffs.

I.  Award such other relief to which Plaintiffs and similarly situated persons are entitled.

**Respectfully submitted on this  28th day of April, 2023,**

**Plaintiffs, on behalf of themselves and all others similarly situated,
by their attorneys,**

**_/s/ Michael W. Bartnik_____
MICHAEL W. BARTNIK (P32534)
Law For Baby Boomers, PLLC
41000 Woodward Ave Ste 350
Bloomfield Hills Michigan 48304
(248) 608-3660 Telephone
(248) 218-9588 Facsimile
Michaelbartnik@protonmail.com
www.michaelbartnik.com**

FIRST AMENDED CLASS
ACTION COMPLAINT
128

*/s/ Elizabeth K. Abdnour*
**ELIZABETH K. ABDNOUR (P78203)**
**Elizabeth Abdnour Law, PLLC**
**1100 W Saginaw St Ste 4A-2**
**Lansing MI 48915-2033**
**(517) 292-0067 Telephone**
**(517) 709-7700 Facsimile**
**Elizabeth@abdnour.com**
**www.abdnour.com**


## LOCAL RULE CERTIFICATION

I, Michael W. Bartnik, certify that this document complies with applicable Court policies, including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length pursuant to applicable Court policies.