## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**JILL BABCOCK,**                                           **CLASS ACTION**
**MARGUERITE MADDOX,**                              **JURY DEMAND**
**and ASHLEY JACOBSON, on**
**behalf of themselves and all others similarly situated,**

      **PLAINTIFFS,**

                            **CASE No.: 22-cv-12951-MAG**
**-vs-**                                        **JUDGE: MARK A. GOLDSMITH**

**STATE OF MICHIGAN,**
**COUNTY OF WAYNE,**
**CITY OF DETROIT,**
**and**
**DETROIT-WAYNE JOINT BUILDING AUTHORITY,**

      **DEFENDANTS, Jointly and Severally.**
_____/

## SECOND AMENDED
## CLASS ACTION CIVIL and DISABILITY RIGHTS COMPLAINT
## FOR INJUNCTIVE and OTHER RELIEF

Plaintiffs JILL BABCOCK, MARGUERITE MADDOX, and ASHLEY

JACOBSON, by and through their attorneys MICHAEL W. BARTNIK and

ELIZABETH K. ABDNOUR, state the following:

## INTRODUCTORY STATEMENT

1. This is an action to enforce the civil rights of persons with disabilities against the State of Michigan and certain of its political subdivisions which have repeatedly and continuously harmed Plaintiffs by denying to them their fundamental civil rights of due process and equal protection, to have equal access to the Defendants' public buildings and facilities, and to have equal access to the services, amenities, programs, activities, and civic responsibilities as enjoyed by other persons in the public buildings and facilities owned, leased, and operated jointly and severally by the Defendants, including for the Defendant governments' executive, legislative,  and judicial branches and electoral and administrative review functions.

2. Defendants' most palpable, egregious, and pernicious violation is their incessant failure to remove architectural barriers to have accessible toilets readily and equally available in their public buildings for disabled members of the public who "need to use the facilities now" in order to actually "use the government facility" to equally access the Defendants' buildings and facilities, to access the Defendants' services, amenities,

SECOND AMENDED
CLASS ACTION
COMPLAINT

programs, and activities, and to exercise the Plaintiffs' civic responsibilities and civil rights.

3. But Defendants' flagrant transgressions extend to other building components, such as non-accessible court facilities, non-accessible interior and exterior routes, and non-compliant means of egress, areas of refuge, entrances, exits, ramps, exterior and interior doors, sidewalks, curb cuts and ramps, pedestrian crosswalks, accessible pedestrian crossing signals, parking and passenger loading and drop-off zones, stairways, service counters, emergency protocols, signage, assistive listening devices, assembly areas, voting registration and polling places, and other violations enumerated below.

4. These are not merely "minor" inconsistencies or failures. They are clear violations of federal and state laws which interfere with Plaintiffs' fundamental equal rights to access public programs and services.

5. Because of Defendants' egregious violation of accessibility laws outlined herein, Plaintiffs were not able to enjoy the programs and services provided by Defendants.

6. Defendants have long been aware of their obligations and their violations for nearly five decades, including since at least the 1961 edition of the

SECOND AMENDED
CLASS ACTION
COMPLAINT

American National Standard A117.1 published the first criteria for accessibility, and since at least 1966 and 1968 when the first State and Federal laws requiring "barrier-free" design were enacted, M.C.L. 125.1351, and 42 U.S.C. § 4151(3), 42 U.S.C. § 4152, and 42 U.S.C. § 4155.

7. Due to Defendants' extensive, long-standing, willful, intentional, and deliberately indifferent violations of applicable Federal and State Constitutions and laws, and Defendants' continuous and intentional patterns, practices, and policies of active illegal discrimination against persons with disabilities, these Plaintiffs have been injured and denied equal access to the Defendants' buildings and facilities and including access to basic and necessary governmental functions and services.

8. Plaintiffs request this Court to take such actions as necessary and proper through declaratory judgment, injunctive relief, and damages to compel these Defendants to comply with the provisions of these and related laws.

## FEDERAL JURISDICTION

9. This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343(a)(3) and (4) over matters contained in this Complaint

including for violations of Title II of the Americans with Disabilities Act

42 U.S.C. § 12133 *et seq.*; Sections 502 and 504 of the Rehabilitation Act

of 1973, 29 U.S.C. § 792 and § 794 *et seq.*; the Voting Accessibility for

the Elderly and Handicapped Act, 52 U.S.C. § 20105(a) *et seq.* and 52

U.S.C. § 20106 *et seq.*; and the Architectural Barriers Act, 42 U.S.C. §

4151 *et seq.*

10. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over

Plaintiffs' state law claims, because they are so related to the federal

question claims that they form part of the same case or controversy.

11. This Court has jurisdiction under 28 U.S.C. §§ 2201 and 2202 to issue

declaratory judgment in this case.

12. The State of Michigan is not immune from this action for injunctive and

declaratory relief, including pursuant to section 5 of the Fourteenth

Amendment; the Rehabilitation Act of 1973, 42 U.S.C. § 2000d-7; Title

II of the Americans with Disabilities Act 42 U.S.C. § 12101 (b) (4), §

12201 (b) and § 12202; and the Michigan Persons with Disabilities Civil

Rights Act, M.C.L. 37.1103(g) and (i), M.C.L. 37.1302(a), and M.C.L.

37.1606.

13. Additionally, the State of Michigan is not immune to private claims for damages under the Michigan Persons with Disabilities Civil Rights Act, M.C.L. 37.1103(g) and (i), M.C.L. 37.1302(a), and M.C.L. 37.1606.

14. None of the other defendants enjoy any immunity under the Eleventh Amendment or Michigan law.

15. The Americans with Disabilities Act does not preempt any other federal or state laws that give equal or greater coverage or protection to persons with disabilities, 42 U.S.C. § 12201(b), including continued availability of civil rights actions under 42 U.S.C. § 1983 and § 1988.

**VENUE**

16. Plaintiffs reside in the Eastern District of Michigan, 28 U.S.C. § 1391(c)(1).

17. A substantial part of the events and omissions giving rise to the claims occurred in the Eastern District of Michigan.

18. All Defendants are located within the Eastern District of Michigan, and Defendant State of Michigan is also located in the United States Western District of Michigan, 28 U.S.C. § 1391(c)(2).

19. Venue is proper in the City of Detroit of the United States District Court for the Eastern District of Michigan, 28 U.S.C. § 1391(b)(1) and (2).

## PARTIES PLAINTIFF

20. Each Plaintiff has been injured by Defendants and otherwise has standing including as:

    a. a "qualified individual with a disability" under applicable Federal laws including 42 U.S.C. § 12131(2);

    b. a "person with a disability", and a "person with disabilities", Michigan Persons with Disabilities Civil Rights Act, M.C.L. 37.1103(h);

    c. a "person in a wheelchair or other persons with physical disabilities", Michigan Sidewalks: Persons with Disabilities Act, M.C.L. 125.1361; and

    d.  being "physically limited" under the Michigan Architectural Barriers Act, M.C.L. 125.1351(f).

21. Each plaintiff has suffered, and will continue to suffer, actual, concrete injuries-in-fact as stated herein, which are traceable to the Defendants'

actions and inaction as stated herein, and which are likely to be redressed by the judicial relief being requested in this case.

22. Plaintiff Jill Babcock is a citizen and resident of the City of Detroit, the County of Wayne, and the State of Michigan.

23. Plaintiff Jill Babcock has several physical disabilities and impairments including *inter alia* a type of Ataxia, a progressive neurological disorder that affects her strength, agility, balance, gait, motor skills, bladder control and speech. These impairments of her bladder and kidney functions, strength, fatigue, and mobility require her to use a manual wheelchair, an electric scooter or wheelchair, or other mobility device to navigate, and as a matter of personal health, also require her to have prompt, if not immediate, access to accessible toilets throughout the day and outside her home to avoid additional injury and harm.

24. Plaintiff Jill Babcock has been denied her rights due to Defendants' inaccessible public buildings including as described in this Complaint.

25. Plaintiff Jill Babcock is an attorney licensed by the State of Michigan to practice law anywhere in the State.

26. Plaintiff Jill Babcock practices law and uses her legal background in her capacity as a volunteer community advocate and disability rights activist,

SECOND AMENDED
CLASS ACTION
COMPLAINT

8

including as a Council Member of the Michigan State Bar Section on

Elder Law and Disability Rights.  She is also employed by the City of

Detroit in the Housing and Revitalization Department (HRD) focusing on

Accessible Housing, but not specifically employed there as an attorney.

HRD is located in the Coleman A. Young Municipal Center (CAYMC) at

2 Woodward Avenue in Detroit.

27. Defendants' lack of accessible buildings and facilities described in this

Complaint illegally discriminates against Plaintiff Jill Babcock due to her

disabilities including as an attorney by interfering with her ability to

engage in and develop her non-employment professional activities, to

enhance her professional reputation within the legal and general

communities, and to enjoy the benefits and personal satisfaction of

achieving her goals to serve within the profession fully and effectively.

28. For example, on April 11, 2023, Plaintiff Jill Babcock was scheduled to

give an in-person public presentation with two other disability rights

activists to a mixed audience of disabled and non-disabled persons in the

13th Floor Public Auditorium of CAYMC.  There is only one accessible

entrance to the auditorium, and it is located all the way around on the far

back-side of the two-story auditorium.  There are no accessible toilet

rooms in the auditorium, nor in the public hallways leading into the

auditorium. It is not possible, or very difficult for a person in a

wheelchair to make such presentation because there are at least two steps

up to both aisles of the speaker dais. Additionally, for the audience and

speakers, a speaker in a wheelchair at the lectern is not visible to persons

on the dais due to the location and height of the lectern. The auditorium

does not have captioning and is not wired for auditory aids for persons

with hearing loss. There are insufficient accessible seats or seating areas

for the audience members in wheelchairs, a serious disadvantage when

one is making a presentation on disability issues which presumably

would have more than four or five audience members in mobility

devices. Other deficiencies as to this auditorium are noted in the DLZ

report attached as Exhibit B. In light of these notable defects in the

building's accessibility, Plaintiff Jill Babcock was informed that the

presentation would be conducted remotely via Zoom due to supposed

construction occurring within the auditorium at that time. However, when

she attempted to visit the auditorium several days following her

presentation, it was clear that no such construction had ever occurred,

that all the defects continued to remain in place, and that she was intentionally and purposefully prevented from accessing the building.

29. As an additional example, in January 2023, Plaintiff Jill Babcock attended a swearing-in ceremony for a newly elected Judge of the State of Michigan 54B Judicial District Court in Lansing, Michigan; however, after the event, in order to go to dinner with the rest of the group after the event, she had to leave the building by herself because the accessible entrance/exit was separate and further away from the destination than the entrance/exit used by the other parties who are not mobility impaired.

30. Immediately prior to the COVID-19 pandemic, in or around late 2019 or early 2020, Plaintiff Jill Babcock was summoned to jury duty for the State of Michigan Third Judicial Circuit Court, Criminal Division, located in the Frank Murphy Hall of Justice.

   a. Due to the slope and due to cracks in the poorly maintained concrete or asphalt, Plaintiff Jill Babcock could not get up the nominally accessible ramp to get into the building without someone assisting her. There were no accessible parking spaces at Gratiot adjacent to the ramp: the spaces were and still are blocked by concrete planters as

described elsewhere in this Complaint. These violations remain as of the date of filing.

b.   In March and April 2023, Plaintiff Jill Babcock was summoned for jury duty to the State of Michigan Thirty Sixth Judicial District Court, but she has been told twice not to appear. However, she is informed and believes the Thirty Sixth Judicial District Court has an unwritten policy to decline jury service to citizens with mobility impairments because the jury assembly room and possibly the jury boxes are not all accessible. In checking the building in advance of her anticipated jury duty, she has also observed that the main entrance to the building is not accessible and inadequately marked with no or with improper directional signs for persons with mobility impairments.  There is no accessible on-street parking, and the drop-off area on Madison is not accessible. The public instead is directed to park in the private, City-licensed parking lot across Madison.  However, that lot does not have any spaces, for accessible parking, and there are no accessible curb cuts or mid-block, marked crosswalk with crossing island and crossing warning signals from that licensed lot to the courthouse across Madison even though almost all pedestrians cross at that mid-

block driveway of that parking lot to take the shortest route to the entrance to the Thirty Sixth Judicial District Court courthouse. There is no such available shortest route free and clear across Madison to the courthouse for Plaintiffs.

31. On multiple occasions in 2019 through 2023, as a resident and citizen, Plaintiff Jill Babcock has needed to access the public areas of CAYMC for personal business matters in such offices as the ombudsman, building and safety, department of public works, public assessors' office, and the elections bureau. She has been discriminated against due to her disabilities and denied full access to these and many other public areas of the building because they are located on public floors of the building where the toilet rooms are locked and do not have accessible toilets, toilet stalls, lavatories, and other accessibility features. She has been denied full access to these and many other public areas of the building because these public offices and areas do not have accessible entrance doors as described in the DLZ Evaluation, Exhibit B, since they are glass, heavy, and lack automatic door openers and the protective barriers at the bottom of the doors. She has been denied full access to these and many other public areas of the building because these public offices and areas do not

have accessible counters, or the counters are blocked. The counters and literature racks exceed the required 36-inch maximum useable height for persons in wheelchairs. Additionally, even during the 2022 election cycle, the elections bureau office in the building did not have its counter at the proper height, nor did it have an area for privately completing a ballot.

32. Plaintiff Jill Babcock has repeatedly been denied full and equal access to the various street festivals such as Hart Plaza, Street Arts at Wayne State, and annually since 2020 through the date of filing at Dally in the Alley, and other such events because the sidewalks and curbs are not all accessible and are inconsistently accessible and poorly maintained. For example, on June 16, 2023, for the Juneteenth Freedom Day events in Spirit Plaza immediately adjacent to CAYMC, she volunteered to attend the Disability Rights booth, but was hindered due to the City's failure to remove the entire curb on Woodward running north and south on the east edge of the Plaza, failure to remove other barriers to this permanent plaza, and failure to maintain the curb cut along Jefferson nearest CAYMC, to the point that the pavement had settled resulting in a large

gap: she and her wheelchair were stuck in that gap until a passer-by pushed her out of it.

33. In 2022 in Detroit, Plaintiff Jill Babcock fell out of her wheelchair while attempting to cross a street due to a poorly maintained curb cut with a large hole at the edges of the curb cut and the street. She caught her wheels in the hole which caused the chair to tip, ejecting her from her chair and injuring her mouth and face.

34. Due to the continued lack of maintenance of the public sidewalks resulting in deterioration, Plaintiff Jill Babcock has even been prevented from visiting her sister's residence, which is just one block from her own home, within the past three years.

35. Within the past three years, Plaintiff Jill Babcock has repeatedly been delayed or discouraged from attending other cultural activities and various restaurants in Detroit and Wayne County due to parking issues and other accessibility issues near and within the venues, including but not limited to:

   a. In general, the City has adopted a "zone method" of replacing parking meters with parking zones and kiosks, which eliminates or severely

restricts accessible parking, properly marked accessible parking, and access to the payment device.

b. There is no on-street accessible parking in the Greektown or Mexican Village neighborhoods of Detroit.

c. When visiting the Michigan Science Center in 2023, there were only two such nominally accessible spaces on the street, but both are too far from the entrance, and neither one has a cone or other sign to prevent or warn against parking within the striped access aisle area of the spaces.

d. There are insufficient and poorly marked accessible parking spaces in other areas of the Cultural Center, and along Michigan Avenue in the Corktown area of Detroit. In those areas which have shared bicycle lanes, Plaintiff Jill Babcock has difficulty safely exiting her vehicle because there is insufficient room to avoid hitting or being hit by bicycles, stand-up scooters, or skateboarders within the past three years.

e. Plaintiff Jill Babcock has been denied equal access to several non-compliant restaurants which have been built or opened as new restaurants within the past three years, for which the City of Detroit

has issued Occupancy Permits, or issued, approved, or renewed

Business or Liquor Licenses even though the buildings and building

plans do not comply with the law, including Title III of the Americans

with Disabilities Act. For example (the trade names of these non-party

businesses are being provided by Plaintiffs' counsel to defense

counsel simultaneously with service of this amended complaint):

   i.  Plaintiff Jill Babcock was unable to attend an event in April

       2023 at a new restaurant on West McNichols between

       Wyoming and Livernois because it has no elevator to the public

       banquet area on the second floor. This is a new restaurant in a

       building which was gutted to the four walls and retrofitted in

       2022 and 2023, partially paid with City of Detroit funding.

       Defendant City of Detroit issued an occupancy permit and

       business licenses and approved liquor licenses even though the

       restaurant blatantly violates accessibility laws by preventing her

       from equal access to the public second floor and by having

       separate areas which do not service persons with disabilities.

  ii.  Within the past three years, the same type of improper approval

       by Defendant City of Detroit has deterred or prevented Plaintiff

Jill Babcock from patronizing a new but non-compliant market

with a restaurant near Wayne State University and the Cultural

Center on Second Avenue in Detroit, because there is no

elevator to the well-advertised, publicly promoted, second floor

customer outdoor eating area overlooking the plaza and garden.

iii. Within the past three years, the same type of improper approval

by Defendant City of Detroit has deterred or prevented Plaintiff

Jill Babcock from patronizing another new, or newly retrofitted,

but non-compliant restaurant which is located down the street

on Second Avenue from the above market and restaurant, where

the Defendants have authorized a valet service. However, when

Plaintiff Jill Babcock went there to attend a birthday party in

2023, the valet service was blocking the only two accessible

parking spaces to the restaurant, and there was no other nearby

accessible parking on the street.

iv. Within the past three years, Plaintiff Jill Babcock was denied

similar access at a restaurant due to improper licensing which

had the proper ramp but did not have any accessible parking

areas in its lot, on the grounds as stated by the owner, that it had

been granted a "variance." As an attorney familiar with disability laws, Plaintiff Jill Babcock knows that no such variances are allowed.

v.   Within the past three years, Plaintiff Jill Babcock has been prevented or deterred from visiting multiple other new or newly retrofitted restaurants in Detroit and Wayne County which have been issued business licenses or occupancy permits despite these and similar violations.

36. Within the past three years, Plaintiff Jill Babcock has experienced many of the same denial of access issues in CAYMC as experienced by Plaintiff Marguerite Maddox due to Defendants' violations described below.

a.   The Office of Disability Affairs on the 12th floor of CAYMC has a heavy glass door which Plaintiff Jill Babcock finds difficult to open due to its weight, and it lacks the required door opener. The toilet rooms on that public floor are also locked, and do not have any accessible toilets or other features.

b.   There are two new accessible, one-person toilet rooms on the public 5th and 9th floors, however these toilet rooms are not open to the public

and require a key instead of a key-fob making it difficult to quickly unlock and access the toilet for a person such as Jill Babcock with hand dexterity or hand strength issues.

c. In addition to the problems noted as to Marguerite Maddox at the Skywalk into CAYMC below, the security device at the employee entrance is not wide enough for a wheelchair. In April 2023, Plaintiff Jill Babcock was initially refused her entry into the employee entrance because security personnel did not have a scanning wand, indicating Defendants' failure to properly equip, train, or supervise. She was delayed for about 15 minutes by this confrontation until eventually one of the other security personnel left to obtain the scanning wand from another area of the building.

37. Plaintiff Marguerite Maddox is a citizen and resident of the City of Detroit, the County of Wayne, and the State of Michigan.

38. Plaintiff Marguerite Maddox requires the use of a service animal for mobility and other assistance. Scarlett has assisted her since 2017, and prior to Scarlett, Plaintiff relied on her service animal, Jello.

39. Plaintiff Marguerite Maddox has Cerebral Palsy, cervical dystonia, hearing impairment, speech impairment, and some vision decline.

40. To access and live within the community, Plaintiff Marguerite Maddox is dependent upon her service dog Scarlett, she is dependent upon various assistive devices and policies for hearing, and communication, and she is dependent upon specialized walkers including a HEAO 4-wheel walker with seat for mobility.

41. Scarlett is a certified assistance dog. Within the past three years, due to Defendants' lack of accessible buildings and facilities, separately and with Scarlett, Plaintiff Marguerite Maddox has been precluded access or has difficulty accessing the community and events, and the Defendants' buildings, voting registration and polling places, facilities, programs, and services without fully compliant shared use and accessible streets, sidewalks, paths or trails, curb cuts and pedestrian crossings, accessible pedestrian crossing signals, entrances, free and clear paths, doorways and doors within buildings, toilet rooms and toilets, assistive listening devices and closed captioning, and other accessible features required by law and including as described in this Complaint.

42. Plaintiff Marguerite Maddox has long been active and is recognized in community affairs and politics as a disability rights activist, including *inter alia*, having been awarded the Spirit of Detroit Award in 2017 with

Jello, her service dog at the time. She started in local political activity

beginning as an adolescent when her grandmother began teaching her

how "the system worked" by taking her to meetings of the Detroit City

Council, and to events and meetings with United States Representative

John Conyers, Jr. She was a member of the Board of Directors of a local

501c3 non-profit, public charity of individuals with disabilities for people

with disabilities.

43. Plaintiff Marguerite Maddox prefers to exercise her right to vote in

person, and votes in person at her precinct voting location, two blocks

from her house, in the Ladder Company Number 7, Engine Company

Number 17 Fire Station located at 6100 Second Avenue in Detroit, which

has not been accessible up to and including the 2022 elections,

precluding her from exercising her Constitutional right within the past

three years. The entrance door is too narrow, and has a step which is too

high, so she must knock on one of the large truck garage doors for it to be

opened, so that she can get into the station. She was told in 2020 that this

location would be fully accessible in 2022, but when she voted in 2022,

she found the conditions had not changed, and the voting location still

had the same defects and was not accessible as required. Additionally,

the accessible voting machine did not work, and it took an hour for staff to get it to work, in 2020 and again when she voted in 2022.

44. Plaintiff Marguerite Maddox with Scarlett tries to attend and to speak publicly on pertinent issues at almost every meeting of the City Council of Defendant City of Detroit and has done so on multiple occasions within the past three years. Defendants' discriminatory and inaccessible conditions described in this Complaint impede her ability to participate, and they also upset her, which in turn further compromises her speech when she is agitated and stressed.

45. Since 2008 through the date of filing, Plaintiff Marguerite Maddox has been asking the Detroit City Council to resolve issues relating to persons with hearing impairments. For example, she has been asking City Council to install proper closed captioning for the public meeting spaces. This issue was not addressed until the COVID-19 pandemic, and the resolution is still inadequate for her needs or the needs of other persons with hearing impairments for the following reasons which have occurred and negatively affected Plaintiff Marguerite Maddox's ability to participate in City Council meetings within the past three years:

a.   For remote attendance, closed captioning is not always "turned on" for cable or zoom audiences, and she must telephone into the meeting, after the meeting has started, to remind staff to activate the service;

b.   When attending in person meetings, Plaintiff Marguerite Maddox has experienced the following within the past three years:

   i.   there is still no wiring for assistive listening devices, and assistive listening devices are not offered;

   ii.   instead of installing one or more large, dedicated, real-time captioning display devices facing into the audience, there are two large video screens with captioning on two sides of the conference table for the Council members, which are parallel instead of perpendicular to the audience, such that these screens are not readily visible to the audience in the main seating section; and

   iii.   there is only one such large video screen perpendicular to face the audience, but that is in the outside "overflow" aisle which does not have sufficient seating for persons with walkers or wheelchairs or service dogs; and

SECOND AMENDED
CLASS ACTION
COMPLAINT
24

c.  City Council does not always have an American Sign Language interpreter at these meetings within the past three years.

d.  Except for installing video monitors described above, these violations remain in place.

46. Additionally, the City Council meeting space and main audience area are positioned behind two heavy glass doors. Both the main and the overflow audience areas do not have sufficient seating for persons with walkers or wheelchairs or service dogs. Plaintiff Marguerite Maddox has been denied proper seating on numerous but not all occasions within the past three years. This inconsistent access indicates poor training and poor supervision because her access depends upon which security personnel happen to be on duty at the time.

47. There is no readily available, public, unlocked, toilet room adjacent to the public City Council meeting room or the 13th floor auditorium, and even when the adjacent toilet rooms are unlocked, there is no accessible toilet, toilet stall, or other required accessible features, so Plaintiff Marguerite Maddox has had to leave the meeting on several occasions to go all the way down to the basement to use the toilet within the past three years. City Council does not pause the meeting and wait for her to return.

48. Plaintiff Marguerite Maddox does not drive and is otherwise dependent upon the local bus system and the People Mover, which do not fully comply with the law. The doors on the People Mover vehicles close too quickly for her. The Rosa Parks Transit Center does not always have an unlocked accessible toilet room, and the accessible lavatory sink has been removed. In April 2023, the automatic door opener at Rosa Parks Transit Center was not working. Plaintiff Marguerite Maddox has observed staff at the Rosa Parks Transit Center and the People Mover who are often untrained and are sometimes verbally abusive to her or other patrons with disabilities. Several of the bus stops adjacent to CAYMC and adjacent to other buildings described in this Complaint, as well as other locations she wants visit in Detroit, are not always completely accessible. Additionally, with her walker and her service dog Scarlett, Plaintiff Marguerite Maddox has found within the past three years that many sidewalks on Woodward near CAYMC at Jefferson are blocked by restaurant outdoor eating areas; that many curb cuts are not wide enough for her, Scarlett, and competing pedestrians and upright scooters and skateboarders; and that many crossing signals are not timed to allow sufficient time to safely cross the street and lack audible pedestrian signals. Further, she cannot

directly access the Millender Center or the Renaissance Center from CAYMC since she cannot return to CAYMC from the Millender Center Skywalk which have negatively affected her constitutional rights within the past three years: the second-floor entrance is for employees only, and there is no elevator from the Skywalk to the ground. For the same reason, on countless occasions, Plaintiff Marguerite Maddox and other persons with mobility disabilities have been unable to use the People Mover Station in the Millender Center to access the Skywalk to CAYMC within the past three years, but instead have had to go outside to cross the busy streets of Randolph and Jefferson meant to be avoided by the Skywalk.

49. For the same reasons of Defendants' inaccessibility, Plaintiff Marguerite Maddox has also been denied access to other public meetings of Defendants in other inaccessible buildings of Defendants described in this Complaint within the past three years, and she has also decided not to attend several meetings in other inaccessible buildings within the past three years described in this Complaint because she knows these, and other accessibility problems exist, which has caused her to experience discrimination as a person with a disability.

50. Plaintiff Ashley Jacobson is a citizen and resident of Whitmore Lake, the County of Washtenaw, and the State of Michigan.

51. Plaintiff Ashley Jacobson has several physical disabilities and impairments including *inter alia* impairments of her bladder, spine, joints, and immune system. Specifically, she is diagnosed with Systemic Lupus Erythematosus, Interstitial Cystitis, and Endometriosis. These impairments affect her strength, balance, restroom needs, dexterity, fine and gross motor skills, and the ability to stand for long periods of time, which often requires her to use a cane or wheelchair. She also consistently utilizes other medical devices, catheters for personal use and bladder treatments, equipment, and mobility aids as her symptoms necessitate.

52. Plaintiff Ashley Jacobson is an attorney licensed by the State of Michigan to practice law anywhere in the State. Within the past three years, she has had to turn down business due to the Defendants' discriminatory refusal to make their buildings accessible as described in this Complaint. Within the past three years, she has also had to endure countless delays and inconveniences not experienced by able-bodied attorneys, due to Defendants' discriminatory refusal to make their

buildings accessible as described in this Complaint. These and

Defendants' other violations which have occurred within the past three

years impair or interfere with her ability to be as efficient as her peers

and competitors in the private licensed practice of law, thereby

interfering with her ability to earn a living or make a profit.

53. For at least the past two years, Plaintiff Ashley Jacobson has represented

and continues to represent at least 15 clients and cases in the State of

Michigan Forty Fourth Judicial Circuit and Juvenile Court and the State

of Michigan Fifty Third Judicial District Court, located at its 204 S.

Highlander Way building in Howell, Michigan. In this building, she

serves as a court-appointed juvenile court attorney representing juveniles

and adults in delinquency and child protective proceedings. She also has

clients who privately retained her and have pending cases in this building

in both the District and Circuit courts.

54. The 204 S. Highlander Way building is not fully accessible and has not

been within the past three years. For example, although the building has

one accessible stall in each toilet room, two of those toilet rooms are at

the very end of each end of the long building making it difficult to get to

in time. The third toilet room is located closer in the very center of the

long hallway, next to the juvenile court referee room in which Plaintiff

Ashley Jacobson has many cases, with security officers posted at the

door.  However, this restroom is always sealed off and closed whenever

the court calls in jurors within the past three years.  It is sectioned off and

only jurors are allowed to use this restroom, which means when it is

necessary for her to use the toilet, she must interrupt or delay her

appearance or consultations and literally hobble with her cane or other

device to either end of the building.  This occurs often, including as

recently as in April 2023. Even though she is not required by applicable

laws, on multiple occasions within the past three years, Plaintiff Ashley

Jacobson has called the court's Americans with Disabilities Act (ADA)

coordinator to discuss this problem and she has never received a return

call or message.

55. Within the past three years, in various courts and with various judges

before whom she practices, Plaintiff Ashley Jacobson has been faced

with the Hobson's choice of whether to wear her mask for her personal

health protection, or to remove it to avoid the ire of some judges or

security personnel. She is immunocompromised and is also on certain

medication which makes her more susceptible to infection including

COVID-19, and accordingly she is prescribed for and prefers to wear a mask, but as the pandemic eases, this issue has confronted her more and will only increase as more cases return to live proceedings in person.

56. During the past three years, up to and through the COVID-19 pandemic to the date of filing, Plaintiff Ashley Jacobson has had multiple cases, hearings, and meetings with and on behalf of her clients before these and other commissions, courts, boards, and offices of each of the various Defendants, including but not limited to the CAYMC and many of the Defendants' buildings and courts described in this Complaint, but which she cannot specifically disclose due to client confidentiality. Within the past three years, she has had to limit or eliminate her practice in certain such inaccessible buildings or courts or share her work and thus the fees with other attorneys who are not disabled. The masking issue has occurred and continues to occur in each of these scenarios within the past three years and is likely to continue beyond the "official" end of the COVID-19 pandemic. Also, in many public meetings within the past three years, and before many judges within the past three years, Plaintiff Ashley Jacobson and/or her clients have repeatedly not been given sufficient time to speak by not being allowed any additional time to the

persons with disabilities to either get to the meeting, or to get to the podium, or to otherwise allow for mobility, incontinence, speech, vision, or hearing impairments. She has observed this treatment as to other persons both in person and on remote hearings within the past three years.

57. Plaintiff Ashley Jacobson lives in Washtenaw County, and when she started her law practice, she sought to become a court-appointed juvenile court attorney in the State of Michigan Twenty Second Judicial Circuit Court located in Washtenaw County. But due to her experiences with the lack of close or accessible parking, lack of accessibility in the building, and lack of accessible entrances as described in this Complaint, she had to eliminate that practice and pursue her work elsewhere. As of the date of filing, she has been unable to practice law as she wishes for these reasons. Within the past three years, the route for ingress and egress have been repeatedly inaccessible because the buttons for the automatic doors were blocked by the garbage containers both inside and outside the building on two occasions, preventing her ready entrance and exit. If accessibility changes to and adjacent to that building were made, Plaintiff

Ashley Jacobson would pursue appointments and private clients in that court.

58. Each in her own way, all three Plaintiffs want to be fully engaged in their communities outside of the four walls of their homes. Each of them also actively advocates for disability rights for themselves and for other persons with disabilities, in their own social, professional, and volunteer circles, and have done so consistently within the past three years.

59. As individuals, Plaintiffs Jill Babcock and Ashley Jacobson, and other similarly situated persons with continence disabilities, have lost control of their bladder or bowel due to Defendants' inaccessible toilet facilities within the past three years.

60. As attorneys, Plaintiffs Jill Babcock and Ashley Jacobson, and other similarly situated attorneys with visible and invisible disabilities already have endured insulting comments, misplaced pity, avoidance, and other discrimination from the bar and from many able-bodied colleagues within the past three years. They have experienced many other impediments to entering and advancing in the profession of law within the past three years.  Defendants' repeated failures to comply with the accessibility requirements of laws that have existed for up to 57 years

within the past three years has (a) further aggravated the illegal

discrimination plaintiffs and similarly situated attorneys already endure,

(b) served as a terrible example to law firms and other legal employers,

and (c) contributed to the low number of attorneys with disabilities

relative to the general population, to wit, less than 5% of attorneys

publicly admit to having a disability, while over 20% of adults publicly

admit to having a disability.

61. All three Plaintiffs, and similarly situated class members, have

experienced increased emotional trauma and pain and suffering due to

illegal discrimination by Defendants including as specified in this

Complaint within the past three years. Additionally, these three Plaintiffs

have had to endure additional emotional distress associated with sharing

their personal, private lives to redress grievances within the past three

years which would not have occurred if Defendants had simply followed

the laws at issue in this Complaint.

62. All three Plaintiffs, and similarly situated class members, also have had

to spend more money than able-bodied persons within the past three

years due to illegal discrimination by Defendants including as specified

in this Complaint: because of inaccessible parking, sidewalks and streets,

they must expend additional money on transportation; Defendants'
failure to design, build, and maintain correct curb cuts damages their
wheeled devices, and also causes water, snow, and ice to flow or collect
at the base of the curb cuts, which in turn leads to deterioration of the
tires, wheels, hand-rims, and undercarriages of their manual wheelchairs
and electric scooters or wheelchairs, leading to increased maintenance or
replacement costs; due to Defendants' locked toilet rooms and
inaccessible toilet rooms and toilets, they must purchase additional
protective undergarments, co-pays on urologist and other medical
consults, increased costs of laundry and dry-cleaning, and other increased
expenditures for incontinence and other medical issues including as
described in this Complaint.

63. Plaintiff Ashley Jacobson and similarly situated class members have also
incurred emotional and financial injury caused by inefficient practice of
law and the stress of having to turn away business within the past three
years, due to their inability to represent clients in Defendants'
inaccessible buildings.

64. As residents and citizens, Plaintiffs Jill Babcock, Marguerite Maddox
with or without Scarlett, and Ashley Jacobson, and similarly situated

SECOND AMENDED
CLASS ACTION
COMPLAINT

class members are fully and equally entitled as any other person without impairments, to equally gain access into and around any of the public government buildings at issue, and to equally access any of the services, programs, and activities contained or conducted in these and other public government buildings by the State of Michigan, the County of Wayne, the City of Detroit, and other counties and units of local government in the State of Michigan.

### Plaintiffs' Injuries as Class Representatives and Class Action Discussion

65. As a direct result of Defendants violating the laws at issue, Plaintiffs and class members have been injured by repeatedly being deprived of their fundamental rights under law.  Within the past three years, unlike able-bodied persons, for example and without limitation:

a.  Plaintiffs and class members are not able to "get around" within the community, or to maneuver, navigate, or travel upon the public streets, roadways, sidewalks, pedestrian crossings, paths or trails, or adjacent areas.

b.  Plaintiffs and class members are not able to gain simple access into these buildings when the Defendants repeatedly and collectively fail

to comply with the laws governing the approaches, parking, ramps, signage, entrances, entrance doors, and entrance door openers into the buildings.

c.  Plaintiffs and class members are not able to maneuver or navigate within the buildings when Defendants repeatedly and collectively fail to have the requisite free and clear path, fail to have space for Plaintiffs and their wheelchairs and assistive devices in offices or public meeting rooms, fail to have internal door openers and doors that are light enough to allow Plaintiffs to open them and to keep them open while using their wheelchairs or assistive devices into the respective offices or public meeting halls, or fail to have clear service counters and document shelves and racks at the mandatory heights.

d.  Plaintiffs and class members cannot access toilet rooms and toilets and lavatories and either lose control or risk losing control of their bladder and bowel, when Defendants repeatedly and collectively refuse to follow mandatory laws on accessible facilities including by locking toilet rooms and otherwise refusing to have fully accessible toilet rooms, toilet stalls, toilet, and lavatories.

e. Plaintiffs Jill Babcock and Ashley Jacobson, and other class members who are attorneys with disabilities, whether or not in private practice or employed as attorneys, are not able to freely maneuver or navigate within the Defendants' inaccessible courtrooms, nor within the court chambers, clerk offices, or attorney conference rooms and other areas set aside for the members of the bench and bar, for themselves in terms of their profession, and equally if not more so, for the benefit of their clients including clients with disabilities.

66. In addition to denying Plaintiffs' and class members' equal participation in their voluntary and other community activities, Defendants' collective refusal to comply with the law has made it difficult or impossible for Plaintiffs and other disabled persons to make a living when their jobs require them to go into public buildings and facilities to conduct business within the past three years.

67. Plaintiff Marguerite Maddox, with or without Scarlett, as citizen and as advocate, has frequently traveled to and attended public meetings and visits the various public offices in Defendants' buildings throughout the metropolitan Detroit area, Lansing, and elsewhere in the State of Michigan within the past three years.  The lack of access described in this

Complaint has illegally interfered with her efforts to advocate for herself and for other persons with disabilities within the past three years.

68. Within the past three years, Plaintiff Ashley Jacobson has made her living and supports herself and her family as an attorney including by going into courts, juvenile facilities, and municipal, county, and State offices and facilities throughout the State of Michigan. As a direct result of Defendants not complying with these laws, she has lost work, continuing business opportunities, and money damages because of her inability to, or additional difficulties to, gain access to the Defendants' buildings and the services, programs, and activities therein within the past three years. The lack of access described in this Complaint has interfered with her ability to do her job or to do it effectively within the past three years.

69. Each Plaintiff and class member is entitled to, qualified to, and otherwise able to equally access Defendants' public buildings and facilities and to use Defendants' services which are being denied due to Plaintiffs' disabilities but for Defendants' actions and inactions and their intentional or willful disregard of their obligations under State and Federal laws within the past three years: U.S. Const. Amend. I (freedoms of speech,

assembly, redress of grievances); U.S. Const. Amend. V (life including bodily integrity, liberty, or property shall not be deprived without due process of law); U.S. Const. Amend. VI (assistance of counsel); U.S. Const. Amend. VII (right to jury); U.S. Const. Amend. IX (enumeration of certain rights shall not be construed to deny others retained by the people); U.S. Const. Amend. XIV, § 1 (privileges and immunities, due process, equal protection) and § 5 (Congressional powers to enforce Amend. XIV); U.S. Const. Amends. XV, XIX, and XXVI (rights to vote); Mich. Const. 1963, Art. I, § 2 (equal protection, non-discrimination); Mich. Const. 1963, Art. I, § 17 (right to bodily integrity); Mich. Const. 1963, Art. I, § 5 (freedom of speech); Mich. Const. 1963, Art. I, § 13 (right to conduct suits in proper person or by counsel); Mich. Const. 1963, Art. I, § 14 (right to jury trial); Mich. Const. 1963, Art. I, § 17 (right to due process of law); Mich. Const. 1963, Art. I, § 23 (enumeration of certain rights not construed to deny or disparage other rights retained by the people); and Mich. Const. 1963, Art. I, § 17 (unjust takings clause).

70. Each Plaintiff and class member has been denied rights, services, or accommodations by Defendants because of Plaintiffs' disabilities within the past three years.

71. The Defendants have treated each Plaintiff and class member adversely due to the Plaintiffs' and class members' disability or disabilities within the past three years.

72. Joinder of Plaintiffs' claims against these common Defendants is proper, including but not limited to similarity of facts and claims, and for reasons of judicial economy.

73. Each Plaintiff and class member is a "qualified individual with a disability" who, without the removal of architectural, communication, or transportation barriers, has been denied, is being denied, and will continue to be denied equal access to the receipt of essential services, or participation in the programs or activities provided by Defendants within the past three years. 42 U.S.C. § 12131(2).

74. Each Plaintiff and class member has been denied, is being denied, and will continue to be denied barrier-free access to the public buildings and facilities at issue and as required by Federal and State laws.

75. Each Plaintiff and class member is a "person with a disability" and is "guaranteed . . . as a civil right" the "full and equal utilization of public accommodations, public services, and educational facilities without discrimination because of a disability." M.C.L. 37.1102 and M.C.L. 37.1103(h).

76. Each Plaintiff and class member has been discriminated against and suffered injury from Defendants within the past three years and is fully representative of a class of injured persons with mobility and incontinence impairments and other disabilities.

77. The class of similar persons are so numerous, and their claims under the facts and laws so similar, that combining their claims with the Plaintiffs' claims into a class action for injunctive and declaratory judgment serves the interest of the class, and the judicial economy interests of the courts and of Defendants.

**PARTIES DEFENDANT**

78. Defendants under Federal laws are "public entit(ies)" as defined by Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131(1)(A) and (B).

SECOND AMENDED
CLASS ACTION
COMPLAINT
42

79. Defendants under Michigan laws are "agencies of state and local government" M.C.L. 125.1361, and "persons" or "entities" which "shall accommodate a person with a disability for purposes of employment, public accommodation, public service, education, or housing unless the person demonstrates that the accommodation would impose an undue hardship." M.C.L. 37.1102(2) and M.C.L. 37.1103(g) and (i).

80. None of these Defendants can demonstrate any difficulty or hardship whatsoever, much less "undue hardship" as a defense to the relief requested.

81. Defendant State of Michigan has been a state and political subdivision of the United States of America since January 26, 1837, and was previously part of the Northwest Territory and Ordinance as of 1787.  Mich. Const. 1963, Art. I, § 1, Eff. Jan. 1, 1964.   It is a public entity. 42 U.S.C. § 12131(1)(A).   With over 10 million residents in 2023, Michigan is the tenth most populous state in the country. According to the Michigan Economic Development Corporation, in 2022 Michigan's economy was ranked number one out of thirty-seven states with more than 2 million residents.  If Michigan was a separate country, comparing 2021 Gross Domestic Products, its economy would be ranked as the 36th largest

economy in the world.   The State of Michigan's budget for fiscal year 2022 was $74.1 billion, with a surplus of $9 billion as of January 2023. The Governor has proposed a budget of $79 billion dollars for fiscal year beginning October 2023, with substantial portions of the surplus being set aside for reserve.

82. Defendant County of Wayne is a political subdivision of the State of Michigan, with an elected county executive, board of supervisors, sheriff, treasurer, county clerk, register of deeds, and prosecuting attorney. Mich. Const. 1963, Art. VII, § 1, Eff. Jan. 1, 1964.  It is a public entity. 42 U.S.C. §§ 12131(1)(A) and (B). The county seat is Detroit. With more than 1,700,000 residents in 2023, it is the most populous, and most densely populated, county in the State.  The County of Wayne budget for fiscal year 2022-2023 is $1.86 billion.

83. Defendant City of Detroit is an incorporated municipality and political subdivision of the State of Michigan, with an elected mayor, city council, city clerk, police commissioner, and city treasurer.  Mich. Const. 1963, Art. VII, § 21, Eff. Jan. 1, 1964.  It is a public entity. 42 U.S.C. §§ 12131(1)(A) and (B).  With more than 621,000 residents in 2023, it is the most populous, and one of the most densely populated, cities in the State.

The City of Detroit budget for fiscal year 2021-2022 was $2.33 billion and for fiscal year 2022-2023 is $2.45 billion, with a surplus of $156 million.

84. Defendant State of Michigan has one court of justice. Mich. Const. 1963, Art. VI, § 1, Eff. Jan. 1, 1964; Am. Init., approved Nov. 6, 2018, Eff. Dec. 22, 2018.

85. Defendant State of Michigan is specifically charged under the United States Constitution, Amend. XIV, § 1 and § 5, *Tennessee v. Lane*, 541 U.S. 509 (2004), and the Constitution of the State of Michigan, Mich. Const. 1963, Art. VI, § 1, Art VI, § 7, with ultimate responsibility for providing fully accessible courts for all judicial proceedings and other manifestations of that process including the courtrooms, chambers, clerk's offices, the jury assembly rooms, the jury boxes, the jury rooms, lock-ups and detention areas, and all ancillary facilities; also, the ADA and the ADA Accessibility Guidelines (ADAAG) created by the U.S. Access Board, most recently amended in 2015, delineates specifications for these facilities.

86. Together with the State, Defendants County of Wayne and City of Detroit are also specifically charged with providing the services

described in the preceding paragraphs within their respective bailiwicks, and the State, County, and City are all severally and jointly responsible for funding all expenses, maintenance, maintenance reserves, capital improvements, and all other  necessary costs of state and federal requirements established by state and federal laws, of the Third Judicial Circuit Court, the Wayne County Probate Court, and the Thirty Sixth District Court of the City of Detroit. M.C.L. 600.9947, M.C.L. 600.9945, M.C.L. 600.837, M.C.L. 600.550, M.C.L. 600.425.

87. Defendants State, County, and City, and the other non-Defendant counties and municipalities with similar facilities and defects as discussed in this Complaint, jointly or severally, have control over the design, layout, construction, and maintenance of the streets and highways, sidewalks and curbs, public parks, and improved areas adjacent to and leading to the buildings and facilities and public parks at issue within their respective bailiwicks.

88. Defendant Detroit-Wayne Joint Building Authority is a public body corporate established by the City of Detroit and by the County of Wayne pursuant to State law, M.C.L. 123.952 and M.C.L. 123.957, to construct, own and manage CAYMC located at the foot of Woodward at East

Jefferson in the City of Detroit, 2 Woodward Avenue, Detroit, Michigan. Its primary tenants currently include the executive and legislative branches of government and certain elected officials for the City of Detroit, for the County of Wayne, the State's Third Judicial Circuit and Probate Courts, the Clerks for the City of Detroit and the County of Wayne, other offices of the City and County, and at least one retail food and sundries shop.  It has authority over approval, design, construction, operation, and maintenance of all the space, building(s), structure(s), improved areas, and public facility occupied, owned, or leased as either lessor or lessee within CAYMC.  It is a public entity. 42 U.S.C. § 12131(1)(B). Since 2005 it has reduced its operating budget from over $15,000,000 to under $8,800,000 annually, but nevertheless has failed to implement the required accessibility features to the premises.

## DEFENDANTS HAVE INJURED EACH OF THE PLAINTIFFS

89. Pursuant to the Federal and State Constitutions cited, Plaintiffs and class members are each entitled to, and in need of the services and participation in the programs or activities provided by one or more of the

Defendants in their buildings described below, including by way of example and not by limitation, to physically attend in their own person:

a. to be engaged in, be integrated into, and be part of the community, including for example and not by limitation, *Olmstead v. L. C.*, 527 U.S. 581 (1999), and 28 C.F.R. § 35.130 (General prohibitions against discrimination).

b. to be "out and about" in their communities, to socialize, to visit with friends and family, to visit cultural institutions such as libraries, museums, and theatres, to visit parks, to visit restaurants, to shop and conduct daily personal business,  to visit health care and veterinarian care providers, and to otherwise engage in the same activities as persons who do not have disabilities.

c. to attend and participate in the public meetings of the legislative, executive, administrative, and judicial bodies of the Defendants.

d. to lobby, instruct, and meet with their representatives, the elected officials, and the other officers and employees of the Defendants, and with other citizens engaged in the same activities.

e. to engage in free speech.

f. to peaceably assemble and protest.

g.  to petition for redress of grievances.

h.  to consult for the common good.

i.  to review and examine in person all public records including as to property, zoning and land use, buildings, marriages, businesses, elections and campaigns, administrative hearings and appeals, and the judicial branch.

j.  to register to vote.

k.  to apply for, receive, and return absentee ballots.

l.  to vote.

m. to file to run for public office or seek volunteer appointments.

n.  to file for and receive permits or licenses.

o.  to pay or to contest taxes, assessments, exemptions, and fees.

p.  to monitor the actions of these governments as they pertain to their own affairs as well as to the general welfare and public good.

q.  to be called to jury duty, to participate in jury pools, and to serve on juries.

r.  and to observe and to participate in the services of the judicial branch and of the administrative hearings and appeals departments of the Defendants.

90. Plaintiff Ashley Jacobson and similar situated attorney class members are engaged in the private practice of law to earn a living and to conduct a profitable business in the State of Michigan.  As such, and to conduct such practice and business on her own behalf and on behalf of her clients, she and other similarly situated attorneys must have immediate, in-person physical access, in the same extent as any other attorney licensed by the State of Michigan, to all the above services, programs and activities, and to other services, programs and activities such as by way of example and not limitation:

   a. to take on any new case or client matter without having to first determine in advance whether proceedings or meetings will be conducted in a public building which is not accessible.

   b. to attend to and conduct depositions, discovery, negotiations, investigations, and other meetings in all branches of Defendants, and in the administrative review sections of the legislative and executive branches, and in Defendants' judicial branches.

   c. to also attend hearings, trials, and appeals in Defendants' judicial branches and in the administrative hearings and appeals sections of

Defendants' legislative and executive branches, in court rooms and judicial facilities which are fully accessible.

d.  to meet with clients or witnesses who are confined in the Juvenile Center or in the lockups of either the City or the Sheriff.

e.  to meet and interact with Judges, administrative hearing judges or officers, and their staff, and other attorneys or parties.

f.  and all such other services, programs, activities and matters as needed or useful or advantageous to meet the needs of her clients and to fulfil her fiduciary and advocacy duties.

## INACCESSIBLE TOILET ROOMS (INCLUDING LOCKED TOILET ROOMS IN PUBLIC AREAS OF PUBLIC BUILDINGS), TOILETS, LAVATORIES AND FIXTURES VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS TO BODILY INTEGRITY

91. Due to their personal experiences, Plaintiffs Jill Babcock and Ashley Jacobson are representative of other similar class members suffering incontinence and other conditions affecting their kidneys, urinary system, bowel system, or gastro-intestinal system, who have been harmed physically and medically by the Defendants' malfeasance and nonfeasance. By way of example, Jill Babcock and Ashley Jacobson have either experienced one or more of the following, or have personal

knowledge of one or more of the following conditions experienced by

other similar class members because of Defendants' actions or failure to

act within the past three years:

a.  Holding urine or feces too long in the body is painful.

b.  Holding urine or feces too long or repeatedly, depletes muscle control

    over the bladder and defecation functions, and increases the risk of

    dangerous infections including urinary tract infections, or

    exacerbating existing medical conditions.

c.  Not having timely access to a toilet and holding urine or feces too

    long can also precipitate Autonomic Dysreflexia (AD), sometimes

    referred to as Autonomic Hyperreflexia, which is a potentially life-

    threatening medical condition including for many people with spinal

    cord injury experience when there is pain or discomfort below their

    level of injury, even if the pain or discomfort cannot be felt. Thus, it is

    essential to have consistent access to an accessible toilet, Having a full

    bladder can trigger AD, which causes a spike in blood pressure to the

    extent a person can die.

d.  Somewhat counterintuitively, without timely access to an accessible

    toilet, if there is constipation, it can induce the vasovagal reflex which

can trigger vasovagal or defecation syncope which in turn can cause cardiac or cerebral ischemia or other cardio-vascular events, resulting in loss of consciousness and sometimes resulting in death.

e.  Urinating or defecating in one's clothing further increases the risk of dangerous infections, rashes, discomfort, and exacerbations.

f.  One can hold urine and feces only to a point, beyond which there is urinary incontinence or fecal incontinence, *i.e.,* partial to full loss of control causing leakage of urine and feces.

g.  Leaking urine or feces occurs on the way to the toilet rooms, and especially when there is not an accessible route to the toilet rooms.

h.  Leaking urine or feces even occurs in the toilet rooms and in the toilet stalls while trying to get into a toilet stall or to transfer onto the toilet, where not properly accessible under the federal and state laws, thereby aggravating all the above.

i.  Urinating or defecating in one's clothing, even if using incontinence aids, is humiliating.

j.  Incontinence entails a risk of criminal charges. Urinating or defecating in any public area is a misdemeanor under State law and most municipal ordinances, punishable by fines or jail or both.  In some

municipalities in Michigan, it is a civil infraction, with civil penalties but a lesser burden of proof. Also, State criminal law remains enforceable even in those jurisdictions.

k.  All the above stigmatizes any person beyond infancy.

l.  It is so humiliating and stigmatizing that persons will not even admit they have ever experienced bladder or fecal incontinence or constipation.

92. Each Plaintiff and class member relies on disability-accessible, barrier-free buildings and toilet rooms as a citizen, an attorney, or an activist or advocate. As a result of Defendants' unwillingness to provide the mandatory accessibility measures, these Plaintiffs have been harmed by Defendants and face discriminatory barriers impeding their respective equal use and access of these buildings in a manner comparable to that of their nondisabled peers within the past three years.

a.  By way of example and not limitation, there is only one nominally accessible, publicly open, toilet for each gender in the East "City" Tower of CAYMC, and as of 2022 or 2023, only one such toilet for men located in the West "Court" Tower.

b.  These publicly accessible toilets are only located in the basement of
    the CAYMC. As of April 19, 2023, the elevator basement lobby of the
    West Tower had signs (which were not otherwise compliant) that
    pointed to the East Tower for accessible toilet rooms, instead of
    directing one toward the recently retrofitted men's accessible toilet in
    the West Tower.

c.  It takes up to 20 or more minutes to get from one of the 14 to 20
    floors at and above grade into an elevator and then to proceed to the
    only (partially) accessible toilets in the basement of the building. It
    takes even longer for one to "go down the hall" from the Court Tower
    elevator to get to the women's accessible toilets in the East Tower
    basement.

d.  On occasion, during events at the auditorium on the 13th floor of the
    East Tower, or for City Council meetings, Defendants' employees
    will unlock the toilet rooms adjacent to those auditorium and meetings
    rooms; however, they are not accessible, and Plaintiffs and similarly
    situated persons must still go to the basement to use the accessible
    toilets, even if the meetings or events continue beyond 4:30 when the
    building closes.

e.  This barrier occurs in other buildings in the State, where there is only one toilet room per gender in a multi-story or a multi-tower, Article II public building, including for example and not limitation: the State of Michigan Eleventh Judicial Circuit Court located in St. Ignace and one of the two towers of the State of Michigan Sixth Judicial Circuit Court located in Pontiac.

93. The ready ability to access the toilet and lavatory with dignity, in a safe toilet room for sanitation and hygiene, is a basic human and constitutional right, for example and not limitation:

a.  "The right to sanitation entitles everyone to have physical and affordable access to sanitation, in all spheres of life, that is safe, hygienic, secure, and socially and culturally acceptable and that provides privacy and ensures dignity." *Human Rights to Water and Sanitation*, UN-WATER, https://www.unwater.org/water-facts/human-rights-water-and-sanitation (last visited Apr. 27, 2023).

b.  Former Special Rapporteur on the Human Right to Water and Sanitation Catarina de Albuquerque states that access to sanitation is one of the "underlying determinants of health and contributors to individual dignity and public welfare…":

SECOND AMENDED
CLASS ACTION
COMPLAINT
56

> The rights to water and sanitation cover the majority of the needs of good hygiene. With respect to the water requirements of good hygiene, General Comment No. 15 states that access to sufficient water for domestic purposes includes access to water for hygiene purposes, the provision of appropriate storage facilities and hygiene in food preparation. With respect to the right to sanitation, the hygiene requirements are that the latrine should be easy to clean and should contain facilities for hand washing. The right to health also covers the underlying determinants of health, including access to water and sanitation…

CATERINA DE ALBUQUERQUE, ON THE RIGHT TRACK: GOOD PRACTICES IN REALISING THE RIGHTS TO WATER AND SANITATION 141 (2012),

https://www.ohchr.org/sites/default/files/Documents/Issues/Water/BookonGoodPractices_en.pdf.

94. Defendants' failure to comply with the laws on disability-accessible restrooms has caused physical demands on Plaintiff Ashley Jacobson within the past three years, as she is required to travel quite far to find the next accessible restroom stall.  She risks falling and is unable to use necessary equipment because of the lack of physical space and mobility bars in the stalls.  Within the past three years, Plaintiff Ashley Jacobson has had to turn down cases in these buildings, which not only affects her

SECOND AMENDED
CLASS ACTION
COMPLAINT

financially, but emotionally as she must consider the inequality she faces

as a disabled attorney and explain it to clients who seek her services in

those buildings.  Additionally, within the past three years, she has had to

spend time considering and compensating for building inaccessibility in

ways her nondisabled peers do not.  The violations of disability rights

inflicted by Defendants has caused and will continue to cause her

physical, financial, and emotional harm until appropriately remedied.

95. Defendants have breached constitutionally protected bodily integrity of

Plaintiffs by failing to provide publicly open toilets and toilet rooms in

their governmental buildings as described herein, and by failing to

provide fully accessible toilets and toilet rooms as described herein.

### INACCESSIBLE PARKING, SIDEWALKS AND CURBS, GRADING, ENTRANCES AND EXITS, AND INTERIOR SPACES

96. Defendants' other violations relating to free and clear access to and

within the buildings also harm Plaintiffs, by denying to them the same

rights as non-disabled persons within the past three years, for example

and not limitation:

a. **PARKING:** Michigan is often referred to as the automotive capital of

the world, and its citizens demand and calibrate travel and parking

time by the minutes to drive to a location and the steps to walk to a building or destination within a building or complex; however, within the past three years Defendants have repeatedly failed to make available to Plaintiffs the mandatory number and type of fully accessible parking spaces and accessible routes through or across parking areas near their public facilities. For example, at the State's complex in Lansing, with the Michigan Hall of Justice at one end, Michigan State Administrative Office Buildings on a concrete plaza over a massive parking garage, the Michigan Capitol, and then the Anderson Legislative Office Building and George W. Romney Office Building, there are no accessible parking spaces or insufficient number of such spaces available on the streets closest to the Supreme Court Building, or the State Capitol or the Legislative and Executive Buildings, and many of the curb-cuts are deficient on slope, materials, direction and safety.

b. **_SIDEWALKS, CURBS, CROSSINGS and OTHER ISSUES:_** Once near, at, or inside the applicable building, as described elsewhere in this Complaint, within the past three years, Plaintiffs and other persons with mobility and other impairments have had to continuously

struggle to proceed up non-existent, or decrepit, or poorly designed or

maintained ramps and curb cuts, and then struggled to open doors

which are heavy or lack openers, or openers which do not work or are

poorly marked or badly located, for example. Defendants have

otherwise failed to comply with mandatory accessibility requirements

in the physical environment as to hearing, and vision impairments

within the past three years, all of which discriminate and injure

Plaintiffs and persons similarly situated.

97. Defendants' repeated failure to follow these laws and the minimum

guidelines within the past three years has caused harm to Plaintiffs and

similarly situated persons with disabilities, including but not limited to

Defendants' failure to follow minimum accessibility guidelines set forth

in the Michigan Construction Code; Michigan Building Code, Chapter 11

(Accessibility); Michigan Plumbing Code, Chapter 4 (Fixtures Faucets

and Fixture Fittings); the International Building Codes); ADA Title II

Regulations, 28 C.F.R. Parts 35 and 36 (Nondiscrimination on the Basis

of Disability in State and Local Government Services); 2010 ADA

Standards for Accessible Design; ABA Accessibility Standards; the

Access Board Courthouse Access Advisory Committee (Designing

Accessible Courthouses); the U.S. Courts Design Guide, revised 2021 (for persuasive authority); and National Center for State Courts, The Courthouse Guide to Planning and Design Needs of Persons with Disabilities.

98. These and other violations of disability rights inflicted by Defendants have caused and will continue to cause other economic, professional, and reputational harm within the past three years to:

    a.  Plaintiff Marguerite Maddox with or without Scarlett as a public advocate for disability rights.

    b.  Plaintiffs Jill Babcock and Ashley Jacobson as licensed attorneys in government and private practice, as well as in the general exercise and advancement of their skills, experiences, wisdom, and standing and reputation in the legal profession.

    c.  Other persons with similar or other employment or professions or organizing and advocacy who have disabilities including but not limited to mobility and continence impairments.

99. These and other violations of disability rights inflicted by Defendants have caused and will continue to cause emotional distress, humiliation,

delay, inconvenience, and other harm to Plaintiffs and other individuals with disabilities including mobility and continence impairments.

100.   Applying the recognized concept of intersectionality in civil rights and discrimination, Defendants' repeated, collective discrimination in these matters has caused and continues to cause even greater harm to all three Plaintiffs who are women, to Plaintiff Marguerite Maddox who is also a Black woman, and to similarly situated class members.

101.   Defendants are jointly and severally liable for these injuries and compensatory damages for economic harm, and damages for emotional distress, humiliation, delay, inconvenience, and other harm to Plaintiffs and the class members for violations stated herein, and without regard to Defendants' attempts to allocate or isolate responsibility between or among themselves or others.

102.   Plaintiffs and similarly situated class members are entitled to punitive damages from Defendants for their common patterns, practices, and policies of repeated and intentional, or willfully indifferent, violations of the Federal and State laws at issue.

## DEFENDANTS HAVE REPEATEDLY VIOLATED FEDERAL AND STATE DISABILITY LAWS DIRECTLY CAUSING HARM TO PLAINTIFFS AND INTERFERING WITH THEIR RIGHTS, INCLUDING AT THESE BUILDINGS AND FACILITIES

103.   Within the past three years, each Defendant has, and all Defendants in

concert have, repeatedly and oftentimes continuously failed to comply

with the laws of the United States and of the State of Michigan to make

their physical spaces fully accessible to Plaintiffs and to other persons

with disabilities to enable Plaintiffs and other persons with disabilities to

have barrier-free access and equal opportunity with other residents and

citizens to fulfill their participatory obligations as citizens such as by

paying taxes, voting, attending public meetings, and performing jury

duty, and to also enable Plaintiffs to have equal access to the services and

amenities provided by the Defendant governments. Mich. Const. 1963,

Art. I, § 2, Eff. Jan. 1, 1964.

104.   Defendants supply these services, programs, and activities to the

public in the buildings described below, and in so doing are obligated to

make these services, programs, and activities fully and equally accessible

to all persons including the Plaintiffs and other persons who have

physical restrictions, in barrier-free buildings and facilities.

105.   Defendant State of Michigan individually or with the applicable county or municipality, controls, owns, leases, operates, and funds or supervises as to all the court buildings and operations described below, and as to similar facilities and operations throughout the State, including for example but not limited to the  court buildings for the Third, Sixth, Eleventh, Sixteenth, Twenty-Second, Thirtieth, Forty-Fourth, and Forty-Seventh Judicial Circuit Courts located in the counties of Wayne, Oakland, Mackinac, Macomb, Washtenaw, Ingham, Livingston, and Delta, and other Probate and District Courts as described in this Complaint.

106.   Each of the Defendants owns, leases, operates, manages, or otherwise has joint authority and control with the other Defendants, and is jointly and severally responsible and liable for accessibility compliance and violations at CAYMC.

107.   Defendants County and City own, lease as lessor or lessee, or operate, and are jointly and severally responsible and liable for accessibility compliance and violations at the Guardian Building.

108.   Except for Detroit-Wayne Joint Building Authority, each of the Defendants also owns, leases, or operates, has joint control with the other

Defendants, and is jointly and severally responsible and liable for accessibility compliance and violations at the following of Defendants' facilities:

a. the Frank Murphy Hall of Justice;

b. the State of Michigan 36th Judicial District Court-Detroit Courthouse,

c. the Lincoln Hall of Juvenile Justice;

d. the State of Michigan Third Judicial Circuit Court Family Court and Friend of the Court Division Offices and Courtrooms located in the Penobscot Building, as lessees;

e. the Wayne County Register of Deeds and the Wayne County Treasurer's Office located at 400 Monroe, Detroit, as lessees, and;

f. the Wayne County Criminal Justice Center under construction at 1301 East Warren Avenue, Detroit.

### *VIOLATIONS AT THE STATE CAPITOL, MICHIGAN HALL OF JUSTICE, GEORGE W. ROMNEY BUILDING, AND OTHER BUILDINGS ON THE PLAZA AND CAPITOL LOOP*

109.   There are multiple violations at the Michigan Supreme Court Hall of Justice in Lansing, Michigan, including by way of example and not limitation:

SECOND AMENDED
CLASS ACTION
COMPLAINT

a. At one or more of the public streets immediately adjacent to the Court Hall of Justice, there is insufficient pedestrian access for persons with disabilities, for example the pedestrian ramps are not fully compliant, there are not enough accessible parking spaces, and any such nominally accessible parking spaces are not fully compliant and are too far from the entrances to the Hall of Justice.

b. Access to the parking garage first requires one to notice a small non-compliant sign for public access for persons with disabilities, and then to call "security" from an inaccessible call box located on the passenger side of the drive.

c. There are no signs, or insufficiently visible signs directing persons with disabilities around the imposing staircases at the east façade of the building.

d. The revolving door entrances to the building are not sufficiently graded or accessible to persons with disabilities.

e. There are no parking or drop-off areas on the streets on the west, north, or south facades which are closest to the Hall of Justice.

f. The nominally accessible parking spaces in the parking lot are too far from the entrances to the Hall of Justice, and due to curb locations,

requires one to travel to the left and away from the entrance, and requires one to travel into the traffic lane of the parking lot. These spots also lack proper curb cuts and accessible routes to the Michigan Library and Constitution Hall located across Walnut.

110. The George W. Romney Building (which includes the Governor's Office), and the Plaza in downtown Lansing, Michigan, are deficient including by way of example and not limitation:

a. Various crosswalk curb cuts and crosswalks on the surrounding streets of Ottawa, Washington, Walnut, Allegan, Townsend, and Capitol are not the proper width, grade, or slope; use paving bricks instead of solid smooth pavement; lack compliant raised, tactile ramp inserts; and/or are cut at dangerous angles into the street or other cross walks. The sidewalk and crossing under the bridge link of the Anderson Building is at a dangerous slope and less than the required level width for that sidewalk.

b. Certain transit stops on the surrounding streets are not compliant, for example constructed on lawns instead of properly sized or positioned concrete pads.

c.  Insufficient number of accessible parking spaces for the public on the streets, and those that exist are too far from the applicable buildings, are next to curbs or planters or signposts, are otherwise dangerous and cannot be used by the drivers or passengers without the person with disability having to maneuver into oncoming traffic to get to the curb cuts and to the sidewalks or parking kiosks.

d.  No visibly marked, compliant accessible drop-off areas.

e.  Insufficient accessible parking spaces or drop off areas for the public, including no such areas on any of the surrounding streets immediately adjacent to the Capitol and Plaza.

f.  The Plaza itself is approximately one-half mile from the Capitol to the Hall of Justice, and approximately one-quarter mile for the State Office Buildings, yet there is only one, poorly marked entrance ramp to the purported "accessible route" to the Plaza from Ottawa and Allegan streets, and none are visible from Walnut. That ramp appears to be at an extreme and unsuitable grade, without appropriate or suitable railings or landings, and is too far from the various destination Office Buildings along the Plaza

g.  Poorly marked and inaccessible parking at the Michigan Library, Michigan Historical Museum, including but not limited to: (a) two directional signs positioned on Walnut without any curb cuts on either side of the street; (b) insufficient directional signage to accessible parking, and (c) the only completely accessible parking areas with proper access aisles and level surfaces appear to be only reserved for employee use not the public, and even the majority of those spaces are not fully compliant.

### *VIOLATIONS AT THE COLEMAN A. YOUNG MUNICIPAL CENTER*

111.  Construction on the Coleman A. Young Municipal Center (CAYMC) in Detroit, Michigan, began in 1951 and was completed in 1954.  It was then known as the "City-County Building."   It was renamed following the 1997 death of Hon. Coleman A. Young, a State Senator, a Civil Rights Leader, the first elected African American Mayor of one of the largest cities in the country, and at 20 years the longest serving elected Mayor of the City of Detroit.

112.  CAYMC is iconic.  It is a nationally recognized, architecturally significant, municipal government structure.

a. CAYMC comprises 745,000 square feet in two office towers, with the West Tower at 20-stories (often called the "Court Tower"), and the East Tower at 14-stories (often called the "City Tower").

b. The towers are connected by a common lobby, a common basement connected via tunnel, a bridged section on each floor above grade, and the roof.

c. With the exception of the lockup in the Court Tower, all of the floors and most of these areas are open to the public.

d. It serves an annual population of visitors and employees of over 1 million people per year, or over 4,000 per business day.

e. With the 2020 Census describing 19% of the City of Detroit population having a recognized disability, 760 individual, daily visitors and employees of the building are likely to have a disability recognized under Federal and State laws.

113. CAYMC is a "public facility" as defined by Act 1 of 1966, M.C.L. 125.1351(g).

114. From initial construction until today, CAYMC has served multiple governmental purposes including for the executive functions of the City and County, for the Legislative functions of the City and of the County,

for the elected officials including at various times the Sheriff of the

County, and Treasurers and Clerks of the City and County, and for the

Judicial functions of Third Judicial Circuit and Probate Court of the

unified State of Michigan Court System.

115.   From initial construction until the date of filing, CAYMC has failed to

comply with the "barrier free design" requirements of Act 1 of 1966,

M.C.L. 125.1351(b) for persons who are "physically limited" as defined

by M.C.L. 125.1351(f), and has failed to comply with the Architectural

Barriers Act, the Rehabilitation Act of 1973, and the Americans with

Disabilities Act as amended and the related regulations, including as

follows:

a.  Few, if any, of the court rooms, jury boxes, jury deliberation or

assembly rooms, or the chambers and offices of the courts, comply

with Federal and State laws cited herein.

b.  Only the Detroit-Wayne Joint Building Authority has conducted the

mandatory access report, attached as Exhibit B, and incorporated in its

entirety here by reference. Conducted by a third-party vendor, DLZ, it

reports multiple violations, including inaccessible toilets and toilet

rooms, entrances into the building, lack of emergency evacuation

equipment in the stairwells, heavy glass doors at interior offices,

improper or non-existent signage, and protrusions into the route of

travel in the hallways and even in the stairwells.

c.  Additionally, except in the basements of each tower, all the toilet

rooms in the 14-story East Tower and many of the women's toilet

rooms in the 20-story West Tower, are illegally closed to the public.

On occasion the toilet rooms at the 13th floor auditorium and City

Council are open during events, but they are not accessible.

d.  The detention areas on the 20th floor do not have accessible toilets,

and there is not enough space in the office for a detainee or an

attorney in a wheelchair to navigate to the either male or female cell.

e.  CAYMC is comparable to a 34-story office tower, if both towers were

stacked, and yet it has only two, purportedly accessible, sets of public

toilet rooms for persons with disabilities, and those are in the

basements.

f.  There is insufficient accessible parking and no drop-off areas on

Jefferson, Woodward, or Randolph, and the drop-off area on Larned is

usually blocked and lacks adequate signage. The accessible parking

space or spaces on Jefferson are similar to the spaces described above

in Lansing, to wit, placed next to curbs and other impediments, and requiring one to travel into oncoming traffic. The accessible parking space at the Randolph entrance is not enforced and instead is used by public officials' vehicles.

g.  Other than one emergency skid observed on the first-floor stairwell, there are no emergency skids for impaired persons to evacuate the building in the event of an emergency. Defendants fail to include impaired persons in fire evacuation drills, and there are no emergency evacuation procedures published or indicated on any signs in the building for persons with disabilities.

h.  The parking, drop-off, and entrance on Larned have been updated, yet are not done correctly, for example and not limitation, inadequate signs as noted above, and an improperly sloped ramp, without properly placed railings, leading to a central revolving door which is not large enough for wheelchairs, requiring persons with wheeled devices or canes or walkers, to cross to the right into the path of able-bodied persons to get to the purportedly accessible entrance doors.

i.   The drinking fountains were also recently updated, yet they violate the guidelines and laws by protruding into the route of travel which is required to be "unobstructed."

116.   Additionally, upon information and belief, beginning in 1954, the Joint Building Authority entered one or more leases of the property back to the City of Detroit and to the County of Wayne for initial period or periods "not to exceed 50 years." M.C.L. 123.958.

117.   Said leases expired no later than 2004.

118.   Pursuant to the Barrier Free Act, upon entering into any new lease or rental agreement of CAYMC after June 30, 1974, Defendants were required ("shall") to bring the entire Center "into compliance (to 'meet the barrier free design requirements contained in the state construction code') before a lease or rental agreement is renewed." M.C.L. 125.1351(g)(ii).

119.   Additionally, on multiple occasions after initial construction up through and including the date of filing, and specifically from and after July 20, 1975, the building, structure, and improved areas of CAYMC have been altered without fulfilling the requirements of barrier free construction, including for example but not limitation:

SECOND AMENDED
CLASS ACTION
COMPLAINT

a. Alterations to the only two "handicap" toilet stalls in the building, located in the basement of the two-tower skyscraper consisting of fourteen floors on the East Tower and twenty floors on the West Tower, including in 2022 or 2023.

b. Alterations to certain other toilet rooms and toilet stalls.

c. Alterations to office space on the 12th floor of the East Tower to establish the physical location for the so called "Office of Disability Rights," specifically targeting persons with disabilities.  Sadly, this office is not compliant, for example and without limitation it has a glass door that is too heavy and lacks the damage plate at the bottom to prevent wheelchair damage.

d. Alterations to the 13th floor of the East Tower including the large auditorium for government and other public meetings.

e. Alterations to other floor(s) of the East Tower including the public areas of the offices of the elected Mayor and the Offices of the City Council and its elected Members.

f. Alterations to the City Council Rooms for public "Meeting of the Whole" and of adjacent public City Council Member offices.

SECOND AMENDED
CLASS ACTION
COMPLAINT
75

g.  Alterations to the ground level offices of the East Tower by altering, removing, and rearranging marble and glass walls, counters, and other physical areas of the public space for interaction between the public and the government.

h.  Alterations to other public areas of the structure and building and improved areas to either remove, expand, or modify public offices of other departments which have moved into and out of the building, including for example the Register of Deeds and Treasury functions of the County have been relocated to 400 Monroe, with such space in CAYMC then becoming occupied by other County or City departments.

i.  Alterations to the ground floor and the second floor for security purposes following the terrorist attack on other skyscrapers in 2001.

j.  Alterations to the 13th Floor of the West Tower for the relocation or installation of "bond" company and "legal newspaper" offices and/or desks and/or enclosed rooms on the court floors.

k.  Placement and removal of foreclosure desks and other counters on main floor and elsewhere in CAYMC.

l.  Alterations to the transition bridges on each floor from one tower into the other.

m. The removal of the full-service public and employee cafeteria in the basement.

n.  Alterations to the East Tower to incorporate an enclosed bridge (or skyway) from the second floor across the parking lot and Randolph Street to the adjacent Millender Center, which included erecting an exterior staircase to the East Tower without any elevator or lift, failing to install accessible entrances on the first and second floors, and failing to install accessible security gates, as well as other violations.

o.  Alterations to remove and replace all the elevators in or about 1991.

p.  Alterations to the entrance ramps and entrances at all four ground floor entrances, including but not limited to a reconstruction of a non-compliant wheelchair ramp at the north entrance, instead of properly grading the ramp, changing the doors, and installing accessible automatic door openers to make the entire area accessible.

q.  Alterations to the parking areas adjacent to the East Entrance, the North Entrance, and the public street portions of the North and the

SECOND AMENDED
CLASS ACTION
COMPLAINT
77

South Entrance, without adding sufficient accessible parking or accessible drop-off areas.

r.   Alterations to the building for LEED certification and national awards.

s.   Alterations to revamp the foundations, plumbing and drainage; install a new bicycle plaza and memorial flag plaza at West entrance; install a new pedestrian plaza at the West entrance; install a new Spirt Plaza adjacent to the Woodward entrance; and install new security parking berms and other security at East entrance.

t.   Alteration and installation of a non-compliant and often non-functional lift elevator between the mezzanine of the Probate Court and other public areas of the Probate Court.

120.   None of these alterations have complied with the mandatory requirements of Act 1 of 1966, M.C.L. 125.1352(2)(b), that the entire public facility shall meet the barrier free design requirements of the state construction code.

121.   Also, the alterations have not complied with the mandatory requirements of Act 1 of 1966, M.C.L. 125.1352(2)(a), that full compliance is necessary in both (a) the area affected by the alteration,

and (b) "the areas necessary to provide a continuous and unobstructed route of travel to and from the affected areas from and including the nearest entrance."

122.   None of the alterations, construction, or reconstruction of the streets, driveways, curbs, sidewalks, ramps, railings, or intersections between pedestrian and motorized lines of travel, on or adjacent to the building, structure and improved areas are constructed in a manner that has the required grading or other requirements to accommodate Plaintiffs or other persons with wheelchairs or other physical disabilities, in violation of Act 8 of 1973, Sidewalks; Persons With Disabilities, M.C.L. 125.1361.

123.   Despite these laws being in effect for decades, despite the mandatory lease provisions and compliance required by M.C.L. 123.958, and despite Defendants' knowledge of the readily available, now routine, design and construction standards for compliance with disability laws, Defendants have spent money and made improvements to the various buildings and facilities, but have not spent any, or sufficient, money or made the required improvements or upgrades as to accessibility at issue in this case.

124.    Plaintiffs and other persons with mobility and incontinence

impairments as putative members of the class routinely use the buildings

identified and are thus, on a constant basis up to and including the date of

filing, subjected to discrimination by Defendants.

125.    Collectively and individually, Defendants have repeatedly, and

knowingly and intentionally (or with deliberate indifference and/or

willful and ignorant disregard of the facts and law) engaged in a pattern,

practice, and policy of discriminating against Plaintiffs and other persons

with mobility and incontinence impairments, in violation of their

obligations under state and federal laws cited in this Complaint.

126.   Due  to the "double I formation" within the central corridor on the

"east-west axis" of each Tower, combined with the two separate, central,

vertically stacked tubes for elevators, plumbing, electrical, internet,

HVAC, and other maintenance access located within each Tower of the

structure, and the nature and sequence of construction or reconstruction

of the structure and of the sidewalks, parking areas and grounds

surrounding the structure, at the present time as of the year 2023 C.E., all

of these alterations yield a situation in which the entire public building

and improved areas collectively do not comply either with the mandatory

barrier-free requirements of Michigan Barrier Free Design Act, Michigan

Construction Code, Sidewalks; Persons with Disabilities Act, Persons

with Disabilities Civil Rights Act, nor with the Federal 1991 ADA

Accessibility Guidelines, 2010 ADA Standards for Accessible Design,

Architectural Barriers Act of 1968, Section 504 of the Rehabilitation Act

of 1973, and Title II of the Americans with Disabilities Act.

127.   Each such failure has deprived Plaintiffs and putative class members

of their civil rights, thereby injuring them, including physically,

financially, and professionally; and caused them pain and suffering,

emotional distress, humiliation, embarrassment, delay, and

inconvenience.

## *VIOLATIONS AT THE FRANK MURPHY HALL OF JUSTICE*

128.   The Frank Murphy Hall of Justice, formerly Recorders Court

Building, has multiple violations, including by way of example and not

limitation:

a.   On information and belief, does not have accessible toilets or toilet

rooms on each floor.

b.   On information and belief, does not have an accessible toilet facility

in each of the lockups.

SECOND AMENDED
CLASS ACTION
COMPLAINT
81

c.  Fails to properly maintain the concrete ramp into the building from Gratiot.

d.  Has a steam tower located in the crosswalk at Gratiot and St. Antoine.

e.  Does not have sufficient accessible parking spaces or accessible vehicles and passenger drop off areas on Gratiot, St. Antoine, or Clinton. The designated accessible spaces on Gratiot have signs which face parallel to the lane of traffic and are not visible to a driver until after having passed the spot. Additionally, the spot or spots are next to curbs or planters or signposts, are otherwise dangerous and cannot be used by the drivers or passengers, without the person with disability having to maneuver into oncoming traffic to get to the curb cuts and to the sidewalk.

129.  Each such failure has deprived Plaintiffs and putative class members of their civil rights, thereby injuring them, including physically, financially, and professionally; and caused them pain and suffering, emotional distress, humiliation, embarrassment, delay, and inconvenience.

## *VIOLATIONS AT THE 36TH DISTRICT COURT BUILDING*

130.   The State of Michigan Thirty-Sixth District Court in the City of

Detroit has multiple violations, including by way of example and not

limitation:

a.  Several of the courtrooms are not fully accessible.

b.  Appears to have a policy of deterring persons with disabilities from

exercising their rights to serve on juries, as described in this

Complaint.

c.  Several of the toilet rooms are not fully accessible, for example,

changing tables and other devices blocking doors to nominally

accessible stalls.

d.   Does not have accessible entrances or proper signage into the facility

as described previously in this Complaint.

e.  Does not have accessible parking or drop off areas as described

previously in this Complaint.

f.   Has a new but non-compliant drinking fountain on the first-floor

public lobby.

g.  Upon information and belief, the jury assembly area is not fully

compliant.

131.   Each such failure has deprived Plaintiffs and putative class members of their civil rights, thereby injuring them, including physically, financially, and professionally; and caused them pain and suffering, emotional distress, humiliation, embarrassment, delay, and inconvenience.

### VIOLATIONS AT THE LINCOLN JUVENILE JUSTICE CENTER

132.   The Lincoln Juvenile Justice Center in Detroit has multiple violations, including by way of example and not limitation:

a.   Does not have enough accessible toilets or toilet rooms.

b.   Does not have accessible entrances into the facility, except for example at the employee-only entrance which is only available through a gated employee parking lot at the back of the building complex.

c.   Does not have accessible parking or drop off areas as described above.

d.   On information and belief, does not have accessible residency or holding areas for the juveniles, either at the Lincoln Juvenile Justice Center or the offsite locations.

133.   Each such failure has deprived Plaintiffs and putative class members of their civil rights, thereby injuring them, including physically,

financially, and professionally; and caused them pain and suffering, emotional distress, humiliation, embarrassment, delay, and inconvenience.

### VIOLATIONS AT THE WAYNE COUNTY CRIMINAL JUSTICE CENTER UNDER CONSTRUCTION ON EAST WARREN

134.   The Wayne County Criminal Justice Center, 1301 East Warren, Detroit, is a $600,000,000.00 new construction, 11-acre campus containing a new 5-story County Jail Adult Detention Center, a new 3-story County Juvenile Detention Center, a 7-story Criminal Courthouse, a Sheriff's Office, and a 4-story Administration Building.

135.   Although the street address is on East Warren, it is set back one-half city block from East Warren, north of the Detroit Department of Transportation Garage and Terminal.

136.   Construction began in 2019, with completion scheduled for early 2022.

137.   The project is not yet completed, and has missed multiple milestone deadlines, including as recently as February 1, 2023.

138.   Once construction is complete, the County predicts move-in will take an additional four to six months for the multiple occupants described above.

139.   The Criminal Justice Center has multiple violations including by way of example and not limitation, and including by direct observation and upon information and belief:

a.   Failure to plan and provide sufficient public parking lots to the public, thereby further limiting accessible parking. The property plans have three parking lots.  There is no readily available parking in the immediate vicinity, since the property is bordered to the west by Interstate-75, to the south by the Detroit Department of Transportation Garage and Terminal, and to the east and north by other buildings including warehouses and office buildings.

b.   Failure to plan and provide accessible transit stops: DDOT Route 40 Russell is the only line servicing the project, with 3 stops on Russell, none of which are accessible.  The next closest is DDOT Route 8 Warren, which is about one-quarter mile away.

140.   Once open to the public, each such failure will deprive Plaintiffs and putative class members of their civil rights, thereby injuring them,

SECOND AMENDED
CLASS ACTION
COMPLAINT
86

including physically, financially, and professionally; and caused= them

pain and suffering, emotional distress, humiliation, embarrassment,

delay, and inconvenience.

### *VIOLATIONS AT WAYNE COUNTY EXECUTIVE AND LEGISLATIVE OFFICES AND CERTAIN PUBLIC CITY OF DETROIT OFFICES IN THE GUARDIAN BUILDING*

141.   Upon information and belief, Defendant Wayne County owns the

Guardian Building. Wayne County Executive Offices, Wayne County

Commission Offices, and City of Detroit's Detroit Economic Growth

Corporation are located on the upper floors of the Guardian Building,

another iconic, architecturally significant skyscraper in downtown

Detroit, Michigan. The public auditorium of the Wayne County

Commission is in the sub-mezzanine at the Congress and Griswold

entrances. The applicable space comprises 200,000 square feet of the

500,000 square foot building.  The Guardian Building, with these major

occupants, has multiple violations, including by way of example and not

limitation:

a.   Insufficient signage at the entrances at Griswold and Congress.

b.   No accessible entrance on Congress, and the entrance on Griswold

only serves a portion of the building, thereby requiring Plaintiffs

essentially to go to the "backdoor" on Larned, creating the following problems:

    i.  The entrances at Griswold and Congress are set into the building for shelter, with awnings and wind-protective screens, and sometimes has been posted with  uniformed door attendants on the sidewalks. Instead any persons with mobility disabilities intending to access the retail lobby or the Commission public meeting room on the lower Mezzanine must proceed south the entire length of the building on Griswold, without the support of an attendant or railings, to the sole, nominally accessible entrance on Larned, which is exposed to the weather and wind off of the Detroit River and has no awning, wind-screen, or outside attendants, to proceed to an interior lift in the small Larned lobby, which may or may not be attended or operational, and then return north to an elevator lobby for the Mezzanine, and through the entire retail lobby.

   ii.  Combined with the interior, grand staircase at the Congress and Griswold lobby, this layout also deprives Plaintiffs equal access to the commercial and retail lobby and upper lobby mezzanine

SECOND AMENDED
CLASS ACTION
COMPLAINT
88

which able-bodied persons can readily access from the
Griswold and Congress entrances.

iii.   The layout also restricts Plaintiffs' access to the public
auditorium for the County Commission on the sub-mezzanine
in the Congress and Griswold lobby, where the County's
legislative branch conducts public meetings.

c.   No accessible parking or drop-off areas, including specifically at the
Larned entrance which has no standing or no parking and is a full
traffic lane. While there is parking on Congress and Griswold, none of
it is accessible, and there is no accessible drop-off area, even though
Defendants encourage and allow private vendors to operate valet
parking in travel lanes of Congress and Griswold in front of the
adjacent Penobscot, Ford, and Buhl Buildings.

d.   No proper notices or signs on Larned, Congress, or Griswold, nor on
Woodward adjacent to the Capital One Café Buildings, to alert the
public to the nearest accessible entrances.

e.   Once inside, the main stairway to the commercial and retail lobbies of
the building are not fully accessible to Plaintiffs, even though they are

fully accessible to other able-bodied visitors to the Defendants' offices.

142.   No fully accessible toilet rooms or toilets in the Congress and Griswold lobby. There is only one purportedly accessible toilet on these public floors, but it is hidden in the north corner of the retail level, and illegally allows for locking the door from the inside even though there are two stalls.

143.   Each such failure has deprived Plaintiffs and putative class members of their civil rights, thereby injuring them, including physically, financially, and professionally; and caused them pain and suffering, emotional distress, humiliation, embarrassment, delay, and inconvenience.

### VIOLATIONS AT THE WAYNE COUNTY REGISTER OF DEEDS AND OTHER PUBLIC OFFICES IN THE 400 MONROE STREET BUILDING

144.   Certain County Register of Deed and City and County Treasurer Offices are located on the upper floors of the 400 Monroe Street Building in Detroit, Michigan, which has multiple violations, including by way of example and not limitation:

SECOND AMENDED
CLASS ACTION
COMPLAINT

a.   No proper notices or signs Monroe or Beaubien to alert the public to the nearest accessible entrances.

b.   Except for one nominally accessible parking space on Monroe Street opposite and across the traffic lanes of Monroe Street, there are no accessible parking or drop off areas, including specifically at the Brush, Monroe or Beaubien entrances which have no standing or no parking for disability access, and are full traffic lanes.

145.   Each such failure has deprived Plaintiffs and putative class members of their civil rights, thereby injuring them, including physically, financially, and professionally; and caused them pain and suffering, emotional distress, humiliation, embarrassment, delay, and inconvenience.

### VIOLATIONS AT THE FRIEND OF THE COURT AND FAMILY COURT OFFICES AND COURTROOMS IN THE PENOBSCOT BUILDING

146.   Certain State of Michigan Third Judicial Circuit Court operations are located on the upper floors of one of the three tower buildings comprising the Penobscot Building in Detroit, Michigan, which has multiple violations, including by way of example and not limitation:

a. No accessible parking or drop off areas, instead either forbidding parking or allowing only paid "valet" parking services.

b. No proper notices or signs on Fort, Shelby, Congress, or Griswold to alert the public to the nearest accessible entrances.

c. No ready access to the stair lift or elevators to the Griswold lobby from the Congress and Fort Street entrances.

d. Not fully accessible toilets or toilet rooms.

e. Not fully accessible referee hearing rooms, chambers, and meeting rooms.

147. Each such failure has deprived Plaintiffs and putative class members of their civil rights, thereby injuring them, including physically, financially, and professionally; and caused them pain and suffering, emotional distress, humiliation, embarrassment, delay, and inconvenience.

### VIOLATIONS AT THE 47TH CIRCUIT COURT AND 94TH DISTRICT COURT BUILDING IN ESCANABA, MICHIGAN

148. The State of Michigan Forty-Seventh Judicial Circuit Court and Ninety-Fourth Judicial District Court are located in the combined Court and Delta County building in Escanaba, Michigan. It has accessible

toilets and accessible entrance; however, it also has other major violations, including by way of example and not limitation:

a. Not enough accessible parking spaces or drop off areas, including that there is no blue striped access aisle space between the only two accessible spaces in the parking lot, and the only accessible parking space on the street is at a curb immediately adjacent to a light pole which partially blocks the space, and requires travel in traffic.

b. A heavy door separating the lavatories from the toilets in the men's room.

c. No accessible jury boxes in the Circuit Courtroom(s), although the District Courtroom does appear to be accessible.

149. Each such failure has deprived Plaintiffs and putative class members of their civil rights, thereby injuring them, including physically, financially, and professionally; and caused them pain and suffering, emotional distress, humiliation, embarrassment, delay, and inconvenience.

## *VIOLATIONS AT THE 44TH CIRCUIT COURT BUILDINGS*

150. The State of Michigan Forty-Fourth Judicial Circuit Court is located in the Livingston County at two locations, one in Brighton and one in

Howell, which have multiple violations, including by way of example and not limitation:

a.  No fully accessible toilets or toilet rooms in Howell, due to the most convenient and centrally located one being blocked whenever there is a jury.

b.  No fully accessible entrance wide enough in Howell.

c.  Not fully accessible or sufficient accessible parking.

151.  Each such failure has deprived Plaintiffs and putative class members of their civil rights, thereby injuring them, including physically, financially, and professionally; and caused them pain and suffering, emotional distress, humiliation, embarrassment, delay, and inconvenience.

## VIOLATIONS AT THE 11TH CIRCUIT COURT BUILDING

152.  The State of Michigan Eleventh Judicial Circuit Court is located in the Mackinac County Offices and Court Building in St. Ignace, Michigan, which has multiple violations, including by way of example and not limitation:

a.  No accessible toilets or toilet rooms on any of the upper floors.

b. No fully accessible entrance into facility: the exterior door to the purportedly accessible exterior elevator below grade, is locked, can only be opened by the deputy on duty at the first-floor interior security gate, and there is no communication device or signage to indicate whether that deputy is readily available.

c. Not have enough accessible parking or drop-off areas.

d. No accessible toilet rooms or toilets other than in the basement.

e. No proper evacuation equipment in the stairwells.

153. Each such failure has deprived Plaintiffs and putative class members of their civil rights, thereby injuring them, including physically, financially, and professionally; and caused them pain and suffering, emotional distress, humiliation, embarrassment, delay, and inconvenience.

## *VIOLATIONS AT THE 16TH CIRCUIT COURT BUILDING*

154. The State of Michigan Sixteenth Judicial Circuit and Probate Courts are located in the Macomb County and Court Building in Mt. Clemens, Michigan, which has multiple violations, including by way of example and not limitation:

a.  Not enough accessible parking or drop off areas and does not properly maintain the parking or drop off areas it designates as accessible.

b.  No proper evacuation equipment in the stairwells.

155.   Each such failure has deprived Plaintiffs and putative class members of their civil rights, thereby injuring them, including physically, financially, and professionally; and caused them pain and suffering, emotional distress, humiliation, embarrassment, delay, and inconvenience.

## VIOLATIONS AT THE 6TH CIRCUIT COURT BUILDINGS

156.   The State of Michigan Sixth Judicial Circuit and Probate Courts are located in the multi-building complex at 1200 North Telegraph in Pontiac, Michigan, which has multiple violations, including by way of example and not limitation:

a.  No accessible toilets or toilet rooms on any of the upper floors of the original Court Tower.

b.  No proper signage or directions to the only accessible toilets in the original Court Tower on the ground floor.

c.  The only accessible toilet rooms in the original Court Tower are not fully accessible.

d. No proper evacuation notices or signs in either tower, and no proper evacuation equipment in many of the stairwells of the upper floors of the original Court Tower.

e. Inaccessible parking and approaches to the Court, for example and not limitation, huge security planters block the path from the north parking lot to the entrance, the formerly accessible public parking in the north and west lots have been assigned to employee or police usage only, and in the south lot the spaces were moved across a new boulevard, they are not properly maintained or marked, and they are painted in two colors, once in blue and once in yellow such that it is impossible to determine the perimeters of the parking spaces or access aisles.

157. Each such failure has deprived Plaintiffs and putative class members of their civil rights, thereby injuring them, including physically, financially, and professionally; and caused them pain and suffering, emotional distress, humiliation, embarrassment, delay, and inconvenience.

## *VIOLATIONS AT THE 22ND JUDICIAL CIRCUIT COURT BUILDING*

158.   The State of Michigan Twenty-Second Judicial Circuit Court and

Probate Courts are located in Ann Arbor, Michigan, and have multiple

violations, including by way of example and not limitation:

a.   No fully accessible entrances into the facility, including the automated

door opener is blocked from Main Street approach by the concrete

garbage container, and the grading at Main Street and Huron Street is

too steep and lacks railings.

b.   The curb cuts at Ann and Main are poorly designed and maintained

causing puddles and ice or snow to accumulate.

c.   No accessible on-street spaces or drop-off areas, and insufficient off-

street parking spaces in the lot at Ann and Main which appears to

serve both the Court and the County buildings.  That off-street parking

does not have an adequate accessible route out of that parking lot, nor

across Main to the Courthouse, and further lacks any signs pointing to

the nearest accessible route crossing Main, whether it should be at

Ann to the County Building or at Huron to the only ostensibly

accessible entrance at Main and Huron. Further, there is no pedestrian

island with appropriate crosswalks and warning lights on Main to

create a free and clear route mid-block like there is in other areas of

Ann Arbor.

159.    Each such failure has deprived Plaintiffs and putative class members

of their civil rights, thereby injuring them, including physically,

financially, and professionally; and caused them pain and suffering,

emotional distress, humiliation, embarrassment, delay, and

inconvenience.

## DEFENDANTS' DUTY TO COMPLY WITH RELEVANT STATE AND FEDERAL ACCESSIBILITY LAWS

160.    Upon information and belief, each of the public entity Defendants has

received Federal funding, including COVID-19 economic relief from the

U.S. Departments of Treasury, Transportation, Health and Human

Services, and/or the State of Michigan; and/or funding from the

American Rescue Plan Act of 2021, the Build Back Better Act, and/or the

Inflation Reduction Act of 2022, subjecting them to the anti-

discrimination and fully access provisions of the Rehabilitation Act of

1973, including 29 U.S.C. §§ 794(b)(1)(A) and (B).

161.   Many if not most of the modifications required to comply with the laws are simple maintenance budget items, such as removing locks to the toilet rooms in CAYMC, switching out non-compliant toilets, lavatories, other restroom fixtures, painting parking spaces and installing signs.

162.   Except for the referenced self-assessment by the Detroit-Wayne Joint Building Authority, and upon information and belief, a 2008 self-assessment audit by the State, none of the Defendants has commissioned or completed any of the initial mandatory self-assessments, or the tri-annual reports, as to the physical limitations in any of the facilities.

163.   Upon information and belief, each of the Defendants has failed to allocate or spend any such money for the needed improvements discussed in this Complaint.

164.   Moreover, during the COVID-19 pandemic beginning on or around January 21, 2020, Defendants failed to take advantage of the closed and semi-closed status of many of these buildings to make the facilities accessible as required by Federal and State law.

165.   Each Defendant knows or should know of their individual and collective failures to correct these deficiencies, including specifically failures of the City to comply in good faith with even the bare minimum

of agreements with the United States Department of Justice over 10 years ago; and more recently, beginning in January 2020, Defendants City, County, and Detroit-Wayne Joint Building Authority's failure to cooperate in good faith to resolve the issues raised via a community *ad hoc* committee that included Plaintiff Jill Babcock. Meetings were finally held in October and November 2021, and January 2022, and then abruptly and unilaterally cancelled by Defendants in February 2022. *See* Exhibit A, agenda circulated before the meetings were cancelled.

166.   Defendants City, County, and Detroit Wayne Joint Building Authority have ignored repeated complaints about the public meeting areas for Detroit City Council, and the public 13th-floor auditorium as to how to make them accessible to the public, or to speakers who have physical disabilities, including such basic items as having adequate aisleways, seating areas, ramps, or rails.

167.   Defendants' repeated failures evidence their pattern, practice, and policy of illegal discrimination.

## CAUSES OF ACTION

### *COUNT I*
### *Violations of Title II of the*
### *Americans with Disabilities Act*
### *42 U.S.C. § 12131* **et seq.**
### *(As to All Defendants)*

168.   Plaintiffs re-allege and incorporate by reference the allegations set

forth in all preceding paragraphs.

169.   Title II of the ADA provides "[N]o qualified individual with a

disability shall, by reason of such disability, be excluded from

participation in or be denied the benefits of the services, programs, or

activities of a public entity, or be subjected to discrimination by any such

entity," 42 U.S.C. § 12132.

170.   Plaintiffs are, and at all times relevant herein were, persons with a

"disability" within the meaning of the ADA, 42 U.S.C. § 12102.

171.   Plaintiffs are, and at all times relevant herein were, "qualified

individual(s) with a disability" within the meaning of the ADA, 42 §

U.S.C. 12131(2), who "with or without reasonable modifications to rules,

policies, or practices, the removal of architectural, communication, or

transportation barriers, or the provision of auxiliary aids and services,

meet[] the essential eligibility requirements for the receipt of services or

the participation in programs or activities provided by a public entity," including as specified in this Complaint.

172.   Defendants are, and at all times relevant herein were, public entities within the meaning of the ADA, 42 U.S.C. §§ 12131(1)(a) and (b).

173.   Defendants' duties under Title II of the ADA are mandatory and well established for over thirty years.

174.   At all times relevant herein, Defendants have known their duties and obligations under Title II of the ADA.

175.   At all times relevant herein, Defendants have knowingly failed to carry out and execute their duties and obligations, both individually and collectively as to their respective buildings, facilities, and bailiwicks as enumerated above.

176.   Defendants' failures have been and are willful and by choice, or deliberately indifferent, or both.

177.   The elements or features of the Defendants' facilities that do not comply prevent persons with disabilities from fully and equally enjoying the Defendants' services, programs, or activities and constitute discrimination on the basis of disability within the meaning of 42 U.S.C. § 12132 and 28 C.F.R. §§ 35.149 and 35.150.

SECOND AMENDED
CLASS ACTION
COMPLAINT

178.  In acting as alleged herein, Defendants individually and collectively have repeatedly and continuously discriminated against Plaintiffs and similarly disabled persons on the basis of their disabilities in violation of Title II of the ADA and its implementing regulations. Defendants' discriminatory conduct includes, *inter alia*:

a.  Excluding them from participating in or denying them the benefits of the services of its executive, legislative, and judicial branches and electoral and administrative review functions in violation of 42 U.S.C. § 12132.

b.  Denying and excluding them from participation by denying them access by failing to eliminate the physical obstacles to their participation as described herein, in violation of 42 U.S.C. § 12132.

c.  Defendants knowingly, deliberately, intentionally, and actively continue to unlawfully discriminate against Plaintiffs and all other similarly situated qualified individuals who have disabilities, by continuing to conduct their executive, legislative, and judicial branches, and electoral and administrative review functions in facilities that Defendants know are not accessible and which

SECOND AMENDED
CLASS ACTION
COMPLAINT
104

otherwise fail to meet the requirements under the ADA and its
implementing regulations.

    d.  Alternatively, Defendants' actions and omissions have been and are
reckless or willfully indifferent to their obligations.

179.  But for these and other failures by Defendants to comply with the law,
Plaintiffs would be able to fully and equally participate in the exercise of
their constitutional and civil activities, they would be able to fully and
equally participate in the Defendants' programs and activities, and they
would be able to fully and equally receive other services and programs
offered by Defendants to the general public who are not disabled or
qualified persons with disabilities.

180.  As a direct and proximate result of Defendants' actions and
omissions, Plaintiffs and all other similarly situated qualified individuals
have suffered damages in the form of extreme embarrassment,
humiliation, emotional and physical distress, delays, other difficulties,
and the loss of their civil rights described hereinabove.

181.  As a direct and proximate result of Defendants' actions and
omissions, Plaintiff Ashley Jacobson and all other similarly situated
qualified individuals who are licensed attorneys engaged in the private

practice of law to support themselves and their families, have also suffered economic damages, including lost profits, wages, or earnings.

182.   As a direct and proximate result of Defendants' actions and omissions, Plaintiffs Jill Babcock and Ashley Jacobson and all other similarly situated qualified individuals with disabilities who are licensed attorneys whether or not engaged in the private practice of law have suffered damage to their professional standing by being deprived of the same access as their able-bodied peers to these activities, facilities, and services, and consequently they have suffered economic damages, including lost opportunity, profits, wages, or earnings.

183.   Pursuant to 42 U.S.C. §§ 12133 and 12205, Plaintiffs are entitled to and pray for judgment as set forth below.

**COUNT II**
***Violations of Section 504 of the***
***Rehabilitation Act of 1973***
***29 U.S.C. § 794* et seq.**
***(As to All Defendants)***

184.   Plaintiffs re-allege and incorporate by reference the allegations set forth in all preceding paragraphs.

185.   Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its implementing regulations provide, in pertinent part, that "[n]o otherwise

qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 20 U.S.C. § 794(a); *see also* 34 C.F.R. § 104.4(a).

186.   A person is an "individual with a disability" under Section 504 if that person experiences "a physical or mental impairment which substantially limits one or more major life activities." 29 U.S.C. § 705(20)(B) (incorporating definition in 42 U.S.C. § 12102 by reference).

187.   "Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

188.   The term "program or activity" means all the operations of:

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance

SECOND AMENDED
CLASS ACTION
COMPLAINT
107

is extended, in the case of assistance to a State or local
government; . . .

(3)(A) an entire corporation, partnership, or other private
organization, or an entire sole proprietorship --

> (i) if assistance is extended to such corporation,
> partnership, private organization, or sole proprietorship
> as a whole; or
> (ii) which is principally engaged in the business of
> providing education, health care, housing, social services,
> or parks and recreation; or

(B) the entire plant or other comparable, geographically
separate facility to which Federal financial assistance is
extended, in the case of any other corporation, partnership,
private organization, or sole proprietorship; or

(4) any other entity which is established by two or more of the
entities described in paragraph (l), (2) or (3); any part of which
is extended Federal financial assistance.

20 U.S.C. § 794(b).

189.   In acting as alleged herein, Defendants individually and collectively

have repeatedly and continuously discriminated against Plaintiffs and

similarly disabled persons on the basis of their disabilities in violation of

Section 504. Defendants' discriminatory conduct includes, *inter alia*:

a.   Excluding them from participating in or denying them the benefits of

the services of its executive, legislative, and judicial branches, and

electoral and administrative review functions, in violation of 20 U.S.C. § 794.

b.  Denying and excluding them from participation by denying them access by failing to eliminate the physical obstacles to their participation as described herein, in violation of 20 U.S.C. § 794.

c.  Defendants knowingly, deliberately, intentionally, and actively continue to unlawfully discriminate against Plaintiffs and all other similarly situated qualified individuals who have disabilities, by continuing to conduct their executive, legislative and judicial branches, and electoral and administrative review functions, in facilities that Defendants know are not accessible and which otherwise fail to meet the requirements under the ADA and its implementing regulations.

d.  Alternatively, Defendants' actions and omissions have been and are deliberately indifferent to their obligations.

190.  Defendants' violations of Section 504 have caused, and continue to cause, actual and proximate harm to Plaintiffs.

191.  At the time Defendants violated Plaintiffs' rights under Section 504 as set forth above, Defendants, and their respective agents, had knowledge

that harm to a federally protected right was substantially likely, and were deliberately indifferent to that risk.

192.  These repeated violations constitute a continuing violation of Section 504.

193.  But for these and other failures by Defendants to comply with the law, Plaintiffs would be able to fully and equally participate in the exercise of their constitutional and civil activities, they would be able to fully and equally participate in the Defendants' programs and activities, and they would be able to fully and equally receive other services and programs offered by Defendants to the general public who are not disabled or qualified persons with disabilities.

194.  As a direct and proximate result of Defendants' actions and omissions, Plaintiffs and all other similarly situated qualified individuals have suffered damages in the form of extreme embarrassment, humiliation, emotional and physical distress, delays, other difficulties, and the loss of their civil rights described hereinabove.

195.  As a direct and proximate result of Defendants' actions and omissions, Plaintiff Ashley Jacobson and all other similarly situated qualified individuals who are licensed attorneys engaged in the private

practice of law to support themselves and their families, have also

suffered economic damages, including lost profits, wages, or earnings.

196.   As a direct and proximate result of Defendants' actions and

omissions, Plaintiffs Jill Babcock and Ashley Jacobson and all other

similarly situated qualified individuals with disabilities who are licensed

attorneys whether or not engaged in the private practice of law have

suffered damage to their professional standing by being deprived of the

same access as their able-bodied peers to these activities, facilities, and

services, and consequently they have suffered economic damages,

including lost opportunity, profits, wages, or earnings.

197.   Pursuant to 29 U.S.C. § 794a, Plaintiffs are entitled to and pray for

judgment as set forth below.

### *COUNT III*
### *Violations of the Michigan Persons with*
### *Disabilities Civil Rights Act*
### *M.C.L. 37.1101* **et seq.**
### *(As to All Defendants)*

198.   Plaintiffs re-allege and incorporate by reference the allegations set

forth in all preceding paragraphs.

199.   Individually and collectively, Defendants have repeatedly and

continuously discriminated against Plaintiffs and similarly disabled

persons in violation of the Michigan Constitution and laws of the State of

Michigan including but not limited to the Michigan Persons with

Disabilities Civil Rights Act (PDCRA), the related Elliott-Larsen Civil

Rights Act (ELCRA), and applicable provisions of the Michigan

Administrative Code and regulations.

200.    The Defendants and their agents are subject to and required to follow

the mandatory provisions of PDCRA: "AN ACT to define the civil rights

of persons with disabilities; to prohibit discriminatory practices, policies,

and customs in the exercise of those rights; to prescribe penalties and to

provide remedies; and to provide for the promulgation of rules." Act 220

of 1976.

201.   PDCRA establishes and guarantees the civil rights of disabled person

at issue in this case, M.C.L. 37.1102(1):

> The opportunity to obtain employment, housing, and other real
> estate and full and equal utilization of public accommodations,
> public services, and educational facilities without
> discrimination because of a disability is guaranteed by this act
> and is a civil right.

202.   PDCRA incorporates and does not conflict with other statutes,

including the ELCRA, M.C.L. 37.1604: "Nothing in this act shall be

interpreted as invalidating any other act that establishes or provides

programs or services for persons with disabilities."

203.   The plaintiffs and similarly situated persons are persons with

disabilities entitled to the protections and civil rights established by

PDCRA, M.C.L. 37.1103:

Definitions:

(d) Except as provided under subdivision (f), "disability" means 1 or more of the following:

(i) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:. . .(f)or purposes of article 3, is unrelated to the individual's ability to utilize and benefit from a place of public accommodation or public service.

(ii) A history of a determinable physical or mental characteristic described in subparagraph (i).

(iii) Being regarded as having a determinable physical or mental characteristic described in subparagraph (i).

(g) "Person" includes an individual. . . ."

(h) "Person with a disability" or "person with disabilities" means an individual who has 1 or more disabilities.

(l) "Unrelated to the individual's ability" means, with or without accommodation, an individual's disability does not prevent the individual from doing 1 or more of the following:

(ii) For purposes of article 3, utilizing and benefiting from a place of public accommodation or public service.

204. PDCRA specifically includes the Defendants, M.C.L. 37.1103:

(g) "Person" includes an individual, agent, association, corporation, joint apprenticeship committee, joint-stock company, labor union, legal representative, mutual company, partnership, receiver, trust, trustee in bankruptcy, unincorporated organization, this state, or any other legal, commercial, or governmental entity or agency.

(i) "Political subdivision" means a county, city, village, township, school district, or special district or authority of this state.

205. PDCRA specifically applies to the Defendants' buildings and facilities and services at issue in this case, Article 3, M.C.L. 37.1301:

(a) "Place of public accommodation" means a business, educational institution, refreshment, entertainment, recreation, health, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public.

(b) "Public service" means a public facility, department, agency, board, or commission owned, operated, or managed by or on behalf of this state or a subdivision of this state, a county, city, village, township, or independent or regional district in

this state or a tax exempt private agency established to provide service to the public, except that public service does not include a state or county correctional facility with respect to actions or decisions regarding an individual serving a sentence of imprisonment.

206.   Defendants are prohibited from discriminatory denial of accommodation and full and equal enjoyment to plaintiffs and other persons with disabilities in the provision of access and services at issue in this case, M.C.L. 37.1302:

> Except where permitted by law, a person shall not:
>
> > (a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation or public service because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages, or accommodations or because of the use by an individual of adaptive devices or aids.

207.   Defendants are also prohibited from aiding or abetting each other or interfering with the exercise or enjoyment of discriminatory denial of accommodation and full and equal enjoyment to plaintiffs and other persons with disabilities in the provision of access and services at issue in this case, M.C.L. 37.1602:

> A person or 2 or more persons shall not do the following:

(a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

(b) Aid, abet, incite, compel, or coerce a person to engage in a violation of this act.

(c) Attempt directly or indirectly to commit an act prohibited by this act.

(d) Willfully interfere with the performance of a duty or the exercise of a power by the commission or any of its authorized representative

(e) Willfully obstruct or prevent a person from complying with this act or an order issued.

(f) Coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by article 5.

208.    Section 102 of PDCRA mandates Defendants ". . . shall accommodate a person with a disability for purposes of employment, public accommodation, public service, education, or housing unless the person demonstrates that the accommodation would impose an undue hardship." M.C.L. 37.1102(2)

209.   Defendants are unable to and have failed to establish any "undue hardship."

210.   Defendants' duties under PDCRA are mandatory and well established for nearly fifty (50) years.

211.   At all times relevant herein, Defendants have known their duties and obligations under PDCRA.

212.   At all times relevant herein, Defendants have knowingly failed to carry out and execute their duties and obligations.

213.   Defendants' failures have been and are willful and by choice, or deliberately indifferent, or both.

214.   The elements or features of the Defendants' facilities that do not comply prevent persons with disabilities from fully and equally enjoying Defendants' services, programs, or activities and constitute discrimination on the basis of disability within the meaning of PDCRA.

215.   In acting as alleged herein, Defendants individually and collectively have repeatedly and continuously discriminated against Plaintiffs and similarly disabled persons on the basis of disability in violation of PDCRA. Defendants' discriminatory conduct includes, *inter alia*:

a.  Excluding them from participating in or denying them the benefits of the services of its executive, legislative, and judicial branches, and electoral and administrative review functions.

b.  Denying and excluding them from participation by denying them access by failing to eliminate the physical obstacles to their participation as described herein.

c.  Defendants knowingly, deliberately, intentionally, and actively continue to unlawfully discriminate against Plaintiffs and all other similarly situated qualified individuals who have disabilities, by continuing to conduct their executive, legislative, and judicial branches and electoral and administrative review functions in facilities that Defendants know are not accessible and which otherwise fail to meet the requirements under PDCRA and ELCRA and their implementing regulations.

d.  Alternatively, Defendants' actions and omissions have been and are reckless or willfully indifferent to their obligations.

216.  But for these and other failures by Defendants to comply with the law, Plaintiffs would be able to fully and equally participate in the exercise of their constitutional and civil activities, they would be able to fully and

equally participate in Defendants' programs and activities, and they would be able to fully and equally receive other services and programs offered by Defendants to the general public who are not disabled or qualified persons with disabilities.

217.  As a direct and proximate result of Defendants' actions and omissions, Plaintiffs and all other similarly situated qualified individuals have suffered damages in the form of extreme embarrassment, humiliation, emotional and physical distress, delays, other difficulties, and the loss of their civil rights described hereinabove.

218.  As a direct and proximate result of Defendants' actions and omissions, Plaintiff Ashley Jacobson and all other similarly situated qualified individuals who are licensed attorneys engaged in the private practice of law to support themselves and their families, have also suffered economic damages, including lost profits, wages, or earnings.

219.  As a direct and proximate result of Defendants' actions and omissions, Plaintiffs Jill Babcock and Ashley Jacobson and all other similarly situated qualified individuals with disabilities who are licensed attorneys whether or not engaged in the private practice of law have suffered damage to their professional standing by being deprived of the

same access as their able-bodied peers to these activities, facilities, and

services, and consequently they have suffered economic damages,

including lost opportunity, profits, wages, or earnings.

220.   By posting signs in the public hallways of CAYMC, the original

tower of the Oakland County Courthouse and County Offices, and other

locations, which state "HANDICAPPED BATHROOMS LOCATED IN

BASEMENT," or similar worded signs, Defendants have published and

posted signs which blatantly indicate they deny to persons with

disabilities full and equal access to the facilities, in violation of ELCRA,

M.C.L. 37.2302:

Prohibited Conduct: . . .

(b) Print, circulate, post, mail, or otherwise cause to be
published a statement, advertisement, or sign which
indicates that the full and equal enjoyment of the goods,
services, facilities, privileges, advantages, and
accommodations of a place of public accommodation or
public service will be refused, withheld from, or denied
an individual because of a disability that is unrelated to
the individual's ability to utilize and benefit from the
goods, services, facilities, privileges, advantages, or
accommodations or because of the use by an individual
of adaptive devices or aids, or that an individual's
patronage of or presence at a place of public
accommodation is objectionable, unwelcome,
unacceptable, or undesirable because of a disability that
is unrelated to the individual's ability to utilize and

benefit from the goods, services, facilities, privileges, advantages, or accommodations or because of the use by an individual of adaptive devices or aids.

221.   Additionally, at all times relevant herein, Defendants have failed to have or timely replace necessary and proper signage as indicated in the complaint and by the proofs at trial, as required by Michigan law at various times up to and including the amendments of October 23, 2022, M.C.L. 37.1102a, including but not limited to such instances which fail to communicate the most basic information, as:

a.   Upside down braille signage on at least one public elevator bank on the main, first floor level, and missing braille signage inside one or more of the public elevators of CAYMC.

b.   Improper and missing signage on multiple public locations in the CAYMC, Oakland County Courthouse, and other Defendant locations.

c.   Improper "emergency route" signs in multiple public locations of Defendants which fail to notate equipment availability and locations, routes, or safe areas for persons with disabilities.

222.   As a direct and proximate cause of Defendants' multiple acts and omissions, Plaintiffs and similarly situated persons have been deprived of

their substantive rights to due process and to equal enjoyment and access

to the facilities and services of the defendants and suffered severe

physical harm, aggravation and exacerbation of existing physical

ailments and impairments, severe emotional distress, loss of civil rights,

frustrations, difficulty, delays, inconvenience, embarrassment.

223.   Plaintiffs and similarly situated persons are entitled to relief requested,

M.C.L. 37.1607, "(t)his act shall not diminish the right of a person to

seek direct and immediate legal or equitable remedies in the courts of this

state."

224.   Plaintiffs and similarly situated persons are also entitled to relief

pursuant to M.C.L. 37.1606:

> (1) A person alleging a violation of this act may bring a civil
> action for appropriate injunctive relief or damages, or both.
> (2) An action commenced pursuant to subsection (1) may be
> brought in the circuit court for the county where the alleged
> violation occurred, or for the county where the person against
> whom the civil complaint is filed resides or has his or her
> principal place of business.
> (3) As used in subsection (1), "damages" means damages for
> injury or loss caused by each violation of this act, including
> reasonable attorneys' fees. (omitting from this quotation
> subsections (4) and (5) which apply to Article 2).

SECOND AMENDED
CLASS ACTION
COMPLAINT

## COUNT IV
### Violations of the Michigan
### Barrier Free Act, Michigan Sidewalks Act,
### Michigan Construction Code,
### Detroit Construction Code, and
### applicable International Building
### and Plumbing Codes
### (As to All Defendants)

225.   Plaintiffs re-allege and incorporate by reference the allegations set

forth in all preceding paragraphs.

226.   Defendants and their agents are subject to and required to follow the

mandatory provisions of Act 1 of 1966, the Barrier Free Act, M.C.L.

125.1351 *et seq*.:

> AN ACT to provide for the accessibility and the utilization by
> the physically limited persons of public facilities and facilities
> used by the public; to create a barrier free design board and to
> prescribe its powers and duties; to prescribe the powers and
> duties of certain other state and local authorities; to provide
> remedies; and to provide for the enforcement of this act.

227.   Beginning with a compliance date of 1974, M.C.L. 125.1352, barrier

free access is mandated at M.C.L. 125.1351(b) as "Barrier free design"

means those architectural designs which eliminate the type of barriers

and hindrances that deter physically limited persons from having access

to and free mobility in and around a building, structure, or improved

area." Building, improved area, and structure are further defined at

M.C.L. 125.1351(c), (e), and (h), and include all the buildings and
adjacent areas at issue in this Complaint.

228.   M.C.L. 125.1352(1) mandates that Defendants'  "…public
facility[ies] or facility[ies] used by the public the contract for
construction of which or the first contract for construction of a portion of
which is made after July 2, 1974, shall meet the barrier free design
requirements contained in the state construction code."

229.   Defendants' improvements or construction on or before July 2, 1974,
must comply with the timelines for compliance mandated by M.C.L.
125.1352(2) and (3).

230.   Pursuant to M.C.L. 125.1355, the Barrier Free Act is implemented
through a Commission, the Director, and the Michigan Stille-Derossett-
Hale Single State Construction Code Act of 1972 (State Construction
Code).

231.   Defendants and their agents are subject to and required to follow the
mandatory provisions of the State Construction Code, including "'Barrier
free design' [which] means design complying with legal requirements for
architectural designs that eliminate the type of barriers and hindrances

that deter persons with disabilities from having access to and free

mobility in and around a building or structure." M.C.L. 125.1502a(1)(d).

232.   The State Construction Code further establishes regulations to

implement the Code for purposes of ensuring the health, safety, and

welfare of the occupants and users of buildings, structures, the land area

incidental to the buildings and structures, and incorporating and updating

on a consistent schedule the applicable international codes including for

the buildings at issue, M.C.L. 125.1504(1), (2) and (5):

> (1) The director shall prepare and promulgate the state
> construction code consisting of rules governing the
> construction, use, and occupation of buildings and structures,
> including land area incidental to the buildings and structures,
> the manufacture and installation of building components and
> equipment, the construction and installation of premanufactured
> units, the standards and requirements for materials to be used in
> connection with the units, and other requirements relating to the
> safety, including safety from fire, and sanitation facilities of the
> buildings and structures.

> (2) The code shall consist of the international residential code,
> the international building code, the international mechanical
> code, the international plumbing code, the international existing
> building code, and the international energy conservation code
> published by the international code council and the national
> electrical code published by the national fire prevention
> association, with amendments, additions, or deletions as the
> director determines appropriate. The director may adopt all or
> any part of these codes or the standards contained within these
> codes by reference.

(5) The director shall add, amend, and rescind rules to update the Michigan building code, the Michigan mechanical code, the Michigan plumbing code, the Michigan rehabilitation code for existing buildings, the Michigan electrical code, and the commercial chapters of the Michigan energy code not less than once every 3 years to coincide with the national code change cycle.

233.   The International Building Code, Plumbing Code, Mechanical Code, and other applicable codes further establish regulations which require implementing the State Construction Code for purposes of ensuring the health, safety, and welfare of the occupants and users of buildings, structures, the land area incidental to the buildings and structures, and incorporating and updating on a consistent schedule the applicable international codes including for the buildings at issue:

(3) The code shall be designed to effectuate the general purposes of this act and the following objectives and standards:

(a) To provide standards and requirements for construction and construction materials consistent with nationally recognized standards and requirements.

(b) To formulate standards and requirements, to the extent practicable in terms of performance objectives, so as to make adequate performance for the use intended the test of acceptability.

(c) To permit to the fullest extent feasible the use of modern technical methods, devices, and improvements,

including premanufactured units, consistent with reasonable requirements for the health, safety, and welfare of the occupants and users of buildings and structures.

(d) To eliminate restrictive, obsolete, conflicting, or unnecessary construction regulations that tend to increase construction costs unnecessarily or restrict the use of new materials, products, or methods of construction, or provide preferential treatment to types or classes of materials or products or methods of construction.

(e) To ensure adequate maintenance of buildings and structures throughout this state and to adequately protect the health, safety, and welfare of the people.

(f) To provide standards and requirements for cost-effective energy efficiency that will be effective April 1, 1997.

(g) Upon periodic review, to continue to seek ever-improving, cost-effective energy efficiencies.

234.   Defendants' toilet and toilet room facilities are required to comply

with the International Plumbing Code, as to number and location of

fixtures, and be accessible and open to the public at all times the building

is occupied. Section 403 Minimum Plumbing Facilities and Section 404

Accessible Plumbing Facilities, Mich. Admin. Code R. 408.30758,

including:

403.3 Employee and public toilet facilities. For structures and tenant spaces intended for public utilization, customers, patrons

and visitors shall be provided with public toilet facilities. . . .
Employee toilet facilities shall be either separate or combined
employee and public toilet facilities.

.

> 403.3.1. Access. The route to the public toilet facilities
> required by section 403.3 shall not pass through kitchens,
> storage rooms, or closets. Access to the required facilities
> shall be from within the building. All routes shall comply
> with the accessibilities requirements of the Michigan
> building code. The public shall have access to the
> required toilet facilities at all times that the building is
> occupied.

> 403.3.3 Location of toilet facilities in occupancies other
> than malls. In occupancies other than covered and open
> mall buildings, the required public and employee toilet
> facilities shall be located not more than one story above
> or below the space required to be provided with toilet
> facilities, and the path of travel to such facilities shall not
> exceed a distance shall not exceed distance of 500 feet
> (152 m). . . .

> 403.3.6 Door locking. Where a toilet room is provided
> for the use of multiple occupants, the egress door for the
> room shall not be lockable from the inside of the room.
> This section does not apply to family or assisted-use
> rooms.

235. In conjunction with the Michigan Construction Code, M.C.L.

125.1508a(2), and as amended, Defendants are also required to comply

with the Detroit Building Codes to the extent the buildings, sites,

facilities, and elements and spaces are located within the corporate

boundaries of the City of Detroit, including but not limited to the Detroit

SECOND AMENDED
CLASS ACTION
COMPLAINT
128

City Building Code, the Detroit City Plumbing Code, the Accessible and
Usable Buildings and Facilities 2009 of Detroit.

236.  Defendant City of Detroit has further discriminated against and
caused harm to Plaintiffs due to their disabilities by approving many
occupancy permits, business licenses, and parking lot and parking garage
franchises or licenses to commercial businesses subject to Title III
obligations even though the plans fail to comply with the barrier free
provisions of the state and federal laws described in this Complaint.

237.  Defendants and their agents are subject to and required to follow the
mandatory provisions of the Sidewalks law.

238.  Plaintiffs and similarly situated persons are persons with disabilities
entitled to the protections established by the Michigan Construction Act,
including M.C.L. 125.1502a Additional Definitions (1) (z) "'Person with
disabilities' means an individual whose physical characteristics limit that
individual's ability to be self-reliant in the individual's movement
throughout and use of the building environment."

SECOND AMENDED
CLASS ACTION
COMPLAINT
129

## COUNT V
### Violation of the Elliott-Larsen Civil Rights Act
### Sex Discrimination
### M.C.L. 37.2101 et seq.
### (As to Defendants City of Detroit,
### County of Wayne, and Detroit-Wayne
### Joint Building Authority)

239.  Plaintiffs re-allege and incorporate by reference the allegations set

forth in all preceding paragraphs.

240.  The buildings referenced in this Complaint are places of public

accommodation by and within the meaning of ELCRA.  M.C.L.

37.2301(a).

241.  Defendants are public services by and within the meaning of ELCRA.

M.C.L. 37.2301(b).

242.  ELCRA prohibits discrimination in places of public accommodation

and/or by public services based on sex, specifically providing that no

such entity shall "[d]eny an individual the full and equal enjoyment of the

goods, services, facilities, privileges, advantages, or accommodations of

a place of public accommodation or public service because of religion,

race, color, national origin, age, sex, or marital status." M.C.L.

37.2302(a).

243.   Defendants discriminated against Plaintiffs by failing to ensure that the women's restroom in the CAYMC basement was upgraded and made accessible when the men's restroom in the CAMYC basement was upgraded and made accessible.

244.   Defendants' repeated, collective discrimination in these matters has caused and continues to cause even greater harm to all three Plaintiffs who are women, as well as all similarly situated female Plaintiffs, than it would to men as many of the conditions and disabilities described in this Complaint affect women more significantly than men.

245.   As a direct and proximate result of Defendants' actions and omissions, Plaintiffs and all other similarly situated qualified individuals have suffered damages in the form of extreme embarrassment, humiliation, emotional and physical distress, delays, other difficulties, and the loss of their civil rights described hereinabove.

246.   As a direct and proximate result of Defendants' actions and omissions, Plaintiff Ashley Jacobson and all other similarly situated qualified individuals who are licensed attorneys engaged in the private practice of law to support themselves and their families, have also suffered economic damages, including lost profits, wages, or earnings.

247.   As a direct and proximate result of Defendants' actions and

omissions, Plaintiffs Jill Babcock and Ashley Jacobson and all other

similarly situated qualified individuals with disabilities who are licensed

attorneys whether or not engaged in the private practice of law have

suffered damage to their professional standing by being deprived of the

same access as their able-bodied peers to these activities, facilities, and

services, and consequently they have suffered economic damages,

including lost opportunity, profits, wages, or earnings.

## DAMAGES

248.   Plaintiffs re-allege and incorporate by reference the allegations set

forth in all the preceding paragraphs.

249.   Defendants' actions and inaction constitute continuing discrimination

in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §

794(a) *et seq*.; Title II of the Americans with Disabilities Act, 42 U.S.C.

§ 12131 *et seq*.; Article III of Michigan's Persons With Disabilities Civil

Rights Act, M.C.L. 37.1101 *et seq*.; and the Elliott-Larsen Civil Rights

Act, M.C.L. 37.2101 *et seq*.

250. Plaintiffs and similarly situated individuals with disabilities have been harmed and continue to be harmed by Defendants' continuous and repeated refusal to make their buildings and facilities readily accessible to and usable by persons with disabilities, and Plaintiffs and similarly situated individuals with disabilities are entitled to damages including compensatory damages, and damages for emotional distress, humiliation, delay, and inconvenience, including under 29 U.S.C. § 794a(a)(2) and (b), 42 U.S.C. § 12133 and M.C.L. 37.1606.

251. As a direct and proximate result of the above-described conduct, Plaintiffs suffered general, specific, incidental, and consequential injuries and damages, past, present, and future, in excess of the jurisdictional threshold of this Court, an amount that shall be fully proven at the time of trial. These past, present, and future damages include, but are not limited to, the following:

a. Pain and suffering;

b. Mental and emotional distress;

c. Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, and humiliation;

d. Loss of constitutional rights;

SECOND AMENDED
CLASS ACTION
COMPLAINT
133

e.   Loss of employment;

f.   Damage to professional reputation;

g.   Economic loss;

h.   Loss of the ordinary pleasures of everyday life;

i.   Loss of relationships;

j.   Travel and travel-related expenses; and

k.   All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## PUNITIVE DAMAGES

252.   Plaintiffs re-allege and incorporate by reference the allegations set forth in all the preceding paragraphs.

253.   Defendants each know their obligations under the laws at issue in this case.

254.   Defendants have each spent money on other improvements without spending money to fulfill their obligations under the laws at issue in this case.

255.   Defendants' actions and inaction, individually and in concert with each other, are intentional, or willfully indifferent violations of the laws at issue in this case.

256.   Defendants' actions, individually and in concert, constitute unlawful patterns, practices, and policies of discrimination.

257.   Plaintiffs and similarly situated individuals have been harmed by Defendants intentional or willfully indifferent discrimination.

258.   Defendants are liable for punitive damages under Federal and State laws, including the Rehabilitation Act of 1973 and M.C.L. 37.1606.

## JURY DEMAND

259.   Plaintiffs demand a trial by a jury of their peers as to their claims for damages and any other claim to which they may be entitled to a jury.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request this Court grant relief including the following:

SECOND AMENDED
CLASS ACTION
COMPLAINT

A. Declare and find that Defendants are jointly and severally liable to Plaintiffs and other similarly affected persons with disabilities under these and other applicable Federal and State laws.

B. Certify this case as a class action.

C. Enter a preliminary order compelling Defendant State of Michigan to survey its court locations which are not barrier-free and equally accessible, and, if necessary, join such court locations and counties or jurisdictions as third-party Defendants.

D. Enter declaratory and injunctive relief compelling Defendants to comply with the disability laws by making their buildings and areas barrier-free and equally accessible to both able-bodied and disabled persons.

E. Enter continuing injunctive relief and maintain jurisdiction in this case until such time as all Defendants demonstrate to this Court that they have made the changes needed to fully comply with this Court's orders and the applicable laws.

F. Enter judgment against Defendants for compensatory damages including for economic losses and for non-economic losses, including but not limited to pain and suffering, emotional distress, humiliation, embarrassment, delay, and inconvenience, in amounts according to the proofs.

G. Enter judgment against Defendants for punitive damages in amounts
   necessary to deter Defendants' future intentional and willfully indifferent
   violations of the law.

H. Award attorneys' fees, costs, and expenses against Defendants and to
   Plaintiffs.

I. Award such other relief to which Plaintiffs and similarly situated persons are
   entitled.

**Respectfully submitted on this 23rd day of June, 2023,**

**Plaintiffs, on behalf of themselves and all others similarly situated,
by their attorneys,**

*/s/ Michael W. Bartnik*_____
**MICHAEL W. BARTNIK (P32534)**
**Law For Baby Boomers, PLLC**
**41000 Woodward Ave., Suite 350**
**Bloomfield Hills, Michigan 48304**
**(248) 608-3660 Telephone**
**(248) 218-9588 Facsimile**
**Michaelbartnik@protonmail.com**
**www.michaelbartnik.com**

*/s/ Elizabeth K. Abdnour*
**ELIZABETH K. ABDNOUR (P78203)**
**Abdnour Weiker LLP**
**500 E. Michigan Ave., Suite 130**

**Lansing, Michigan 48912**
**(517) 292-0067 Telephone**
**(517) 709-7700 Facsimile**
**Elizabeth@abdnour.com**
**lawyers4students.com**

## CERTIFICATE OF SERVICE

I, Elizabeth K. Abdnour, certify that on June 23, 2023, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

Dated: June 23, 2023          */s/ Elizabeth K. Abdnour*
                             By: Elizabeth K. Abdnour (P78203)

## LOCAL RULE CERTIFICATION

I, Michael W. Bartnik, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

Dated: June 23, 2023          */s/ Michael W. Bartnik*
                             By: Michael W. Bartnik (P32534)

SECOND AMENDED
CLASS ACTION
COMPLAINT
138