UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JILL BABCOCK, et al.,                    Case No.: 2:22-cv-12951

    Plaintiffs,                    JUDGE JONATHAN J.C. GREY

v.

STATE OF MICHIGAN, et al.,

    Defendants.

## PLAINTIFFS' OPPOSITION TO  DEFENDANT STATE OF MICHIGAN'S SECOND MOTION TO DISMISS, OR TO STATE'S ALTERNATIVE MOTION FOR SUMMARY JUDGMENT, AS TO ITS NON-LIABILITY FOR LOCAL COURT FACILITIES

Plaintiffs Jill Babcock, Marguerite Maddox, and Ashley Jacobson, through undersigned counsel, respectfully submit this Opposition to Defendant State of Michigan's Second Motion to Dismiss Or Alternatively for Summary Judgement As To Its Non-Liability For Local Court Facilities ("Motion") (ECF No. 136).  This Court has already ruled on these issues in its March 30, 2024, Order Granting in Part and Denying in Part Motions to Dismiss Filed by State of Michigan (ECF No. 82 (ECF No. 103). To the extent any new issues remain, Plaintiffs have properly stated their claims against the State of Michigan, and this Motion must be denied. Plaintiffs incorporate by reference their Opposition to the State's first Motion to Dismiss (ECF No. 82)

## <u>TABLE OF CONTENTS</u>

I.    CONCISE STATEMENT OF ISSUES PRESENTED ...................................*3*

II.   CONTROLLING OR MOST APPROPRIATE AUTHORITIES................*4*

III. STANDARD OF REVIEW ...........................................................................*5*

    A.  COUNTERSTATEMENT OF PROCEDURAL FACTS ...............................5

IV. LAW AND ARGUMENT ...........................................................................*6*

    A.  *TENNESSEE v. LANE* DOES NOT ALLOW THE STATE TO AVOID LIABILITY ......................................................................................................6

    B.  THE STATE CANNOT AVOID ITS LIABILITY DUE TO FUNDING OR OWNERSHIP ASSERTIONS................................................................................9

    C.  THE STATE'S FAILURE TO JOIN OTHER PARTIES IS NOT GROUNDS FOR DISMISSAL OF PLAINTIFFS' CLAIMS AGAINST THE STATE..........15

    D.  PWDCRA CLAIMS ARE ACTIONABLE AGAINST THE STATE IN THIS PENDING FEDERAL COURT CASE...........................................................18

    E.  PLAINTIFFS HAVE PLEAD SUFFICIENT EVIDENCE OF DELIBERATE INDIFFERENCE TO STATE A CLAIM FOR DAMAGES ......20

V.   CONCLUSION ..............................................................................................**20**

I.　　**CONCISE STATEMENT OF ISSUES PRESENTED**

1. Can Defendant State of Michigan avoid liability to Plaintiffs under the holding of *Tennessee v. Lane*?

2. Can Defendant State of Michigan avoid liability to Plaintiffs due to funding or ownership assertions?

3. Can the Court dismiss Plaintiffs' claims if Defendant State of Michigan failed to join necessary parties?

4. Is the Persons with Disabilities Civil Rights Act actionable against Defendant State of Michigan?

5. Have Plaintiffs sufficiently plead deliberate indifference to state a claim for damages against the State of Michigan?

## II.   <u>CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

Statutes:

- M.C.L. 600.151, 600.152, 600.219

- Michigan Constitution of 1963, Art. 6

- Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*

- Trial Court Funding Act of 2024, M.C.L. 600.11111.new *et seq.*

Cases:

- *Access Living of Metropolitan Chicago v. City of Chicago*, 2024 WL 4346630, No. 1:2018cv03399 (N.D. Ill. Sep. 30, 2024)

- *Christie v. Wayne State University*, 993 N.W.2d 392 (Mich 2023)

- *Detroit v. Recorder's Court Judge*, 85 Mich. App. 284; 271 N.W.2d 202 (1978)

- *In re Lafayette Towers*, 200 Mich. App. 269 (1993)

- *Larson v. Valente*, 456 U.S. 228 (1982)

- *Livingston City v. Livingston Circuit Judge*, 393 Mich. 265, 279 (1975)

- *Mote v. City of Chelsea,* 252 F. Supp. 3d 642 (E.D. Mich 2017)

- *Tennessee v. Lane*, 541 U.S. 509 (2004)

- *Timbs v. Indiana*, 586 U.S. 146 (2019)

### III.   <u>STANDARD OF REVIEW</u>

This Court has already ruled against the State on the major points which it refiles in this Motion to Dismiss, 12(b)(1) or 12(b)(6).

Defendant raises no additional point which justifies Dismissal at this stage. Defendant also fails to comply with the minimum local court procedures for filing an "alternate" Rule 56 Motion for Summary Judgment, including for example failing to begin with a Statement of Material Facts, or a Fact Appendix. (Motion Practice Guidelines, part 2/2, Practice Guidelines for Judge Jonathan J.C. Grey).

### A.   COUNTERSTATEMENT OF PROCEDURAL FACTS

The principal facts relating to non-compliance by the State in its courts were described by this Court in its March 30, 2024, Order Granting in Part and Denying in Part, pages 5-6 (omitting citations here):

> Plaintiffs allege that the tenants at the CAYMC consist of executive and legislative branches of government, including certain elected officials for the City and the County, as well as some of the State's circuit and probate courts. The CAYMC also houses other City and County offices and at least one retail food and sundries shop. Plaintiffs allege that all four defendants are responsible for the court facilities located in the CAYMC. Plaintiffs claim there are few, if any, accessible jury boxes in any court room, accessible jury deliberation rooms, accessible toilets in the jury deliberation rooms, and upon information and belief no accessible toilets in the jury assembly room, even though there have been multiple alterations to the interior and exterior of the CAYMC after enactment of applicable disability laws, including original courtrooms that have been modified, reduced, enlarged, or eliminated. Plaintiffs claim that the public can move

between the towers only in the basement, all toilet rooms in the office tower are locked in public halls and some of the women's toilet rooms are closed to the public above the eighth floor of the court tower.

Plaintiffs also complain of similar deprivations of rights at buildings that house Michigan courts in seven other counties, including Delta, Ingham, Livingston, Mackinac, Macomb, Oakland, and Washtenaw. Plaintiffs further allege accessibility issues pertaining to sidewalks, curb cuts, streets, and building entrances in various locations, including at the Plaza and Capitol Loop in Lansing and Hart Plaza in Detroit.

## IV.   LAW AND ARGUMENT

### A.   *TENNESSEE v. LANE* DOES NOT ALLOW THE STATE TO AVOID LIABILITY

On Standing, the State rehashes the arguments already presented unsuccessfully in its first Motions.  This Court already found in Plaintiffs' favor on all elements of standing, cause of action, and lack of immunity, as to the locations in question and as to the plaintiffs in question as specified in the Court's opinion. This Court already found that Plaintiffs have standing by sufficiently alleging injury in fact (14-21), causation (20-21), and redressability (22-23).

At page 15 of its Order, this Court stated:

The Court finds that portions of the present complaint do not suffer from the same deficiency as that in *Babcock I.* Although "facility accessibility is not, standing alone, a cognizable claim under Title II's private right of action," a cognizable claim exists if "that facility's inaccessibility interferes with access to public services, programs, or activities." *Mote v City of Chelsea,* 252 F. Supp. 3d 642, 650 (E.D. Mich 2017) (quoting *Babcock I*, 812 F.3d at 536).

The State of Michigan has again taken the remarkable position that its unified state court system is not subject to the ADA and cites for support the holding in *Tennessee v. Lane*, 541 U.S. 509 (2004). Despite its extensive regulatory oversight of the court system, the State disregards the authority delegated to it under the Michigan constitution to compel state trial courts to make their physical facilities accessible to the public, including individuals with disabilities. This is contrary to the applicable law.

The State's argument that it cannot, or more accurately will not, comply with an order for injunctive relief is undermined by this Court's March 30, 2024, Order finding at pages 22-23:

> 3.   Redressability. Finally, the Court finds that plaintiffs have demonstrated that it is likely, not just speculative, that a favorable decision will redress the injury. *Larson v. Valente*, 456 U.S. 228, 243 (1982) (a favorable decision will redress the injury with "substantial and meaningful relief" if the court imposes obligations). If a decision favoring plaintiffs is rendered, numerous physical barriers will be altered or removed: plaintiffs will then have improved accessibility to locations, buildings, courts, toilet rooms, and public offices where defendants' services, programs, and activities are provided that they have been unable to meaningfully access and participate in."

This Court's ruling is further buttressed by the basic principle that Article III Federal Courts having jurisdiction over civil rights matters do, indeed, have the authority to issue orders to the State defendant to comply with the applicable law, where, as here, the State does not have immunity for its non-compliance.

The State adroitly avoids addressing the applicable holding in *Tennessee v. Lane*, 541 U.S. 509 (2004). In Lane, the Supreme Court makes it very clear the State is not immune from Title II obligations of its court system (omitting citations and footnotes here):

> The only question that remains is whether Title II is an appropriate response to this history and pattern of unequal treatment. . . . .
>
> . . . Congress' chosen remedy for the pattern of exclusion and discrimination described above, Title II's requirement of program accessibility, is congruent and proportional to its object of enforcing the right of access to the courts. The unequal treatment of disabled persons in the administration of judicial services has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination. Faced with considerable evidence of the shortcomings of previous legislative responses, Congress was justified in concluding that this "difficult and intractable proble[m]" warranted "added prophylactic measures in response . . . ."
>
> . . . Each of these cases makes clear that ordinary considerations of cost and convenience alone cannot justify a State's failure to provide individuals with a meaningful right of access to the courts. Judged against this backdrop, Title II's affirmative obligation to accommodate persons with disabilities in the administration of justice cannot be said to be "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." It is, rather, a reasonable prophylactic measure, reasonably targeted to a legitimate end.
>
> For these reasons, we conclude that Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' §5 authority to enforce the guarantees of the Fourteenth Amendment. The judgment of the Court of Appeals is therefore affirmed.

**B.     THE STATE CANNOT AVOID ITS LIABILITY DUE TO FUNDING OR OWNERSHIP ASSERTIONS**

In its current motion, the State expands on its argument that it has no control over the court buildings, on the grounds that the local governments own the buildings.  The State claims lack of funding control.

Claiming that the State or its court system does not have authority to correct disability violations does not make it so.

First, there is actually nothing in those statutes to prevent the State from operating its courts in another location if the existing court buildings do not comply with the minimum requirements for conducting court. Conceptually, we lawyers learn a "court" sits whenever and wherever a duly empowered Judge opens the court proceedings. This concept is the historical reason for "circuit" courts in both our Federal and State systems, and in the Common Law courts of England. Given that understanding, the State's court system has inherent power over its own operations, which includes the decision as to where a particular court sits at any one time. For example, the State would undoubtedly find another location for one of its courts to sit if a particular county provided its statutorily and locally funded, mandated building, but without any electricity, without any physical security for its judges or staff, without any plumbing, or without any internet access.

Article VI, Section 4 of the Michigan Constitution states that "the supreme court shall have general *superintending control* over all courts; power to issue, hear and determine prerogative and remedial writs; and appellate jurisdiction as provided by rules of the supreme court" (emphasis added). Const. 1963, Art. 6, § 4.

The statutes further support this authority.

> MCL 600.151, "The judicial power of the state is vested exclusively in 1 court of justice which shall be divided into 1 supreme court, 1 court of appeals, 1 trial court of general jurisdiction known as the circuit court, 1 probate court, and courts of limited jurisdiction created by the legislature."

> MCL 600.152 "The chief justice of the supreme court is the head of the judicial system."

> MCL 600.219, "The supreme court has a general superintending control over all inferior courts and tribunals. The supreme court has authority to issue any writs, directives, and mandates that it judges necessary and expedient to effectuate its determinations, and to take any action it deems proper to facilitate the proper administration of justice."

Unsurprisingly, Michigan's own courts recognize this ancient power. Plaintiffs highlighted these cases pages 12-14 of its earlier brief, including that "Superintending control is the proper vehicle to challenge the general practices of an inferior court." *In re Lafayette Towers*, 200 Mich. App. 269, 272 (1993) (citing *Detroit v. Recorder's Court Judge*, 85 Mich. App. 284, 289; 271 N.W.2d 202 (1978)). "The State Supreme Court has general superintending control over all inferior courts.... The Supreme Court's rulemaking power is constitutionally supreme

in matters of practice and procedure." *Id.* at 275 (citing *Kirby v. Larson*, 400 Mich. 585, 598; 256 N.W.2d 400 (1977); MCL 600.219.

Plaintiffs also discussed the *Livingston* case, which acknowledged there was a funding issue, but that it does not interfere with the Court's inherent powers, in that case involving staffing, while also recognizing the "emergency" nature of the powers that might be available. We argued this distinction provided an opening for asserting authority to correct ADA violations, concluding at page 13-14 of our brief:

> *Livingston City v. Livingston Circuit Judge*, 393 Mich. 265, 279 (1975). "Courts do not possess inherent power to appropriate money or require expenditures for whatever needs the judge, the Court Administrator, and this Court on review, determine are reasonable. Inherent power exists only for true emergencies." *Id.* at 293. Courts do, however, possess "inherent power in cases of emergency, urgency, or necessity to compel appropriation of funds necessary to preserve the operation of the court." *Id.* at 289. In Livingston, the Court held that courts "can intervene under the legislative mandate on the counties or under inherent power and require the payment of...amounts as may be necessary to hire and retain the services of competent personnel." *Id.*

> *Livingston* cautions that "[h]owever desirable or beneficial the sought-for change may be, it does not create an emergency justifying invocation of inherent power." *Id.* at 292. In these cases, although "the present system of local financing supplemented by state financing may not be optimally efficient and may allocate and distribute revenue in a less than satisfactory manner, it has enabled the one court of justice to function 'serviceably as a co-equal branch of Michigan's government' for 138 years." However, in the present case, Plaintiffs have alleged that the State courts have not "operated" for persons with disabilities for several decades, and that Michigan's "one court of justice" is not "functioning serviceably" as it is excluding an entire population of citizens. Thus, the State must use its inherent powers to require the payment of funds necessary to "preserve the operation of the court."

For these reasons, Plaintiffs have stated a viable claim under the ADA and Defendant's Motion should be denied.

Second, in essence, the State here attempts to abdicate its superintending control over operations of its third branch of government by claiming another branch is responsible for funding it. Aside from being a complete misunderstanding of the Venn diagram type relationship between the three branches of the government, which actually work together, this fundamental distortion is not allowed as a means to evade Title II liability. *Access Living v Chicago*, Northern District of Illinois, Eastern Division, Memorandum and Opinion, September 30, 2024, 2024 WL 4346630 (emphasis added):

> Section 504 and Title II cover all programs and activities of a public entity, and do not distinguish between a program provided directly by the public entity and a program provided through a contractual or other arrangement. 29 U.S.C. § 794(a) (Section 504), 42 U.S.C. § 12132 (Title II). The regulations make clear that when a city's program is carried out through "contractual, licensing, or other arrangements," the city maintains its Section 504 and Title II obligations. 24 C.F.R. § 8.4(b)(iii), (viii) (Section 504); 28 C.F.R. §§ 35.102(a), 35.130(b)(1) (Title II); City Mem. at 7 (acknowledging that it cannot avoid its obligations by "ceding its governmental functions to private entities"). For example, in Castle v. Eurofresh, Inc., Arizona contracted with a private company to provide a work incentive program to Arizona state inmates, and the inmate alleged that the private company discriminated against him because of his disability. 731 F.3d 901, 909-10 (9th Cir. 2013). The Ninth Circuit determined the work incentive program was a benefit provided to the inmate by the State, and not the private company, and that the State was liable to ensure compliance with Title II. Id.; *see also Armstrong v. Schwarzenegger, 622 F.3d 1058, 1066 (9th Cir. 2010)* **(state maintained its Title II obligations to state inmates who were housed in county jails through arrangements between the State and County); Marks v. Colorado Department of Corrections, 976 F.3d 1087,**

*1098 (10th Cir. 2020) (public entities can "farm out operations to others, but doing so would not prevent liability under [Section 504 or Title II]").*"

Third, in further support of its argument, the State engages in a convoluted discussion of the "State" is not responsible, but that it is the judicial branch which needs to be added to the lawsuit. This argument shows a basic misunderstanding of the operation of the State government. The three branches are not three separate trees surrounded by separate fenced plots of land, but rather are three branches of the same tree, supporting the common purpose while exercising different powers of government. Their roles and operations intersect and overlap with each other, especially when it comes to funding and following the law.

As argued above, and in Plaintiffs' earlier Brief, funding does not supersede superintending control, or the "inherent power in cases of emergency, urgency, or necessity to compel appropriation of funds necessary to preserve the operation of the court." *Livingston, supra.* at 289.

Moreover, Defendant's brief is relying on the antiquated system of funding, which has been found to inflict unconstitutional, Eighth Amendment harms upon criminal defendants when sentencing judges impose "court costs" as a means to fund the District or Circuit Court operations. Among other quirks, criminal fines and civil infraction violations fund the libraries, so "costs" are imposed as a means to fund

the court operations, creating an unconstitutional punishment unrelated to the defendant or offense.

Working together, the State's executive, legislative, and judicial branches in set up the Trial Court Funding Commission, by Public Act 65 of 2017. Pursuant to that Commission's mandatory report, in 2024 Michigan passed its new Trial Court Funding Act of 2024, Act 47 or 2024, which is designed to develop proposals to replace the existing funding mechanism cited by the State, including to specifically propose funding for court facilities, including capital improvements, construction, or maintenance of court facilities. Costs to be addressed specifically include capital improvements, or construction or maintenance of court facilities (emphasis added):

**MCL 600.11113.new State court administrative office; analysis and determination of revenue lost, operational costs, and maintenance of effort expenditures; state and local input requirement**.
        . . . . (2) The state court administrative office, under the direction and supervision of the supreme court, shall work with local units of government to determine the maintenance of effort. The allocation of costs used to determine the maintenance of effort must comply with the following:
        (a) Be based on expenditures for operating a court, including, but not limited to, the following:
            ***. . . . (iii) Court facility operation and maintenance***

**MCL 600.11117.new Proposal for funding court facilities' capital improvement costs; requirements**.
        The state court administrative office, under the direction and supervision of the supreme court, shall work with the department to develop proposals for funding court facilities' capital improvement costs. The proposals under this section must consider all other

recommended legislative proposals under this act and address all of the following:

. . . . *(d) Future court facility capital improvement and maintenance needs.*

This new law is part of an effort in place since 2017 to reform the State's funding to comply with court rulings finding Eight Amendment constitutional violations arising out of the State's method of calculating criminal defendant's fines and costs based on the local court budget. As summarized in the Executive Summary, of the Trial Court Funding Commission Final Report, September 6, 2019, page 4:

> The Michigan Legislature created the Trial Court Funding Commission (TCFC), through Act 65 of 2017, to review Michigan's trial court funding system and make recommendations. This legislation was enacted in response to People v. Cunningham, a Michigan Supreme Court decision that determined state law does not provide courts with the authority to impose costs upon criminal defendants to fund the day-to-day operation of the courts.

and at page 10:

> The United States Supreme Court unanimously decided Timbs v. Indiana on February 20, 2019. Narrowly, the Timbs decision provides that the "excessive fines" provision of the Eighth Amendment to the U.S. Constitution applies to the states through the 14th Amendment's due process clause. However, the discussion in Timbs confirms that the TCFC's identification of problems with the Michigan trial court funding system are well-founded.

## C.   THE STATE'S FAILURE TO JOIN OTHER PARTIES IS NOT GROUNDS FOR DISMISSAL OF PLAINTIFFS' CLAIMS AGAINST THE STATE

In addition to the above substantive arguments against the State's motion, Plaintiffs submit the State's joinder arguments are not valid and as they will only add unnecessary expense and delay to the proceedings.   Their argument also demonstrates a disregard for *Tennessee v. Lane*, which also involved similar facts regarding the interplay between Tennessee and its 32 of its 92 state courts located in the Middle District for the State of Tennessee.

Despite its claims for misjoinder or nonjoinder, the State seeks to dismiss all claims against it, even though Plaintiffs have already named three other defendants relating to court operations in the City of Detroit and County of Wayne, including the DWJBA. F.R.Civ.P 21 does not allow a case to be dismissed due to misjoinder or failure to join parties.

Procedurally, this is really a question of the State's failure to seek permissive joinder against the Michigan Supreme Court and the other counties or municipalities if the State believes they are responsible. Plaintiffs argue that the State itself is responsible.  Instead, the State waited until its second motion to dismiss, after several pre-trial status conferences, to raise the argument, even though F.R.Civ.P. 12(b) (7) requires such a defense be raised in the first instance by a motion prior to the answer to the complaint. They did plead it as an affirmative defense, but they did not timely file their motion to dismiss on that issue. (ECF No 106, PageID.1825, "failed to

name or join as a party to this suit all person and/or entities against whom a finding of fault is properly directed."

Most recently it also takes the position that plaintiffs basically have to sue each county or municipality with a court system, and, must show that each such plaintiff suffered an actual injury caused by each such courthouse. This cannot have been the Congressional intent: such a scenario is beyond the scope of any "private attorney general" provisions of either the State or Federal laws against disability discrimination.

*Tennessee v. Lane* is once again pertinent. Attached are two motions by plaintiff to add plaintiffs with claims against the State of Tennessee and 32 of the 96 counties in the State.

Two of the attachments are joinder motions to add parties, one filed in 1998 and the other in 2003, along the lines of what the State implies must be accomplished here.

The third attachment is the settlement document. At .pdf pages 44 to 45 and 59 to 61, the parties explicitly recognize the State's supervisory functions can and shall be exercised over "facilities" which are defined at 44-45 to include physical structures, and which shall be modified or if not modified, relocated as may be needed, pages 59-61.

Additionally, as to the practical question of finding an injured plaintiff in each of the 82 counties and naming 82 counties in the State of Michigan, or even just the 32 counties located in the Eastern District, the *Lane* parties resolved that issue by basically just requiring the counties in that case to agree to comply with the law, and to pay collectively about $67,000.00 of the $900,000.00 attorney fees awarded (see, pages 1-8- the next 35 pages are signatures of the counties).

The State cannot again ignore the key holding in *Lane,* makes it impossible to ever achieve any relief as to the courts in the multiple counties which are non-compliant, and which can be modified and brought into compliance with modest, and attentive effort.

### D.    PWDCRA CLAIMS ARE ACTIONABLE AGAINST THE STATE IN THIS PENDING FEDERAL COURT CASE

The State filed its first motion to dismiss on July 6, 2023, approximately 60 days following the May 2, 2024 decision by the Michigan Supreme Court, *Christie v Wayne State University*, 993 N.W.2d 392 (Mich 2023), yet it never cited that line of cases or the Court of Claims Act upon which it relies here.

This Court already ruled at page 39 on March 30, 2024, that "plaintiffs' PWDCRA claims are denied or survive to the same extent that their ADA claims do, as set forth in Section IV.E." (ECF No. 103, PageID.1757).

At page 34, Section IV.E, the Court held, "(w)ith respect to the allegations

set forth in Section IV.B.1, the Court holds that plaintiffs have sufficiently pleaded claims for purposes of *Iqbal/Twombly.* Accordingly, those allegations and claims remain viable, and defendants' motions are denied with respect to those claims." (ECF No. 103, PageID.1752).

At pages 17-18 and 20-21 the Court specified the applicable locations, including as to the State's court locations, *i.e.*, the District Courts in Detroit and East Lansing, the Circuit Courts located in the Frank Murphy Hall of Justice and CAYMC in Detroit, Wayne County, the 22nd Circuit Court in Washtenaw County, and the Howell location of the 44th Circuit and 53rd District Courts in Livingston County. (ECF No. 103, PageID.1735-1736).

This new argument is really an untimely Motion For Reconsideration which should have been brought within the time specified and procedure stated under Local Rule 7.1 (h) (1) or (2).

Additionally, *Christie* has absolutely no bearing on the federal ADA claims and the separate grounds for jurisdiction, standing, waiver of immunity and other grounds stated in the Court's March 30, 2024, Order and by plaintiffs in this response. Plaintiffs have stated a cause of action against the State under the ADA, they have standing against the State, and the State is not immune from this action, as already held by this Court on March 30, 2024.  So, even if *Christie* is found to apply here, it is not grounds for dismissing the ADA claims against the State.

**E.   PLAINTIFFS HAVE PLEAD SUFFICIENT EVIDENCE OF DELIBERATE INDIFFERENCE TO STATE A CLAIM FOR DAMAGES**

Plaintiffs agree with State that compensatory damages are available under the ADA under the intentional discrimination standard, which requires evidence of deliberate indifference as shown by (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood.is necessary to obtain them (See discussion by State at page 20 of its Brief, ECF No. 136, PageID.2175).

**V.   <u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendant's Second Motion to Dismiss.

Respectfully Submitted,

Dated: November 8, 2024        */s/ Michael W. Bartnik*
                               MICHAEL W. BARTNIK (P32534)
                               Law For Baby Boomers, PLLC
                               41000 Woodward Ave., Ste. 350
                               Bloomfield Hills, Michigan 48304
                               (248) 608-3660 Telephone
                               michaelbartnik@protonmail.com

                               Elizabeth K. Abdnour (P78203)

Abdnour Weiker, LLP
500 E. Michigan Ave., Ste. 130
Lansing, Michigan 48912
(517) 994-1776 Telephone
liz@education-rights.com

Renee A. Stromski (Ohio 0101347)
Abdnour Weiker, LLP
262 South Third St.
Columbus, Ohio 43215
(216) 714-1515 Telephone
renee@education-rights.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Michael W. Bartnik, counsel for Plaintiffs, certify that on November 8, 2024, I filed this document by use of this Court's ECF system, which will serve copies to all counsel of record.

<div style="margin-left: 40%;">

*/s/ Michael W. Bartnik*
Michael W. Bartnik

</div>