# Trial Court Funding Commission Final Report

**09.06.19**



STATE OF MICHIGAN
**TRIAL COURT FUNDING COMMISSION**
LANSING

### Commission Members

Judge Thomas Boyd, Chair
Judge James M. Alexander
Judge Michelle Appel
Michael Bosanac
Eric R. DeLong
Todd A. Drysdale
Judge Shauna Dunnings
Judge Beth Ann Gibson
Milton L. Mack
Richard B. Poling
Thomas C. Rombach
Shannon Schlegel
Valerie Ann Thornburg
Patrick J. Williams

### Staff Support

Department of Treasury
Wendy Lamphier

Public Sector Consultants
Scott Dzurka
James Durian
Patrick Lyons
Pam Sanders

# Table of Contents

**Executive Summary** ........................................................................................................................ 4

**Overview** .......................................................................................................................................... 7

*Cunningham*, the Legislature, and the Creation of the TCFC ............................................................ 8

Defining the Problem ........................................................................................................................... 8

*People v. Cameron* ............................................................................................................................ 9

*Caliste v. Cantrell* ............................................................................................................................ 10

The Role of *Timbs* ........................................................................................................................... 10

**Michigan's Landscape** ................................................................................................................... 11

Court Structure .................................................................................................................................. 11

Court Funding .................................................................................................................................... 13

Court Funding System Reform .......................................................................................................... 17

**National Landscape** ....................................................................................................................... 17

**Lessons Learned** ............................................................................................................................ 18

**A New Court Funding System for Michigan** ................................................................................ 20

**Recommendations** ......................................................................................................................... 21

Recommendation One: Establish a Stable Court Funding System ................................................... 21

Recommendation Two: The State Shall Offer to Provide All Court Technology Needs ................... 25

Recommendation Three: Establish Uniform Assessments and Centralized Collections .................. 27

Recommendation Four: Move Toward a Uniform Employment System ............................................ 30

Recommendation Five: Establish a Transition Plan for the New Court Funding Model .................... 32

**Appendix A: Definitions/Terms** ..................................................................................................... 35

**Appendix B: Financial Information Summary** ............................................................................. 37

**Appendix C: Stakeholder Engagement** ........................................................................................ 39

**Appendix D: Michigan Trial Courts Maps** ................................................................................... 40

**Appendix E: References** ................................................................................................................ 43

**Appendix F: Acknowledgements** .................................................................................................. 46

# Executive Summary

Michigan residents going to court should not face a judge who needs money from a defendant to satisfy demands for court operating expenses. The recommendations contained in this report are designed to address the historic problem with money's influence on the justice system as manifested in Michigan.

The Michigan Legislature created the Trial Court Funding Commission (TCFC), through Act 65 of 2017, to review Michigan's trial court funding system and make recommendations. This legislation was enacted in response to *People v. Cunningham*, a Michigan Supreme Court decision that determined state law does not provide courts with the authority to impose costs upon criminal defendants to fund the day-to-day operation of the courts.

The TCFC first reviewed the existing trial court funding system with presentations from experts on circuit, probate, and district courts. This information was used to create a comprehensive survey of stakeholder groups to determine the nature and extent of existing problems with the trial court funding system. The TCFC next identified a set of principles to guide recommendations for change. A list of principles was created by the TCFC membership and then compared to national norms to establish a final set of governing principles.

The TCFC has been mindful of the timeliness of this work. Michigan's trial courts are facing the possibility of a financial emergency due to changes in financing methods brought on by *People v. Cameron*, a case which was recently decided in the Michigan Supreme Court, in which the defendant directly challenged the constitutionality of the assessment of court operational costs as part of his sentence. Further, the United States Supreme Court in *Timbs v. Indiana*, issued February 20, 2019, questioned the use of courts to generate revenue, a conclusion that could impact future court funding. Finally, the TCFC reviewed the United States Department of Justice's report and actions in response to the civil unrest in Ferguson, Missouri, where excessive police and court enforcement were used to provide municipal revenue.

In the midst of these challenges, the TCFC examined Michigan's historic and existing trial court funding system, national innovations, and best practices, as well as some cautionary examples. After extensive review and evaluation, the commission has unanimously concluded that the existing system is broken, and it is imperative to create a stable and consistent funding source for Michigan trial courts that removes trial court judges from the role of raising money for the operation of the courts.

The recommendations outlined in this report are intended to address the following problems:

- A real or perceived conflict of interest between a judge's impartiality and the obligation to use the courts to generate revenue;
- Inadequate funding from all sources due to excessive dependence on local government funding; and
- Unequal access to justice harming those who are most vulnerable and have the least access to financial resources.

With this framework in mind, the TCFC makes the following recommendations for the governor, Michigan Legislature, and the Michigan Supreme Court to consider.

**Recommendation One: Establish a Stable Court Funding System**

A balanced state and local partnership is necessary to ensure that Michigan's residents have equal access to justice. To fulfill this responsibility, the state must create the Trial Court Fund for receipt of all trial court assessments and state general fund payments. The Trial Court Fund must then distribute appropriate monies to fund trial courts based on operational requirements. Decisions about local trial court operations must remain local.

**Recommendation Two: Provide All Court Technology Needs**

The State of Michigan must make available and fund all of the technology needs of the courts, including case and document management services, and also supply and manage technology products and services for all courts, including hardware, software, infrastructure, training, and ongoing technology support. The State will bear the cost of all technology it provides and create a uniform system throughout Michigan.

**Recommendation Three: Establish Uniform Assessments and Centralized Collections**

The State Court Administrative Office (SCAO) must establish a system of uniform assessments and centralized collections to be implemented for all trial courts. This system will maintain judicial discretion for ordering fines within the limits set by law and determination of ability to pay. Centralization of some court business functions will reduce cost overall, promote efficiency, and eliminate the ethical dilemma of trial court judges being incentivized to maximize revenue from court users for budget support. Centralizing court collections will achieve greater efficiency and achieve a higher level of uniform customer service.

**Recommendation Four: Move Toward a Uniform Employment System**

There are inefficiencies and inequality in the current payment system for trial court judges' salaries and benefits. The State pays these judicial salaries in part directly and in part by reimbursement to local government. Benefits are paid through local government and vary widely. Making the trial court judges direct employees of the state eliminates issues of dual employment and allows all trial court judges to be treated equally in salaries and fringe and retirement benefits, while removing a considerable cost burden from local governments' budgets. Referees and magistrates should also become state employees to allow for common training, easier coordination, and for potential synergies. Over time, state and local governments should consider working together to transition other court personnel into state employment while being respectful of existing bargaining units and labor agreements.

**Recommendation Five: Establish a Transition Plan for the New Court Funding Model**

In order to implement a new court funding model, there must be a plan for the systematic transition of finances and the promotion of funding sustainability. Success will depend on thoughtful planning and a phased implementation over a period of years. A task force, led by the SCAO, must be created to develop a plan for transition to the new trial court funding model, which must include a timeline for short-term, intermediate, and long-term objectives and milestones to be achieved. The transition plan must also include technical assistance and funding for local units of government for any shortfall in operating funds

due to implementation. Once the model is implemented, a Michigan Judicial Council must be established to exercise administrative policymaking authority to ensure continued progress toward a unified Michigan court system.

With the implementation of these recommendations, we will lead Michigan's court system well into the future. This new trial court system will eliminate real or perceived conflict of interests, ensure adequate funding and guarantees access to justice.

# Overview

Michigan trial courts are funded through a complex collection of general tax revenue and monies assessed and collected by the courts. A comprehensive study conducted by the Trial Court Funding Commission shows that it costs up to $1.44 billion each year to operate Michigan's trial courts. This total is the sum of funds:

- Transferred from the state (22.7 percent)
- From federal sources (7.2 percent)
- From local funding sources (43.9 percent)
- Generated by the trial courts (26.2 percent)

A significant proportion of the funds generated by the trial courts are assessments on criminal defendants as part of sentencing. The TCFC estimates that these assessments directly account for as high as $291 million annually in support (most of the 26.2 percent generated). Additionally, approximately $127 million of the annual funds transferred from the State originate from court assessments at sentencing. When totaled, Michigan trial courts are supported, in significant part, by over $418 million assessed to criminal defendants.

This number is concerning, considering the fact that assessing the cost for the day-to-day operation of the courts to criminal defendants was not legal until 2014. Beginning in 1835 with Michigan's first constitution and carrying through to the current one, the State of Michigan requires penal fines to be allocated to library funding—not the courts. However, money worked its way into the system and has called into question the independence of judicial decision makers. Groups, including the Michigan Municipal League, called on the 1962 Constitutional Convention to prohibit "any member of the judicial branch of government from being compensated out of fees earned by the court over which he presides." The drafters of Michigan's current constitution recognized the potential for conflict of interest in judges benefiting from the proceeds of their work and prohibited compensation for judges through the existing fee system. One result of this concern was the creation of local government-funded district courts in 1968 (1968 PA 154).

The constitutional separation of courts and the revenue they produce through the creation of the district courts failed shortly after their creation. For example, by 1980, the percentage of court-generated revenue in Saginaw County going to libraries sank to 11 percent. The libraries sued and the Michigan Court of Appeals (COA) concluded that the libraries were not promised a specific amount of money. However, the COA also made it clear that the costs "cannot include the cost of daily operations of the courts or other governmental costs". However, the Michigan Legislature had granted authority to assess convicted defendants with costs associated with their arrest and prosecution, including "any cost in addition to the minimum state cost . . . " (MCL 769.1k(1)(b)(ii)). Courts also began to impose costs on convicted defendants to fund court operations (contrary to the COA's decision in the Saginaw libraries case). This chain of events and court decisions eventually led to the challenges raised in *People v. Cunningham* (496 Mich 145 2014), where the higher courts once again declared that trial courts could not impose court costs to fund their operation.

## *Cunningham*, the Legislature, and the Creation of the TCFC

In *People v. Cunningham*, the Michigan Supreme Court ruled that state law does not provide courts with the authority to impose costs upon criminal defendants to fund the day-to-day operation of the courts. Instead, state law only provides courts with the authority to assess costs the Legislature has specifically authorized and there was no such authority concerning the cost of court operation. This ruling directly eliminated the authority to assess monies that pay for roughly 26 percent of trial court expenses. The result was a push for swift legislative action to allow the assessing of costs.

In 2017, the Michigan Legislature, with the enactment of Public Act (PA) 64 of 2017, responded to *Cunningham* by authorizing trial courts to assess criminal defendants the cost of court operations related to their case. However, in consideration of the relevant history and calls for caution, a sunset provision was included, meaning that authority to assess these costs would exist for only 36 months. Subsequently, this sunset was extended to October 2020 and the TCFC was created to review Michigan's trial court funding system and make recommendations to improve its effectiveness, including any changes to the methods by which courts impose and allocate fees and costs.

## Defining the Problem

The TCFC is comprised of 14 commissioners appointed by the governor, representing a variety of stakeholders in the operation and financing of trial courts. The commission dedicated itself to an open-minded review of Michigan's current trial court funding system before developing any recommended changes.

Over the past 14 months, the TCFC engaged state and national experts, conducted research, engaged stakeholders, and conducted a variety of surveys and analyses to better understand the strengths and weaknesses of the existing court funding system in Michigan. The commission identified the following key barriers to an effective trial court funding system:

- A real or perceived conflict of interest between a judge's impartiality and the obligation to use the courts to generate operating revenue;
- Inadequate funding from all sources due to excessive dependence on local government funding; and
- Unequal access to justice, harming those who are most vulnerable and have the least access to financial resources.

In order to better understand the problem, and identify potential solutions, the TCFC conducted a survey of stakeholders that received 1,097 responses and also conducted interviews with 14 groups of stakeholders. Generally, there was agreement from stakeholders on the importance of implementing a more unified court funding system. Stakeholders believe a more unified system could deliver services more effectively and achieve greater equity in the administration of justice. However, there were concerns regarding the centralization of certain services under state government and the potential for the disruption of ongoing court services during implementation. The strongest support from stakeholders was for a partially unified system, where the state and SCAO provide services (like e-filing, document management, and technology) while local communities retain operational control. Exhibit 1 below provides a summary of responses from stakeholders regarding how the trial courts should be funded.

**EXHIBIT 1.** Future Trial Court Funding Source



Source: TCFC Stakeholder Survey

The TCFC heard from many stakeholders concerned that the courts are under increasing pressure from state and local governments to increase revenue. Some stakeholders believe that even the perception that judges are considering revenues when making judicial decisions can undermine the public trust in the court system.

The TCFC focused on those policy solutions that are most effective in addressing these problems while also being reasonable and actionable in Michigan's current political and financial environment. These recommendations are provided in this report along with the rationale to support them and best strategies for implementation. In order to understand the legal and political environment under which these recommendations are being considered, it is important to note the impact of a pending Michigan Supreme Court case (*People v. Cameron*) and a recent U.S. Supreme Court case (*Timbs v. Indiana*).

## *People v. Cameron*

On July 10, 2019, the Michigan Supreme Court considered *People v. Cameron*, which challenged the constitutionality of trial courts assessing criminal defendants the cost of court operations related to their case on two technical grounds. The Supreme Court allowed a lower court decision rejecting *Cameron's* challenges to stand. In a concurring opinion, the chief justice agreed to deny leave because Cameron failed to prove either of the technical defects he alleged.

The chief justice's opinion warned that the *Cameron* decision is limited to these specific challenges and that the trial court funding system may still be constitutionally flawed. She noted, "the United States Supreme Court has consistently overturned convictions where the presiding judge had any form of pecuniary interest in a defendant's conviction. She questioned whether the appearance of impropriety can be avoided where local funding units pressure judges to tax criminal defendants to finance court operations. Significantly, the chief justice noted that the potential conflict-of-interest issues were not before the court in *Cameron*, "[b]ut I expect we will see them brought directly to us before long." (*People v. Cameron*)

The recommendations contained in this report address the systemic trial court funding problems identified by the TCFC regardless of how *Cameron* was decided. The chief justice acknowledged the TCFC in *Cameron* and urged the legislature to take seriously these recommendations.

## *Caliste v. Cantrell*

Court funding challenges are not unique to Michigan. On August 29, 2019, the U.S. Court of Appeals for the Fifth Circuit decided *Adrian Caliste and Brian Gisclair v. Harry E. Cantrell*. The court found unconstitutional a court financing structure in Louisiana that relied in part on revenue from bonds set by magistrate judges. The court held that the judge received significant nonmonetary benefits from the monies generated by his bond determinations. These benefits included helping fund critical pieces of a well-functioning chambers. The court also noted, "if an elected judge is unable to perform the duties of the job, the job may be at risk." (*Caliste v. Cantrell*) In Michigan, judges who assess costs receive similar nonmonetary benefits. The court concluded, "it may well turn out that the only way to eliminate unconstitutional temptation is to sever the direct link between the money the criminal court generates and the Judicial Expense Fund that supports its operations." (*Caliste v. Cantrell*)

## The Role of *Timbs*

The United States Supreme Court unanimously decided *Timbs v. Indiana* on February 20, 2019. Narrowly, the *Timbs* decision provides that the "excessive fines" provision of the Eighth Amendment to the U.S. Constitution applies to the states through the 14th Amendment's due process clause. However, the discussion in *Timbs* confirms that the TCFC's identification of problems with the Michigan trial court funding system are well-founded.

The Supreme Court's analysis in determining whether or not the "excessive fines" provision of the Eighth Amendment applies to the states begins with the question of whether the prohibition on excessive fines is fundamental to the American scheme of ordered liberty and deeply rooted in our history and tradition. In the *Timbs* case, the court then discussed America's legal heritage dating back to 1215 and the Magna Carta's call for proportionate consequences and admonition against unaffordable sanctions. The term "fine" was discussed expansively, like the definition of assessment as used by the TCFC. The court went on to note that money has had a corrupting influence throughout history, citing as far back as the Stuart kings (17th century), who were criticized for using large fines to raise revenue.

Finally, the *Timbs* court discussed the potential risk in allowing excessive assessments in criminal cases by referencing a previous decision that criticizes such assessments, saying that even absent a political motive, fines may be employed in a measure out of accord with the penal goals of retribution and deterrence, for fines are a source of revenue, while other forms of punishment cost a state money.

# Michigan's Landscape

To grasp the complexity of the court funding challenge, it is necessary to first understand how Michigan's court system is structurally divided as well as where and how funding is currently allocated, and how reform efforts have been building to improve the trial court funding system.

## Court Structure

Over the years, Michigan has struggled to achieve a more unified court system. A paradigm shift occurred with Michigan's 1963 constitution, which introduced the concept that Michigan was a single court with several divisions, each devoting attention to a certain level of judicial administration. The Michigan Constitution provides that:

> The judicial power of the state is vested exclusively in one court of justice which shall be divided into one supreme court, one court of appeals, one trial court of general jurisdiction known as the circuit court, one probate court, and courts of limited jurisdiction that the legislature may establish by a two-thirds vote of the members elected to and serving in each house. (Mich. Const. 1963, art. VI, § 1)

In Michigan, in addition to a supreme court and a court of appeals, there are currently 242 trial courts, which include 57 circuit courts, 78 probate courts, 103 district courts, and four municipal courts. There are currently 559 total circuit, district, probate, and municipal judges in Michigan. Exhibit 2 below provides additional details regarding the structure of Michigan's trial courts.

**EXHIBIT 2.** Michigan Judicial Branch



**State Court Administrative Office**

**Supreme Court**
7 Justices

**Jurisdiction (Court of Last Resort)**

• Considers applications for leave to appeal, mainly from decisions of the Court of Appeals; grants appeals as a matter of discretion

**Court of Claims**
4 Judges from at least 2 COA districts

**Court of General Jurisdiction**

• Claims and demands against state over $1,000 except where circuit court has jurisdiction; State Administrative Board has discretionary authority in claims up to $1,000
• Jury trials possible
• No workers' compensation claims

**Court of Appeals**
4 Districts
25 Judges

**Jurisdiction (Intermediate Appellate Court)**

• Appeals by right from circuit court, court of claims, probate court, and other tribunals as established by law or rule
• Considers applications for leave to appeal, primarily interlocutory; grants appeals as a matter of discretion

**Circuit Court (57)**
217 Judges

**Court of General Jurisdiction**

• Equity; general civil over $25,000
• Felonies
• Appeals from district court; de novo or on record
• Administrative appeals
• Jury trials

**Family Division Jurisdiction**

• Domestic relations
• Delinquency, child protective proceedings, and adoptions
• Ancillary jurisidiction for mental health, guardianship/conservatorship
• No jury trials for domestic relations or adoptions

**District Court (103)**
235 Judges

**Court of Limited Jurisdiction**

• Civil litigation up to $25,000 excluding equity; small claims up to $6,000
• Misdemeanors
• Ordinance violations
• Felony preliminary exams
• Landlord/tenant or summary proceedings
• Jury trials
• Traffic

**Municipal Court (4)**
4 Judges

**Court of Limited Jurisdiction**

• Civil, landlord/tenant up to $1,500 ($3,000 if a resolution is passed)
• Conciliation division up to $100 ($600 is a resolution is passed)
• Misdemeanors; traffic and ordinance violations with fines less than $500 and sentence less than 1 year; felony preliminary exams
• Jury trials

**Probate Court (78)**
103 Judges

**Court of Limited Jurisdiction**

• Cases pertaining to guardianships, conservatorships, protective proceedings, estates, trusts, and the mentally ill
• Jury trials (no jury trials for minor proceedings)
• Certain civil cases and miscellaneous

(#) indicates number of courts     Arrow indicates route of appeal

Our constitution is a product of the 1960s when court unification was popular. However, in the 1980s, courts began shifting the lens of judicial reform from unification to examination of individual court performance. This has opened a more nuanced view of unification that focuses on individual elements, which may have more positive outcomes than a comprehensive state-centralized approach. For example, studies show that a State-provided, unified information technology system could prove beneficial in terms of efficiency and would leave control of other court infrastructure to local government. Centralizing all court functions under the State may be problematic but targeting certain specific areas including court technology and collections could lead to more efficient and equitable outcomes.

## Court Funding

In recent years, Michigan's courts have struggled to deliver justice with diminishing resources, and recent court decisions further threaten to remove existing court funding streams. To better understand these challenges, the TCFC also sought to determine the amount of resources currently spent within all trial court systems. Michigan lacks a system to determine all local court revenues and expenses, as that information must be gathered from each of the 165 separate court funding units. Exhibit 3 below provides a graphic of the complexity of our current court funding system. The TCFC collaborated with the local court funding units to collect accurate financial data as of 2017 to understand the resources used by the courts and make policy recommendations based upon those findings.

Before reviewing local revenues and expenses, it is important to understand the financial resources that state government contributes to Michigan's court system. The state judiciary budget is comprised of 2 percent ($192.6 million) of the total state general fund budget. The state government funds both the supreme court and court of appeals entirely in its budget. Of the $192.6 million of general fund expenditures within the state judiciary budget, almost 50 percent ($93.5 million) supports justices' and judges' compensation. The state reimburses local units for all trial court judge salaries and a minor portion of the benefits. While these are sizeable resources to support local courts, it is important to understand the level that other funding sources are contributing to Michigan's court system.

**EXHIBIT 3.** 2017 Court Equity Funding Sources (in millions)



## Sources of Funding

The current system is dependent upon court assessments (fees, fines, and costs) to generate substantial revenues to fund roughly one-third of court operations. The balance comes primarily from local general operating funds with the remaining portions from state and federal payments and grants. Exhibit 4, below, provides a summary of sources of funding of Michigan's trial courts. This is a challenge of Michigan's current system—as local general funds are pressured, the temptation rises to increase court revenues through court assessments.

While a significant portion of the court assessments are sent to state government, very little is ultimately appropriated from the state's general fund to actually fund the trial court system. Tens of millions of dollars are transferred to other state functions that do not directly support courts. Exhibit 3 provides a breakdown of where these court assessment funds are directed.

State support to the courts is 26.2 percent of all funding. Of this amount, a considerable portion is made up of court assessments that are from local courts. Courts and local funding units remit back to the state $127 million. When removing the $127 million that is sent back to the state from local court assessments, the state share of funding is greatly reduced. Local government units are the largest source of funding for trial courts. Exhibit 5 illustrates the amount of state resources that support local judicial systems.

While these percentages are in total across the state, it should be noted that the range of percentage contributions varies greatly. Each local unit varies in its percentages based upon what courts the unit may house. For example, most counties have circuit, district, and probate courts. In six Michigan counties (Ingham, Kent, Macomb, Oakland, Wayne, and Washtenaw), local municipalities (cities, townships) provide for a district court. Given that most user fee revenues are collected in district courts, those local units only housing a district court will have a greater portion of their expenses covered by court assessments instead of the local funding unit.

**EXHIBIT 4.** Source of Local Court Resources



■ State funding (includes both general fund and assessments returned to local units)
■ Federal funding
■ Court-generated revenue (retained locally)
■ Local funding

Source: TCFC Financial Survey

**EXHIBIT 5.** State Contributions to Local Trial Courts

| | |
|---|---:|
| State grants/payments sent to local funding units: | $96,647,493 |
| Court equity fund payments: | $48,697,247 |
| **Total** | **$145,344,740** |
| Remittances from local units paid to the state: | $127,754,717 |
| Difference (amount of state general fund contribution to local units): | $17,590,023 |
| Percentage of local court operations expenses covered by state general fund: | 2.24% |

Source: SCAO Court Payments and Remittances FY 2018 and TCFC Financial Survey

**EXHIBIT 6.** Financial Data Survey Results

| Court Function | Projected Expense Range | Range Mean |
|---|:---:|---:|
| Circuit court | $284,167,824 to $301,456,974 | $292,812,399 |
| District court | $208,139,180 to $328,251,257 | $268,195,219 |
| Probate court | $46,617,237 to $64,261,713 | $55,439,475 |
| Other court functions | $546,439,015 to $885,971,608 | $716,205,312 |
| **Total** | **$1,141,847,711 to $1,436,139,681** | **$1,288,993,696** |

Source: TCFC Financial Survey (see Appendix B for more information)

**EXHIBIT 7.** Court Expenditures, by Court Type



■ Circuit court   ■ District court   ■ Probate court   ■ Other court functions

Source: TCFC Financial Survey

**Expenditures**

The TCFC gathered considerable data from each court and funding unit on its expenditures. A survey of local funding units was conducted, and the data was compiled and confirmed for accuracy. Findings from the survey of local funding units show that the total cost of Michigan's court system (outside of the supreme court and court of appeals) amounts to between $1.14 billion and $1.44 billion. For purposes of this report, calculations use the average of that range (1.29 billion). See Appendix B for a further explanation of court expenditures. In addition, Exhibit 6 and 7 provide a breakdown of local trial court expenses.

# Court Funding System Reform

There have been recent efforts in Michigan to address ongoing challenges to the court funding system. These efforts have been led by the State Bar of Michigan (SBM), working with other key stakeholders to improve the system. The TCFC is building upon these valuable efforts.

The SBM, court staff, and other key stakeholders have been working to address challenges in court funding and improve court performance and the administration of justice. In 2011, the SBM Judicial Crossroads Task Force published a report (*Delivering Justice in the Face of Diminishing Resources*) that concluded, "urgent and purposeful action needed to be taken" because the state could no longer afford its current court system. The report asserted that the tools exist to change the system and that spending of tax dollars must occur more strategically, and that these recommended system changes could be implemented without a substantial increase in funding.

More recently, in 2016, the *SBM 21st Century Practice Task Force Report* established a roadmap for shedding antiquated court customs and applying technology and business process thinking to legal practice and court operations. The task force concluded that adopting technology and new analytical tools to deliver affordable, quality legal services could improve court efficiency and increase access to legal services. The TCFC has incorporated the ideas and lessons learned from these previous efforts and concurs with these prior recommendations.

There has been progress since the publication of these reports and the TCFC seeks to build upon that momentum. Changes so far include reform of indigency defense, creation of the business court, expansion of concurrent jurisdiction and the reduction of 35 judge positions (as of the report date), and expansion of case and document management and technology services for courts across the state.

# National Landscape

In addition to engaging Michigan experts and stakeholders to better understand the Michigan system, the TCFC also researched the national landscape. Over the past 14 months, the commission consulted with a select group of experts from across the country to gather insight on how best to design a court funding system that promotes efficiency, equitable outcomes, and the effective administration of justice. Challenges other states encountered were also outlined.

The National Center for State Courts (NCSC) provided a national perspective on court funding and assisted the TCFC in developing guiding principles. The NCSC discussed various funding and expenditure sources for trial courts, the history of how courts were funded, budget principle management,

adequate funding principles, and the effects of state financing. In addition to these broader principles of court administration, principles surrounding fines, fees, and bail practices have become increasingly important in guiding the effective administration of justice. A variety of studies and news stories have highlighted examples of the harm that can result from unfair or unconstitutional practices as they relate to pretrial detention and the imposition of costs, fines, and fees. In order to draw attention to these challenges and promote improvements, in 2016, the Conference of Chief Justices and the Conference of State Court Administrators established the National Task Force on Fines, Fees, and Bail Practices (National Task Force). This group developed recommendations that promote the fair and efficient enforcement of the law and created resources for courts to ensure that individuals have access to justice.

Also, representatives from a variety of states provided key information to the TCFC on best practices and lessons learned. Minnesota was identified as a best practice based on its effective transition into a unified court funding system. Minnesota's judicial branch went through a decade-long transition process to a unified state system and has been state funded for 13 years. Minnesota's counties typically are responsible for building and security costs. Other incurred expenses are negotiated with the state.

Arizona was also identified as a best practice even though their court system is not as centralized as Minnesota's. Arizona's trial court system has a hybrid funding system, where its strengths are court order enforcement and a centralized collections program. In addition, the roles and responsibilities of municipal court governance are clearly communicated within that model.

## Lessons Learned

Kansas, Ohio, and California were viewed as states where important cautionary lessons could be learned regarding court system funding. Statewide funding appears to work well in Minnesota. However, Kansas shows there may be a downside to centralized statewide funding. The centralized statewide funding model may subject the courts to political conflict unrelated to court funding. For example, a series of court decisions concerning school funding increased tensions between the judicial and legislative branches of government with the legislature responding with several attempts to limit the funding of the judicial branch.

Ohio is not a unified judiciary and the TCFC learned that within the judicial system, the various courts do not effectively coordinate efforts. Ohio is working to better coordinate its judicial system and seeking additional assistance from the state in promoting a more unified approach.

California experienced challenges to transitioning to a state funding system, and there have been ongoing issues in funding court infrastructure and facilities. As a result of not defining roles and obligations related to court facilities, those facilities are not being properly maintained.

Exhibit 8 below distinguishes between those states that are mostly state funded as opposed to those that are mostly locally funded.

**EXHIBIT 8.** Court Funding in the 50 States



**KEY**

- ■ Mostly state funding
- ■ Mostly local funding
- ■ Fee funding

In addition to learning about the strengths and weaknesses of state funding structures, the TCFC also analyzed the impact court funding schemes can have on communities. The TCFC was provided a background summary of the events that occurred in Ferguson Missouri on August 9, 2014. In the Ferguson case, an unarmed teenager was shot and killed by the police, causing long-term unrest in the community. In March 2015, after an investigation, the U.S. Department of Justice called on Ferguson to overhaul its criminal justice system, as courts in the city were accused of using law enforcement and the court system to generate revenue, specifically through the issuing of expensive citations. This approach to generating revenue for noncourt purposes caused constitutionality issues and damaged the trust between the community and the local government, courts, and police. To exacerbate the problem, courts did not take into consideration the ability to pay. This practice violates principle 1.5 of the National Task Force's report on the *Principles on Fines, Fees, and Bail Practices*, and violates individual due process rights.

# A New Court Funding System for Michigan

The TCFC's review of the current state of Michigan's court funding system and comparison of it to national best practices has found that the current system must be overhauled to produce the justice outcomes the people of Michigan deserve.

The TCFC was charged with reviewing existing funding mechanisms and recommending changes that would improve efficiency, the administration of justice, and justice outcomes. Commissioners unanimously agreed that any and all changes must be based on established principles and tested best practices. The TCFC reviewed and incorporated ideas from two sets of principles: the *Principles for Judicial Administration* articulated by the NCSC and the National Task Force *Principles on Fines, Fees, and Bail Practices*. The NCSC has compiled its principles to help guide state-level leaders as they restructure court services and secure adequate funding. The National Task Force developed its principles to be used as a basis for promoting more fair, transparent, and efficient judicial practices. Building from these two sets of national principles, the TCFC adopted key principles to drive the establishment of a new court funding system and guide policymakers and transition teams as they implement the TCFC's recommendations. The TCFC guiding principles are prescribed below in Exhibit 9.

**EXHIBIT 9.** Guiding Principles

| TCFC Guiding Principles | NCSC Principles | National Task Force on Fines, Fees, and Bail |
|---|---|---|
| **Reasonable, necessary, uniform, and sustainable funding:** A standardized system of fees and costs that generates a revenue stream resulting in stable and consistent court funding | 6, 11, 16, 19, 23, 20 | 1.5, 1.6, 2.3, 3.3, 6.1, 6.2 |
| **Streamlined operations:** The use of centralization, technology, and consolidation to improve efficiency | 5, 6, 11, 23 | 1.3, 1.10, 2.1, 2.3, 3.2, 3.5, 6.3, 6.7, 6.8 |
| **Rational court organization:** A process driven by best practices, data, outcomes, and accountability | 1, 4, 15, 16, 17, 20 | 2.1, 3.3, 3.4, 4.3 |
| **Judicial independence:** A separation of courtroom decisions from operating budgets | 10, 13, 19, 25 | 1.5, 1.6, 1.8, 6.1, 6.2, 6.3, 6.8 |
| **Equity and inclusion:** Principles that ensure the courts are impartial and fair to all community members | 14, 25, 12 | 1.1, 1.4, 1.6, 3.3, 3.5, 4.1, 4.3, 5.1, 5.2, 5.3, 6.5, 6.6 |
| **Court professionalism:** Education and training to continuously improve the performance of court staff and judicial officers | 7 | 1.8, 6.4, 6.7, 7.1 |
| **Preservation of procedural due process:** Importance of promoting procedural fairness, access to justice, and court safety | 8, 12, 13, 14, 22 | 3.3 |

The TCFC envisions a court system focused on administering justice, ensuring public safety, and upholding a high level of public confidence. Justice, not revenue, is the desired outcome.

Consistent, predictable, and proportional resources across Michigan's courts are essential in providing due process and judicial independence, thereby ensuring the integrity of the court and just outcomes for the people of Michigan. This will also provide a platform for accelerating innovation to ensure that the evolution of the justice system keeps pace with Michigan's progress.

This vision can be achieved by clearly defining and streamlining a new financing model administered by the state that includes new state investment into the trial court system. This new court funding system will improve justice outcomes by creating opportunities for local governments to increase investment in improved law enforcement, criminal justice deferral programs, assistance for mental health services, and other innovative programs.

# Recommendations

The TCFC arrived at five recommendations to implement its vision for a new funding system for Michigan's trial courts. These recommendations are based on sound principles of judicial administration, best practices from other states, information about Michigan's court system, as well as a practical understanding of what can be realistically achieved. These recommendations resolve the issues raised by *Cunningham*; meet Act 64 of 2017 obligations; and establish a new court funding system that is more efficient, fair, and equitable.

## Recommendation One: Establish a Stable Court Funding System

### Summary

The TCFC recommends establishing a stable court funding model to invest in improved justice and performance outcomes, building on existing resources. Rebalancing funding between state and local government is essential to ensure ongoing and sustainable funding. Establishing a funding model that is consistent, and predictable, with proportional resources across courts is essential in providing due process and judicial independence. This new funding model will ensure the integrity of the courts and just outcomes for all the people of Michigan.

### Description

The state must accept responsibility and act to ensure adequate funding for trial courts with local government continuing to play a role in providing funding and support of the judiciary. A rebalanced state/local partnership is necessary to meet the fundamental duty that everyone has equal access to justice. To fulfill this responsibility, the state must create a Trial Court Fund for receipt of all trial court collections and receipt of state general fund payments. The Trial Court Fund must distribute necessary and appropriate monies to fund trial courts. All functions that support this principle should be state funded and managed.

Court revenues must not be redirected to any noncourt expenses, either within state government or local government, including fines which currently fund libraries. In addition, any and all trial court revenues must be sent to the Trial Court Fund for distribution to cover court expenses. This requires the state to recognize its responsibility to finally fund the trial courts, in partnership with the local funding units.

When state funding is established, decisions about local trial court operations must continue to be made by chief judges. Discretion over the administration of the court will remain with the chief judge in conjunction with the normal budgetary appropriation process that occurs with the local funding unit. These officials are best positioned to respond to their community's needs.

The Trial Court Fund must distribute funds to local governments that fund trial courts according to a Court Operations Resources Report (CORR). Similar to the current Judicial Resources Report (SCAO's report of judicial personnel needed), the CORR will be based on a weighted caseload study and appropriate allocation for local facility expenses. Case weights should be determined by a thorough statewide study to determine how much staff time is needed to fulfill each core function of a court's work. Differential cost of living, and therefore employee compensation, must be done on a regional basis (either by SCAO region or state government prosperity regions). The state must determine and ensure that a minimum level of staffing, such as district court probation personnel, exists at every trial court since the CORR could result in a smaller number of staff than is needed to efficiently operate an office and serve the public. Nothing should prohibit a local community from increasing its contribution to ensure a locally appropriate level of service. Such additional local funds must not reduce the payment from the Trial Court Fund, as established by the CORR.

Local governments that fund trial courts must maintain their current level of general fund spending (based on the average actual expenditures for the three years preceding legislative creation of the Trial Court Fund). The state must fully fund the cost of technology, including but not limited to, case management, e-filing, and video conferencing. Additionally, the state must fully fund the court collections function and total compensation expenses related to judges, one judicial assistant per judge, magistrates, court administrators, and probate registrars, with no assessment or cost sharing with the local funding unit for these costs. The sum of these expenses must be deducted from the required local government's current level of general fund spending.

Each court facility is the responsibility of the local government that funds the trial courts that use that facility. If a local government has existing debt for a court facility, the CORR must incorporate that annual cost into the formula to determine annual payments to local funding units. If no bonded indebtedness exists at the time of legislative creation of the Trial Court Fund, the CORR must include a fixed percentage of identified facility operating costs. Once a local unit ceases to have debt for a court facility, the CORR must then include a fixed percentage of operating costs for facilities for that local funding unit. "Existing debt" as used in this section means facilities constructed prior to legislative creation of the Trial Court Fund for which debt remains outstanding. A local unit may use facility funds for facility operating costs or capital replacement costs.

Clearly defined roles and obligations related to court facilities are essential to successful transition in Michigan. Minimum standards for court facilities should be established in advance and reviewed every five years.

Consistent, predictable, and proportional resources for all trial courts will improve justice outcomes, as these courts and their local funding units will be able to focus on justice, not revenue. This change in focus will motivate trial courts to meet quality and performance metrics that will improve outcomes. This recommendation will establish a baseline for trial court functions, including probation interventions, that will ensure equitable access to justice services. The TCFC supports the performance measures created by the NCSC, many of which have already been adopted by the SCAO. The CORR must be administered

in such a way as to promote the highest achievement on these performance measures. The SCAO should be provided additional flexibility through state general fund appropriations to promote innovation and continue the growth of problem-solving courts (e.g., veterans treatment, drug and sobriety, eviction diversion, and mental health courts).

Expanded court innovations and efficiencies will help resolve some court funding challenges. The TCFC further recommends expanding upon the innovation and success of problem-solving courts and other promising innovations. These include: online dispute resolution, programs providing access to justice to low-income and other vulnerable court users, community and peer dispute resolution, presumptive bonds, and other emerging initiatives. Each of these has the promise of improving justice outcomes.

Each year the SCAO will be responsible for working with the governor to develop recommended Trial Court Fund expenditures for inclusion in the executive budget recommendation. The SCAO will be responsible for presentation and explanation of the Trial Court Fund expenditures to the Legislature. The Legislature must appropriate the funds necessary to meet the requirements of the CORR as defined by the SCAO. The SCAO will then administer Trial Court Fund distribution to each local government that funds a trial court. It is understood that the SCAO operates under the supervision of the supreme court, and it is anticipated that the supreme court will agree with these requirements.

The TCFC is aware that the redirection of court costs as a funding stream will have a negative impact on the budgets of certain local funding units. Certain courts currently have revenues in excess of their costs, but most do not. As the recommendations set forth by the TCFC are implemented, the intent is to level the playing field for all parties. As a result of this change, there may be up to a $27 million shortfall for these communities' general fund budgets. Exhibit 10 below provides a representation of this new funding system.

**EXHIBIT 10.** New Court Funding Model



## Rationale/Findings

Separating courts from the revenue they create is imperative and fundamental concept in Michigan. The first Michigan Constitution in 1835 provided that all penal fines shall be paid to support libraries. This directive has remained consistent in each of the state's constitutions. The current constitution from 1963 states, "All fines assessed and collected in the several counties, townships, and cities for any breach of the penal laws shall be exclusively applied to the support of such public libraries, and county law libraries as provided by law." If the recommendations in this report are implemented, this diversion of court revenue will no longer be needed to separate courts from the revenue they create.

The TCFC has determined that Michigan's existing trial court funding system is a broken collection of assessments and transfers that does not achieve sustainability or equity throughout the state. The new trial court funding model will first seek to more equitably share the costs of funding the trial court system. It is recognized that this can only be accomplished by the state increasing its investment in the trial court system. It is recognized the importance of court costs to the current budget of local funding units.

It is important to develop a system where funding for the court is predictable, sustainable, sufficient, uniform, and fair. Currently, over $30 million per year in local trial court revenues are diverted to other non-court state functions, such as corrections, Michigan State Police, Secondary Road Patrol, and the state forensic laboratory. Courts should not serve as tax assessors and collectors for the benefit of other programs and organizations. Instead, court revenues should be committed to the operations of the courts. Reinvesting diverted court revenues in Michigan courts will make up a significant percentage of any funding deficit caused by removing pressure on judges to fund their court.

## Implementation Plan

### Short Term

Creation of the Trial Court Fund would require legislation. The legislation should authorize a distribution formula according to the Court Operations Resources Report based on a weighted caseload study and appropriate allocation for local facility expenses. The fund will include local ordinance revenue as well. A careful transition plan must be established in order to minimize disruption to local municipalities resulting from the change in funding. Each and every statute that transfers money to or from a trial court must be amended. These amendments shall implement the new funding model. Statutes needing amendment have been identified by the Trial Court Funding Commission, see Appendix E (Dillon 2018; Haskamp 2018; Norton 2018; and Oeffner 2018).

### Long Term

Legislation requiring local governments to maintain their general fund spending will be needed once the Trial Court Fund is providing local revenues. In addition, policies to define minimum court facility standards will be needed. CORR will also need to establish any performance measures for local trial courts. Ongoing legislative appropriations to maintain the Trial Court Fund will be needed.

# Recommendation Two: The State Shall Offer to Provide All Court Technology Needs

## Summary

To create a uniform system and alleviate burden on court funding units, the State of Michigan must provide and fund, through the SCAO, all court technology needs, including case and document management services, and must also supply and manage technology products and services, including hardware, software, infrastructure, training, and ongoing technology support.

## Description

Michigan's trial courts currently use 20 different case management systems and 150 different computer systems. In order to aggregate data, each of the trial courts must gather data and transmit it to the SCAO. A unified technology system would enable courts to discontinue the use of staff to prepare these reports. More significantly, a unified system would enable broader use of online court services and resource sharing, would eliminate the cost to provide those services, and would reduce demands on staff, resulting in further savings. Technology can enable resource sharing as well, including aspects such as interpreters, secure digital court recording, and transcription. The system must, however, continue to protect certain confidential proceedings. All of this would result in reduced cost to local government while improving service to the public.

The state already provides courtroom video conferencing, resulting in over $7.4 million in annual savings for the Department of Corrections. Local law enforcement is also benefiting by conducting arraignments and other proceedings from jail, which provides greater security and reduced transportation costs. The SCAO is currently deploying e-filing in all of Michigan's courts. Providing for all of the technology needs for Michigan's courts will bring greater efficiency and better service to the people of Michigan.

A unified system will support consistent case processing and record management statewide. The State should complete and enhance the new electronic document management system because many courts currently lack the resources to effectively and efficiently adapt to new digital systems. This initiative would provide a unified platform for document management and eliminate duplicative efforts at the local level, providing a tool for the SCAO to manage data in a single location, rather than collect it from individual courts, thereby eliminating the necessity for multiple reports.

A common technology platform will also support the expansion of online dispute resolution. It will be less expensive to taxpayers to support a single system than the myriad systems currently supported by local funding units. Today, multiple systems create duplication of effort and systemic waste. The purchasing power of the state, along with the expertise to assess the value and quality of technology systems, will improve the overall quality of the experience of the courts and the users.

## Rationale/Findings

In a data-driven world, a common data collection point is vital for service improvement. With a common system, trial courts would no longer be required to prepare reports from different data management systems that make report generation time consuming and difficult. Additionally, the likelihood of error would be reduced if the SCAO could collect the data from the system directly. With a single system, the likelihood of the data being accurate, reliable, and consistent is improved.

The SCAO reports that there was resistance to performance measures in Michigan when they were originally proposed. Today, judges accept those measures and expect the data that supports those measures to be used for improving court operations. Trial courts routinely provide these reports to local media to demonstrate how well the court is performing.

Research also suggests that more state dollars to support in-service training, a statewide personnel system, and a statewide information technology (IT) system are cost-saving measures of unification. This unification will also improve access to services, improve the customer experience, and drive improvement in system performance. For example, online dispute resolution supported by a statewide IT system greatly increases access to court—over 50 percent of the public that uses online dispute resolution report that they could not have participated in the proceedings at all without this service.

In relation to this accessibility improvement, TCFC research found dramatically unequal resource allocation between courts and, therefore, vastly different court experiences for those using the system. The State must act to provide a uniform experience for all court users and provide transparency in the governance of the judicial branch. Uniformity in reporting and understanding of court performance across all communities must be achieved. All courts should be able to opt in to a standard technology platform. Currently, the various court systems provide inconsistent and inefficient reporting.

These challenges should be addressed by the SCAO providing technology to ensure equity in resources for all courts while also improving court efficiency. This leadership role will allow the SCAO to partner through agreements with their IT staffs of local funding units as well.

The SCAO must bear the cost of all technology enhancements. State general funds must be appropriated to the Trial Court Fund to meet this need. This will create efficiencies and a better model to further improve the court system.

## Implementation Plan

### Short Term

Statutory authority will be needed to designate court technology to be paid for from the Trial Court Fund. Once statutory authority is established, a legislative appropriation for court technology will be needed. The state must fund this service either through the state general fund or through civil filing fees or a combination. Any filing fee must remain as low as practical and funds received through this fee must be transmitted to the Trial Court Fund like all other trial court revenue.

A comprehensive technology plan needs to be developed by the SCAO incorporating all the technology elements contained within the recommendation. This plan will include a transition plan for all local courts to use the state unified technology system. Through its technology plan for courts, the state will provide case management services to all courts and continue its development of e-filing across the state.

### Long Term

Based on the technology plan, the SCAO must supply and manage all technology products and services for the courts. Ongoing legislative appropriations will be needed to support technology in trial courts.

# Recommendation Three: Establish Uniform Assessments and Centralized Collections

## Summary

The TCFC recommends that a system of uniform assessments and centralized collections be implemented for all courts as a function of the SCAO. This system will maintain judicial discretion for ordering fines within the limits set by law and determining indigence (ability to pay). This new system will help ensure that the administration of justice is separate from the business function of the court.

## Description

A variety of court business functions can be performed centrally that will reduce cost overall, promote efficiency, and eliminate the ethical dilemma of judges being incentivized to maximize revenue from parties to support their budgets. This new uniform system, administered by the SCAO, would build public confidence in the impartiality of the justice system and improve efficiency.

Efficiency in overall court operations will be enhanced with centralized core court business functions. Within each local court system an individual collection system exists. Centralizing court collections will achieve greater efficiency and achieve a higher level of uniform customer service. It is essential that the business function of court collections be removed from the trial courts and transferred to the state to ensure that administration of justice is the courts' sole function.

The best way to achieve this goal is through mandates from the supreme court and legislation that requires this focused standardization of the business functions of the court. An element of the centralized collection process is to eliminate all non-court-related assessments and create greater uniformity.

Standardizing fees and costs will prevent judicial and/or government abuse of the system by disincentivizing the use of courts to generate revenue as opposed to administer justice. However, judicial discretion should be available when assessing fines to allow a court to consider specific circumstances in reference to the matter pending before the court.

Court fines and costs must be assessed upon and subject to an individual's ability to pay. Important functions of a logical court funding model are to streamline the courts and require them to follow the same guidelines when determining fee amounts or an individual's ability to pay. Thus, having uniformity and consistency for revenue generation and distribution is critical to establishing a system that is perceived as fair for all involved. In its collection practices, the state shall comply with appropriate state and federal law. By centralizing collections, Michigan can reduce the cost to local units and increase the efficiency of collections, eliminating incentives for generating revenue. All court revenues must be subject to this new state collections program.

The SCAO must establish the appropriate actual cost for civil infraction and criminal cases. Costs assessed to an individual defendant must be based on a sliding scale and ability to pay, as established by the SCAO.

## Rationale/Findings

This new uniform assessment and centralized collections policy will eliminate the ethical dilemma judges face as well as the public perception that judges fine individuals in order to fund their courts. Additionally, this policy will separate judicial function from revenue collection, eliminating a conflict of interest.

A judge's decision to impose a legal financial obligation should be entirely unrelated to the use of revenue generated from the imposition of such obligations (Principle 1.5, Principles on Fines, Fees, and Bail Practices, December 2017). Centralizing judicial collections will streamline judicial function, as collections are a poor use of judicial time and court resources. Creating consistency of collections around the state will also help ensure equal treatment of offenders.

For example, the collection of restitution for crime victims is a priority of trial court collections, and transferring this responsibility to the state will allow greater collection opportunities by the department to collect on behalf of the victims. Ensuring that victims receive funding and support must remain a priority.

Court assessments would be based on a cost allocation plan calculated using the standards in OMB Circular A-87 and calculated by an independent party every five years. This circular provides principles and standards for determining costs for grants, awards, and other agreements with state and local governments.

## Implementation Plan

### Short Term

Legislation is needed to authorize SCAO to create standardized court assessments. This legislation will provide judicial discretion to reduce court assessments based on ability to pay. Once legislation is passed, rules will be needed authorizing the SCAO to establish a fixed schedule for court assessments that are based on actual costs, which will be implemented across all courts in phases. The SCAO will also need to develop the appropriate forms and the technology to deliver them.

Legislation is also needed authorizing the Michigan Department of Treasury (Treasury) to collect assessments for each court. The Treasury will then need to implement rules and procedures on the transmittal of assessments from local courts to the Treasury. The Treasury will also need to establish its procedures for collecting assessments. It is important to require that the Treasury consider ability to pay as a criteria for collection and include an opportunity for community service if a person does not have the financial resources to pay for court assessments.

Legislative action on these recommendations must be adopted prior to the sunset of Act 64 of 2017. The Legislature should extend the statute allowing for fines and costs to be imposed in criminal cases until the state acts to replace this court-generated revenue with state general fund support.

### Long Term

Once the system is in place for state collections through the Michigan Department of Treasury, local courts will transfer outstanding collections to the state. Legislation will be needed to make this transfer. Policies from Minnesota could be looked at as a best practice for centralizing court payment processing.

Several pieces of legislation will be needed to move existing revenues directed to noncourt expenses to the Trial Court Fund (see Exhibit 2 for a listing of existing revenues). Once the State decides on an alternative funding stream for libraries, a constitutional amendment should be pursued to provide penal fines to the Trial Court Fund.

# Recommendation Four: Move Toward a Uniform Employment System

## Summary

Michigan lacks a uniform system of justice due in large part to disparate and unequal local funding. All court employees, beginning with trial court judges, referees, and magistrates, should be transitioned to state employment, which would provide for uniform compensation, wages, and benefits as well as standardized qualifications for nonjudicial personnel, training, and conduct requirements. This is a long-term goal that should incrementally progress after other recommendations are enacted.

## Description

The transition to state employment should begin with trial court judges, as they are currently both state and local employees. The initial transition should also include referees and magistrates. Ultimately, this transition would make all trial court judges, referees, and magistrates solely state employees for all purposes, including salary, compensation, liability, healthcare, and retirement benefits. Additionally, the change would result in equal compensation and benefits for trial court judges, referees, and magistrates across the state. Current trial court judges, referees, and magistrates should be allowed an opportunity to continue with existing compensation, benefits, and expense programs. This would be similar to the transition from defined benefit pensions to defined contribution programs for state employees in 1997.

The SCAO should be assigned the responsibility of developing a plan for phasing in all other court employees. The TCFC recommends transitioning by categories of court employees, such as court administrators, probate registers, probation officers, and clerks on a set schedule. This process will also include establishing uniform standards for compensation, benefits, qualifications, training, and conduct, with the intent of improving the performance of court employees.

It is important to focus on the uniform employment concept from both organizational and administrative perspectives. All court employees should be under a single employer instead of the current decentralized and inconsistent system. Employees are currently compensated and managed under a vast array of standards based on the policies and resources of each local unit of government and court, which results in a myriad of challenges and essentially no uniformity of court employees across the state.

## Rationale/Findings

Currently, the State pays trial court judges' salaries—part directly to the trial court judge and part as a reimbursement to the funding unit. With the added processes of payment and reimbursement, as well as dual employment, this method of salary payment is inefficient. Making trial court judges, referees, and magistrates state employees would:

- Standardize salaries, fringe benefits, and retirement benefits so that there is equal treatment
- Transfer the cost of visiting judges from funding units to the state
- Allow for more direct control over temporary assignments if help is needed in other courts
- Provide for easier and more uniform training and education
- Eliminate considerable costs for the local communities and funding agencies
- Eliminate dual employment concerns

- Help maintain the separation of the three branches of government as well as judicial independence
- Allow for consolidation or elimination of judgeships where demand for the service is less

Courtroom personnel, in assisting trial court judges, should be directly supervised by the judge.

## Implementation Plan

### Short Term

Legislation is needed to transition judges, referees, and magistrates to direct employees of the State of Michigan, including moving them to state benefits. Current trial court judges, referees, and magistrates must be given the option to continue with existing compensation, benefits, and expense programs. The State should transition trial court judges, referees, and magistrates to state employment to begin to build a more streamlined and clearer organizational structure for the courts under the judicial branch.

After trial court judges, referees, and magistrates become state employees, the SCAO will develop a transition plan to move court administrators and probate registers into state employment. This will occur once the Trial Court Fund is providing adequate funding for trial courts. Legislation is needed to transition these employees.

### Long Term

Eventually, all court personnel will become employees of the State of Michigan. The Michigan Supreme Court will develop a plan to transition court employees into a single employer under the state, with the goal of uniformity within local trial courts.

# Recommendation Five: Establish a Transition Plan for the New Court Funding Model

## Summary

In order to implement a new court funding model, there must be a plan for the systematic transition of finances and the promotion of funding sustainability. Success will depend on thoughtful planning of a phased implementation that recognizes it will take time to fully achieve the goals laid out in these recommendations. The SCAO must lead the drafting of this transition plan, which must include technical assistance and funding to local units of government to cover the residual burdens of local support for the courts throughout the implementation.

## Description

In order to implement a new court funding model, there must be a plan for systematic transition of finances and funding sustainability that is thoughtful and deliberate in order to minimize disruption to local courts and funding units. The plan must address how functional areas of operation in IT (including case management), facilities, assessments, collections, uniform employment, and other court operations will be transitioned under the recommendations from the TCFC. It is important that this transition plan hold local governments harmless (i.e., no additional funding is required from local funding units to cover the costs of a transition to a new funding model). The basis for this position is the current funding model and the unequal funding obligation currently residing with local funding units supporting the state court system. The state government should provide all funding and resources necessary to cover transition plan costs. The SCAO must be provided with a funding appropriation to begin the implementation and operation phase of the transition plan based upon their expertise in understanding what will be required for success.

The transition plan must lay out a timeline for short-term, intermediate, and long-term objectives to be achieved. To assist and support the SCAO, a legislatively created task force must be established to implement the recommendations and lead the transition. Membership of the task force must include key stakeholders from the Michigan Department of Treasury; the Michigan Legislature; the Executive Office of the Governor; Department of Technology, Management, and Budget; Michigan Association of Counties; Michigan Municipal League; Michigan Townships Association; judicial associations; county clerk associations; Prosecuting Attorneys Association of Michigan; State Bar of Michigan; practicing attorneys; court administrators; and the general public. The primary purpose of the transition task force is to ensure the TCFC's vision is realized through the implementation of a new model to fund Michigan's trial courts.

Once the new trial court funding model has been implemented, a Michigan Judicial Council shall be created. The council will be made up of court system stakeholders and housed under the Michigan Supreme Court. The council will explore and prioritize with the SCAO the additional actions that must be taken to continue implementing TCFC recommendations. In collaboration with SCAO, the council must include an evaluation component to measure the timely and effective implementation of each of the TCFC recommendations to ensure they are achieving the intended outcomes.

As new technologies are introduced, the council must ensure that legislation, rules, and practices are modified to take advantage of these new tools to support court services. Beyond applications that include e-filing and benefits of unified case management, efforts should include strengthening the overall value of technology to make better use of court resources and ensure success through rigorous pilot programs

and testing ahead of statewide implementation. As the state continues providing services to Michigan residents in the information age and beyond, it is essential that court services have a central focus in leading technologies that may assist in providing additional avenues to promote timely access to the justice system.

A system for funding trial courts that is simpler than the current model will save both overall costs and enhance transparency in the allocation of resources and the sources of funding. The Michigan Judicial Council must adopt a schedule of consistent and uniform assessment of costs and ensure there is an equitable range of costs across all courts. Standardized fines, fees, and costs within a reasonable range to assist in preventing judicial or government abuse of the system must be implemented. These fines, fees, and costs should allow for trial court judges to have discretion when assessing fines so that a court can consider the specific circumstances in reference to the matter pending before the court, including a limit on costs and fines in relation to an individual's ability to pay. An important element of a logical court funding model is for all courts to follow the same rules and guidelines. Having uniformity and consistency for court collections is critical to establishing a system that is perceived as fair for all involved.

## Rationale/Findings

The TCFC recognizes that court operations must change to successfully realize these recommendations. The changes will allow for an improved funding model and overall enhancements to the Michigan court system so court services may be more equitably delivered to Michigan's residents.

The legislatively created task force would drive the full transition plan, understanding the time required to successfully implement TCFC recommendations. The task force will develop a realistic structure and schedule for transition implementation and oversight, initially focusing on achieving the goals of the new court funding model. The task force will then create the Michigan Judicial Council to facilitate the long-term implementation effort. This task force will report annually to the legislature on progress in conjunction with making requests for adequate appropriations for sustainable funding.

## Implementation Plan

### Short Term

Legislation must be enacted to establish an implementation task force of key stakeholders authorized to create a transition action plan, in conjunction with the SCAO, and oversee implementation of the new court funding model transition. This task force will report annually to the legislature on its progress. The SCAO, with guidance from the task force, will establish a formula based on case weights to be used to distribute and fund the trial courts. Variances must be made to ensure staff is funded appropriately in order to meet basic operational needs of each court. It will be essential to appropriate funding for the SCAO to administer the implementation plan and provide for its success.

If court costs are eliminated as a source of trial court funding prior to the case weight formula being developed and implemented, the SCAO must be authorized to devise an allocation formula based on existing data. Funds necessary to meet this shortfall must be appropriated by the legislature.

Long Term

After the task force has completed its planning and a new funding model is in place, rules are needed to create the Michigan Judicial Council under the judicial branch. The council will address ongoing and longer-term implementation and action efforts, and will also monitor outcomes and make suggestions or take appropriate action to modify the TCFC's core recommendations if unintended outcomes occur.

In conjunction with the supreme court, the Michigan Judicial Council will develop a plan to align all court employees under a single state employer following the transition of trial court judges and court administrators. Alignment of the employment structure should occur through a long-term approach and be completed in phases, with careful consideration for uniformity of organizational structures, workload and staffing match, and local adjustment for equitable compensation.

# Appendix A: Definitions/Terms

- **State court system:** The state court system is divided into the constitutionally created supreme court, court of appeals, a trial court of general jurisdiction known as the circuit court, a probate court, and the legislatively created district court (Const 1963, art 6, §1 and the Revised Judicature Act of 1961, MCL 600.101 et seq).
- **Court administrator:** Includes the highest-level administrator, or director of the court, who functions under the general direction of the chief justice or chief judge
- **Court assessments:** All monies authorized by statute to be paid to the court. These assessments are defined as follows:

  - Restitution: Money collected by the court to be paid directly to a victim of a crime
  - Fees: Imposed on an individual for a service provided directly to that individual (e.g., court-appointed attorney fees)
  - Fines: Imposed on an individual for a violation of statute or ordinance

    - Statutory fines: Imposed for a state penal law violation or civil infraction
    - Ordinance fines: Imposed for a violation of a municipality's ordinance

  - Court costs: Any cost reasonably related to the actual costs incurred by the trial court without separately calculating those costs involved in the particular case, including, but not limited to:

    - Salaries and benefits for relevant court personnel
    - Goods and services necessary for the operation of the court
    - Necessary expenses for the operation and maintenance of court buildings and facilities

- **Court expenses:** Costs of operating a trial court (including compensation for all judicial employees and court facilities), restitution paid directly to a victim, funds paid directly to crime victims pursuant to the William Van Regenmorter Crime Victim Rights Act, records retention and archival programs, supportive programs within the judicial branch (e.g., Michigan Judicial Institute), access to justice programs and civil legal assistance to low-income individuals, and community dispute resolution centers
- **Court technology:** Capital equipment used to operate the court, including computer hardware and software, training, court video systems to record proceedings and to allow remote access communication/participation, audio recording and amplification equipment
- **Case weight:** The average number of minutes necessary to perform certain tasks associated with a case
- **Case load:** The number of cases filed in a court
- **Justice outcomes:** The sum of the experience an individual has with the court system that, taken together with all cases before the court, creates community safety and well-being and reduces reoffence (includes access to the court, representation, trial process, diversion opportunities, sentencing, supervision, probation, and the performance of the courts across the state according to SCAO standards)

- **Problem solving courts:** Evidence-based probationary programs to address specific needs for enhanced supervision and treatment designed to reduce recidivism (e.g., drug court, sobriety court, mental health court, and veterans treatment court)

# Appendix B: Financial Information Summary

Local trial court financial information is not collected by the State of Michigan. Some past studies have attempted to project local court expenses, but the data is outdated. To determine local finances, the TCFC surveyed all local funding units and courts requesting all revenue and expenditure information from their last audited fiscal year. The data collected for court revenue and expenses includes all local unit court types (circuit, probate, and district) as well as data for other court functions including friend of the court, child care fund, security services, clerk costs covered by the county clerk, and all specialty courts (see Exhibit 12 for a breakdown of these expenses). The 83 counties and 47 municipalities with local courts were surveyed with a total maximum response number of 130. A total of 109 local funding units provided responses to the survey, which represents responses from 95.8 percent of Michigan's population covered by those courts.

The survey response data was compiled by Public Sector Consultants (PSC) and confirmed against known totals including Court Equity Fund payments and state remittances as provided by the SCAO for accuracy. Using the data set, several models were constructed to estimate total court funding by projecting those data elements to the state as a whole. The model took into consideration both court size (based upon the number of judges and population served) as well as court type (circuit, district, and probate court) to project a single statewide total. Finally, the model data and the survey results were used to calculate 95 percent confidence intervals around the statewide total. This is the data used for any calculations in this study:

**EXHIBIT 11.** Projected Local Trial Court Expenses, Assessments, and State Remittances

| Line Item | Projection (Range Mean) | Range with 95 Percent Confidence |
|---|---|---|
| Total court expenditures | $1,288,993,696 | $1,141,847,711 to $1,436,139,681 |
| Total court assessments (retained by the local unit) | $255,121,674 | $218,814,209 to $291,429,139 |
| Total state remittances | $134,549,943 | $132,662,336 to $136,437,549 |

Findings from the survey of local funding units using the projection model show that the total expenses of Michigan's local trial court system is between $1.14 billion and $1.44 billion. For purposes of this report, calculations use the average of that range ($1.29 billion).

The same model was used to produce expense ranges for each of the court types (circuit, district, probate, and other court functions). The mean for each of these ranges is used for any calculations in this report. Included in this table is the proportion of expenses based on both the range and the proportions from the actual data collected from the local courts. Given the high level of responses to the survey, this comparison assisted in demonstrating the accuracy of the model calculations. For purposes of this report, the actual expense proportions are used.

**EXHIBIT 12.** Projected Local Trial Court Expenses by Court Type

| Court Type | Projection (Range Mean) | Range with 95 Percent Confidence | Proportion of Projected Range | Actual Proportion of Expenses |
|---|---|---|---|---|
| Circuit court | $292,812,399 | $284,167,824 to $301,456,974 | 18% to 23% | 21% |
| District court | $268,195,219 | $208,139,180 to $328,251,257 | 20% to 26% | 23% |
| Probate court | $55,439,475 | $46,617,237 to $64,261,713 | 4.1% to 4.5% | 4.8% |
| Other court functions* | $716,205,312 | $546,439,015 to $885,971,608 | 48% to 62% | 51% |

*Other court functions include friend of the court, child care fund, security services, clerk costs covered by the county clerk, and all specialty courts.

The data from the survey responses also provided calculations of the sources of funding based on the total expenses. The TCFC survey collected data for all court functions, including the county child care fund, which falls outside of the operations of the court (a small amount of the county child care fund does fund operations in the juvenile division). To better assess the funding streams for court operations, the TCFC also compared the funding sources for court operations only (i.e., total court expenses minus county child care fund). The following table provides the funding source percentages based on total expenditures as provided by the actual data:

**EXHIBIT 13.** Sources of Local Trial Court Funding

| Funding Source | Source as a Percentage of Total Court Expenditures | Source as a Percentage of Court Operations |
|---|---|---|
| State funding (includes both state general fund and assessments returned to local units) | 22.7% | 14.4% |
| Federal funding | 7.2% | 10.1% |
| Court-generated revenue (retained locally) | 26.2% | 32.4% |
| Local funding | 43.9% | 43.1% |
| **Total** | **100%** | **100%** |

# Appendix C: Stakeholder Engagement

To inform their mission and recommendations, the TCFC conducted a survey to solicit feedback from key stakeholders across the state. This survey helped TCFC members understand the current system and helped them design realistic, actionable recommendations. The TCFC received over a thousand responses from a diverse group of stakeholders, including attorneys, judges, organized labor, local government leadership and others. The stakeholders identified key problems and solutions that the TCFC should address. The exhibit below summarizes the key issues survey respondents said should be addressed by the TCFC.

**EXHIBIT 14.** Issues TCFC Should Address, All Survey Respondents



# Appendix D: Michigan Trial Courts Maps

Michigan Trial Courts
May 2017



C = Circuit Court
P = Probate Court
PD = Probate District Court
D = District Court
* See District Court Detail Map

# District Court Detail
## May 2017



On the district court detail map, the blue shading indicates a county-funded court.

# District Court Detail
## May 2017

### Oakland

### Macomb





43 Ferndale, Hazel Park, Madison Heights
44 Royal Oak
45 Oak Park
46 Southfield
47 Farmington Hills
48 Bloomfield Hills
50 Pontiac
51 Waterford

37 Center Line, Warren
38 Eastpointe
39 Fraser, Roseville
40 St. Clair Shores
41A Shelby Twp, Sterling Hts
41B Clinton Twp

### Wayne



Municipal Courts
Grosse Pointe Woods
Grosse Pointe Farms
Grosse Pointe City
Grosse Pointe Park

16 Livonia
17 Redford
18 Westland
19 Dearborn
20 Dearborn Heights
21 Garden City
22 Inkster
23 Taylor
24 Allen Park
25 Lincoln Park

27 Wyandotte
28 Southgate
29 Wayne City
30 Highland Park
31 Hamtramck
32A Harper Woods
33 Woodhaven
34 Romulus
35 Plymouth
36 Detroit

On the district court detail map, the blue shading indicates a county-funded court.

# Appendix E: References

Bains, Chiraag. April 26, 2018. "Ferguson Report Summary." Presentation. Lansing, MI.

Boyd, Tom. August 23, 2018. "Overview of Kansas." Presentation. Lansing, MI.

Dillon, Michael. February 22, 2018. "District Court Funding/Cash Flow." Presentation. Lansing, MI.
https://pscinc.box.com/s/exuehxkuoo6fqrzxq4h3j2mjke8vey8x

Dunnings, Shauna. October 25, 2018. "Where Does Court Revenue Go?" Presentation. Lansing, MI.

Hall, Daniel. April 26, 2018. "Court Funding: A National Perspective." Presentation. Lansing, MI.
https://pscinc.box.com/s/62v7b66ctaks9g5h7ftrbc8balk4ii6k

Haskamp, Mary. February 22, 2018. "Kalamazoo County Probate Court." Presentation. Lansing, MI.
https://pscinc.box.com/s/02le7wjzejw3ewxz20bines9dg7m0yne

Hogg, David A. February 2011. "District Court Tax Farming." *Michigan Bar Journal.* Accessed April 1, 2019. http://house.michigan.gov/sessiondocs/2013-2014/testimony/Committee219-5-8-2013.pdf

Hutzel, Laura. August 23, 2018. "Trial Court Performance Measures." Presentation. Lansing, MI.

Maciag, Mike. September 2019. "Addicted to Fines." *Governing.* Accessed September 6, 2019.
https://www.governing.com/topics/finance/gov-addicted-to-fines.html?utm_term=Addicted%20to%20Fines&utm_campaign=Addicted%20to%20Fines&utm_content=email&utm_source=Act-On+Software&utm_medium=email

Mack, Milton. December 18, 2017. "History of Funding Reform Efforts at SCAO." Presentation. Lansing, MI.

Mack, Milton. February 28, 2019. "A Unified Court System: A Summary of Raftery." Presentation. Lansing, MI.

McCormack, Bridget. "Michigan Senate Appropriations Subcommittee on the Judiciary, Thursday March 14, 2019. Presentation. Lansing MI. https://pscinc.app.box.com/file/428952072787

Michigan Supreme Court. July 10, 2019. People of the State of Michigan v. Shawn Loveto Cameron, Jr. Accessed September 6, 2019.
https://courts.michigan.gov/Courts/MichiganSupremeCourt/Clerks/RecentCourtOrders/18-19%20Orders/155849.pdf

National Center for State Courts. July 2012. *Principles for Judicial Administration*. Accessed March 20, 2019.
https://www.ncsc.org/~/media/Files/PDF/Information%20and%20Resources/Budget%20Resource%20Center/Judicial%20Administration%20Report%209-20-12.ashx

National Task Force on Fines, Fees, and Bail Practices. August 2018. *Principles on Fines, Fees, and Bail Practices*. Accessed March 18, 2019.
https://www.ncsc.org/~/media/Files/PDF/Topics/Fines%20and%20Fees/Principles%201%2017%2019.ashx

Norton, Julia. February 22, 2018. "Court Collections." Presentation. Lansing, MI.
https://pscinc.box.com/s/8mtl6gn73uep2ihsgh6vda2fsv01i3si

Oeffner, Kevin. February 22, 2018. "Circuit Court Funding/Cash Flow." Presentation. Lansing, MI.
https://pscinc.box.com/s/ixnru5nyyglvnyhwvqqw6ice1wqwqvny

Ostrom, Brian. August 23, 2018. "Measuring Court Performance." Presentation. Lansing, MI.

Parks, Jessica. October 25, 2018. "Treatment Courts." Presentation. Lansing, MI.

Quasarano, Thomas. December. 2018. "Why Are We Being Sued Under the Open Meetings Act?" *State Bar of Michigan Administrative Law Journal* 30: 1—4.
https://pscinc.box.com/s/sl61mhjn6u0q69qjmxr7b5pevkn8h10c

Raftery, William. May 2016. *Judicial Unification and its Impact on Efficiency*. Accessed March 18, 2019.
https://www.ncsc.org/~/media/Files/PDF/Education%20and%20Careers/CEDP%20Papers/2016/
Judicial%20Unification%20and%20Its%20Impacts%20on%20Efficiency.ashx

Reinkensmeyer, Marcus. July 28, 2018. "Arizona Trial Courts Funding Strategies: Briefing for the Michigan Trial Court Funding Commission." Presentation. Lansing, MI.
https://pscinc.box.com/s/k05nx2gxicylzcdvbqwb6k6e6l8pn5kd

Risko, Robin. January 2018. "Budget Briefing: Judiciary." Accessed February 25, 2019.
https://www.house.mi.gov/hfa/PDF/Briefings/Judiciary_BudgetBriefing_fy17-18.pdf

Rombach, Thomas. February 28, 2019. "21st Century Practice Task Force: Background and Summary." Presentation. Lansing, MI.

SBM 21st Century Practice Task Force. July 18, 2016. *Envisioning a New Future Today.* Accessed March 25, 2018. https://www.michbar.org/file/future/21c_WorkProduct.pdf

SBM Judicial Crossroads Task Force. March 2011. *Delivering Justice in the Face of Diminishing Resources*. Accessed March 18, 2019.
https://www.michbar.org/file/judicialcrossroads/JudicialCrossroadsReport.pdf

Shorba, Jeff. June 28, 2018. "Minnesota Judicial Branch Transition and Transformation." Presentation. Lansing, MI. https://pscinc.box.com/s/huqlhrco9xbusamhnawfgjahtocrt2f7

Speaker, Liisa. July 19, 2018. *Amicus Curiae Brief of the Michigan District Judges Association for People v. Cameron.* Accessed March 18, 2019.
https://courts.michigan.gov/Courts/MichiganSupremeCourt/Clerks/Documents/2018-
2019/155849/155849_74_01_AC_MDJA_Brf.pdf

United States Court of Appeals for the Fifth Circuit. August 29, 2019. Adrian Caliste & Brian Gisclair v. Harry E. Cantrell. Accessed September 6, 2019. http://www.ca5.uscourts.gov/opinions/pub/18/18-
30954-CV0.pdf

United States Department of Justice. March 4, 2015. *Investigation of the Ferguson Police Department.* Accessed March 20, 2019. https://www.justice.gov/sites/default/files/opa/press-
releases/attachments/2015/03/04/ferguson_police_department_report.pdf

VanNorman, John. June 28, 2018. "Judicial System Structure of Ohio." Presentation. Lansing, MI.

Welch, Janet. December 18, 2017. "Trial Courts." Presentation. Lansing, MI.
https://pscinc.box.com/s/mevwxmj0pn9oputkcmx57cc2fwgzclxw

Welch, Janet. December 18, 2017. "Michigan Courts: An Historical Perspective." Presentation. Lansing, MI. https://pscinc.box.com/s/6tz3c4pl9hzj5ualc7u71f4euanu4qtq

# Appendix F: Acknowledgements

Chiraag Bains; director of legal strategies, Demos; Washington, D.C.

Beth Barber; finance director, State Court Administrative Office; Lansing, Michigan

Michael Dillon; court administrator, 55th District Court; Michigan

Rachel Eubanks; state treasurer, Michigan Department of Treasury; Lansing, Michigan

Jeff Getting; prosecutor; Kalamazoo County, Michigan

Dan Hall; vice president, National Center for State Courts; Williamsburg, Virginia

Mary Haskamp; deputy court administrator/chief deputy register, Kalamazoo County Probate Court; Michigan

Judge David Hogg; retired district court judge; Wexford County, Michigan

Laura Hutzel; statistical research director, State Court Administrative Office; Lansing, Michigan

Nick Khouri; former state treasurer, Michigan Department of Treasury; Lansing, Michigan

Rebecca Mack; grant manager, Michigan Indigent Defense Commission; Lansing, Michigan

Julia Norton; collections management analyst, State Court Administrative Office; Lansing, Michigan

Kevin Oeffner; court administrator, Oakland Circuit Court; Pontiac, Michigan

Brian Ostrom; principal court research consultant, National Center for State Courts; Williamsburg, Virginia

Dr. Jessica Parks; deputy director, State Court Administrative Office; Lansing, Michigan

Tom Quasarano; assistant attorney general, Department of Attorney General; Lansing, Michigan

Marcus Reinkensmeyer; director of court services for the administrative office of the courts, Supreme Court of Arizona

Chad Schmucker; former state court administrator, State Court Administrative Office; Lansing, Michigan

Jeff Shorba; state court administrator, Minnesota Judicial Branch; St. Paul, Minnesota

Liisa R. Speaker; founder, Speaker Law Firm, PLLC; Lansing, Michigan

KC Steckelberg; director of public affairs, Prosecuting Attorneys Association of Michigan; Lansing, Michigan

John VanNorman; deputy chief legal counsel, Supreme Court of Ohio

Rep. Robert J. VerHeulen (R—74th District)

Janet Welch; executive director, State Bar of Michigan; Lansing, Michigan

---

The TCFC would also like to thank the SCAO regional office staff for their patience and due diligence in helping to collect the information needed to make strong and informed policy recommendations.

- Lisa Blehm; regional office assistant, SCAO; Lansing, Michigan
- Esther Davis; regional management assistant, SCAO; Lansing, Michigan
- Lisa Kelley; regional office assistant, SCAO; Lansing, Michigan
- Denise Kruger; regional management assistant, SCAO; Lansing Michigan
- Sherri Swan; regional management assistant, SCAO; Lansing, Michigan
- Kim Szafranski; regional office assistant, SCAO; Lansing, Michigan
- Karri Zangoulas; regional management assistant, SCAO; Lansing, Michigan